## IN THE MATTER OF THE ESTATE OF OTTO ERNST ISENBERG, DECEASED.

### No. 1550.

APPEAL FROM CIRCUIT JUDGE FIRST CIRCUIT.
HON. R. J. O'BRIEN, JUDGE.

ARGUED MARCH 24, 25, 26, 27, 1925.    DECIDED SEPTEMBER 1, 1925.

PETERS, C. J., PERRY AND LINDSAY, JJ.

WILLS—*construction—vested estates.*

A testator left all of his property upon the following trusts, after payment of debts: "To set apart one-third of the remainder * * * for the use and benefit" of his wife "and annually or oftener to pay to her the net income, issues and profits thereof so long as she shall live. And at her death to hold and apply the principal of said one-third (or so much thereof as shall then remain) together with all unapplied income thereof as hereinafter set forth.

"To divide the remaining two-thirds into as many equal portions as I shall have children then living, and pay over one such portion (or the proceeds thereof) to each of said children who has then arrived at the age of twenty-five years, and hold one of such portions for each of the remaining children respectively and annually or oftener pay the net income, issues or profits thereof to the child for whom the same is so held as aforesaid. And as such remaining children shall each successively arrive at the age of twenty-five years, to pay to him or her the portion so held for him or her respectively (or so much thereof as shall remain) together with the unapplied income thereof.

"Provided, however, that should any of my said children die before my decease leaving lawful issue surviving, such issue shall be deemed to represent the deceased parent and shall be entitled to the same portion as the parent would have been entitled to had he or she survived me, and such remaining two-thirds of the trust property shall be divided accordingly. And such issue shall annually or oftener receive the net income of such portion or portions, respectively until the youngest of my surviving children shall reach the age of twenty-five years, when the portion or portions (or the proceeds thereof) so held for the issue of any

Syllabus.

deceased child or children shall thereupon be paid over to such issue.

"Upon the death of my said wife the principal of the one-third of the trust property so set apart for her as aforesaid, or so much thereof as shall then remain, together with the unapplied income thereof, shall be divided in the manner and held upon the same trusts as hereinbefore directed to be done with the other two-thirds of the trust property, provided always, that none of my said children shall receive his or her portion of the principal trust property until arriving at the age of twenty-five years, and the issue of any deceased child shall not receive any of such principal until my youngest child shall reach such age." The widow and all nine children of the testator survived him. *Held*, that the widow was given by the will the income of one-third for the remainder of her life; and that each of the nine children was given an equitable interest in the two-thirds and in the one-third as well, that such interest consisted of the right to receive from time to time the income of the two-thirds from the testator's death until each child should reach the age of twenty-five, the right to receive from time to time the income of the one-third from the date of the widow's death until each should reach the age of twenty-five and the right to receive the principal, as to each child, of one-ninth of the two-thirds when each child should reach the age of twenty-five or, in the case of any child dying before reaching that age, when such child would have reached the age of twenty-five if he had lived and the right to receive the principal of one-ninth of the one-third when each child should reach the age of twenty-five or in the case of a child dying before reaching that age when he would have reached twenty-five if he had lived or upon the death of the widow; whichever of the two events should happen last; and further *held* that these interests of the nine children became vested immediately upon the death of the testator and were not contingent upon their reaching the age of twenty-five; and that these interests of the nine children were descendible, devisable and assignable.

SAME—*whether interests are vested or contingent—construction in favor of vesting and early vesting.*

For many reasons not the least of which is that testators have in mind the actual enjoyment rather than the technical ownership of their property, and that sound policy as well as practical convenience requires that titles should be vested at the earliest period, estates, legal or equitable, given by will, should always be regarded as vesting immediately unless the testator has by very clear words manifested an intention that they should be contingent.

592 SUPREME COURT OF HAWAII.

Syllabus.

SAME—*presumption against partial intestacy.*

In construing a will there is a strong presumption against partial intestacy.

When the language of a will is susceptible of two constructions, one producing and the other avoiding a partial intestacy, the latter is to be favored.

SAME—*vested or contingent—time of possession deferred.*

If a grantor does not annex a statement of the time to the grant or gift itself but merely to the payment, possession or enjoyment, or, in other words, if he makes a devise unconnected with any particular age and then by a distinct sentence or member of a sentence directs that the beneficiary be let into the possession or enjoyment when he shall attain a given age, the devise confers an interest immediately vested in right but not to take effect in possession until the attainment of the age or period specified.

SAME—*vested interests—alienability.*

That which one owns he can sell or devise or allow to pass under the law to his heirs.

EQUITY—*alienability of equitable interests.*

Equitable interests are alienable and their assignment will be enforced in equity.

ESTATES—*equitable and legal.*

Equitable estates are governed by the same rules as legal estates.

WILLS—*construction—whether gift vested or contingent—absence of alternative gift and reversion.*

In construing a will the absence of an alternative gift and of a provision for reversion in favor of the testator's heirs is indicative of an intention to make the gift vested and not contingent.

SAME—*same—same—naming of specified age as marking a period of time.*

The mere postponement by a testator of the time of possession or enjoyment does not make contingent a gift otherwise vested. When it is apparent that the testator was not thinking of the attainment of a specified age by the legatee as an uncertain event but merely as marking a period of time the devise or gift is not contingent.

SAME—*same—same—gift of intermediate use.*

A gift of the intermediate use or income to or for the benefit of the legatee is a strong circumstance going to show that the gift is not contingent upon the attainment of a specified age.

SAME—*same—same—postponement of enjoyment, to let in some other interest.*

If the enjoyment of a gift of the principal is postponed in order to let in some other interest, as, for example, a life interest in the income, the gift is vested, the presumption being that the testator postponed the distribution or payment for the purposes of the prior bequest and not to prevent the ulterior legacy from vesting.

WAR—*life interest in income seizable by alien property custodian.*

The life interest of the widow of the testator in the income of one-third was demandable and seizable by the alien property custodian under the Trading with the Enemy Act of October 6, 1917, and its amendments and under the Executive Orders of the President issued thereunder.

SAME—*vested interests in income and in principal seizable by custodian.*

The interests of the nine children of the testator under the will were demandable and seizable by the alien property custodian under the Act and Orders above mentioned.

SAME—*equitable interests seizable by custodian.*

Equitable interests, as well as legal interests, were demandable and seizable by the alien property custodian.

SAME—*vested legacies seizable, even though payable in futuro.*

Vested legacies, even though not payable until after the passage of the Resolution of Peace, were demandable and seizable by the alien property custodian.

SAME—*demand by custodian upon a corporation for stock it had issued to another, ineffective to transfer title.*

A demand addressed by the alien property custodian to the Kekaha Sugar Company (a corporation which had not been entrusted with the care or custody of the stock about to be mentioned) for the right, title and interest of the "Estate of Otto Isenberg," therein declared to be an enemy, in and to 840 shares of the capital stock of the Kekaha Sugar Company did not of itself operate to transfer to the custodian any title either of the trustees or of the beneficiaries under the will because the corporation did not hold any property belonging either to the trustees or to the beneficiaries.

CORPORATIONS—*stock certificates—merely evidence of ownership of shares.*

Stock certificates are not themselves the shares in a corporation but are merely one form of evidence of the ownership of the shares.

38

WAR—*demand by custodian for every right, title and interest, includes life estate in income.*

A demand by the alien property custodian for "every right, title and interest" of the widow "in and to the estate of" the testator constituted a demand for the right of the widow to receive then and thereafter the income from the one-third of the trust property above mentioned.

SAME—*demand by custodian for every right, title and interest, includes right to receive income and principal at times designated by testator.*

A demand by the alien property custodian for "every. right, title and interest" of each of seven of the children of the testator "in and to the estate of" the testator constituted a demand for all of the right of each of the seven children (a) to receive the income from their portions of the two-thirds of the property as well as from their portions of the one-third of the property after the widow's death and (b) to receive at designated times the principal of their portions of the two-thirds as well as the principal of their portions of the one-third.

SAME—*custodian's demands, duly served, vested title in him.*

Demands of the alien property custodian duly served operated to vest immediately in the custodian the titles or property demanded.

SAME—*service of demands of custodian upon one of two trustees sufficient to vest title in custodian.*

Service of the demands of the custodian upon one of the two trustees under the will in question was sufficient to constitute a seizure of the property demanded and a transfer to the custodian of the equitable interests demanded.

SAME—*after service of demands of custodian, no title left in demandees.*

After service of the demands of the custodian for "every right, title and interest" of the widow and of the seven children, neither the widow nor any of the seven children had any right to either the income or the principal of the trust property.

SAME—*enemy—definition under Trading with Enemy Act.*

Under the provision of the Trading with the Enemy Act that "any individual * * * of any nationality resident within the territory * * * of any nation with which the United States is at war" is an enemy, it is immaterial whether the widow or the seven children whose property was demanded and seized were Americans or were Germans, their presence in Germany at the time of the seizure being sufficient to justify the determination of the custodian that they were enemies.

APPEAL AND ERROR—*appeals in equity cases—appellate court may weigh evidence.*

Upon an appeal in an equity case this court is not limited to the question of law whether there is sufficient evidence to support findings of the trial court but may weigh the evidence and make its own findings of fact as well as rulings of law.

EVIDENCE—*finding that custodian sold enemy-owned property.*

Upon the evidence in this case the court finds that it was the alien property custodian who sold at public auction in Honolulu on January 17, 1919, all of the interests, which were demanded and seized, of the widow and the seven enemy children.

WAR—*after seizure of equitable interests by custodian, what right left in trustee.*

After the seizure by the custodian of the beneficial interests of the widow and the seven enemy children there remained in the trustee at best the power to withhold delivery of possession of the principal until the dates named in the will and the power in the meantime to change the form of the investments from time to time.

WAR—*effect of seizure and sale of whole beneficial interest by custodian—restoration of principal by trustee will not now be decreed.*

Assuming that the legal title of the trustee was not seized, the sale by the custodian of 670 shares of the capital stock of the Kekaha Sugar Company, Limited, operated in law as a sale of all of the right, title and interest which the custodian had demanded and seized and included all of the equitable interests of the seven enemy children and of the widow. The purchasers at the auction sale acquired from the custodian all that the widow and the seven enemy children owned at the time of the service of the eight demands, which included not only the right to receive the income of the shares from time to time but also the right to receive the principal of the shares at the dates designated in the will. The purchasers at the sale acquired through the custodian the right to demand and receive at the dates designated in the will the possession of the principal of the stock sold. Under these circumstances a court of equity will not now, after the dates so designated, require the trustee to repurchase the stock and produce it in court.

EQUITY—*damages—none against a trustee for doing voluntarily what he was judicially compellable to do.*

That which a court of equity would have compelled the trustee to do at a stated time or times a court of equity will not condemn it for doing without a compulsory order of the court. A

court of equity will not exact damages from a trustee for having done voluntarily what he would have been judicially compellable to do.

WAR—*equitable interests seizable by custodian, even before final accounting in court.*

The equitable interests of the enemy beneficiaries under the will above mentioned were demandable and seizable by the custodian even prior to final accounting by the trustee and the making of a final order of distribution by the court.

WAR—*seizure by custodian—rights of trustee and custodian after seizure.*

The same right which the trustee had prior to demand and seizure by the custodian to ask for commissions against the enemy beneficiaries it now has against the custodian or the latter's assignees, although he could not sue the custodian for an accounting, without recognizing the title of the custodian. The same right which the enemies had to require an accounting from the trustee the custodian or his assignees now have as against the trustee.

WAR—*section 9 of Trading with Enemy Act—no remedy in favor of enemies.*

While section 9 of the Trading with the Enemy Act prescribes certain methods in court and out of court for securing restoration of property improperly seized by the custodian, none of those remedies were available by the terms of the Act to persons who were in fact enemies.

SAME—*custodian's duty after seizure of property—subsequent disposal of property to await action of Congress.*

After the seizures were made it was the custodian's duty to hold the property seized or its proceeds on behalf of the United States to be disposed of subsequently as Congress might direct. Any conjecture that the custodian might have been persuaded by argument to restore the property seized is immaterial. He could not lawfully make any such restoration, upon argument or otherwise, the authority to so restore being vested by the Act solely in the attorney-general of the United States and in certain courts. It was the duty of trustees as well as of beneficiaries and other persons to respect seizures or other acts of the custodian lawfully done in cases of enemy-owned property.

TRUSTS—*duties of trustee.*

The interests of two of the testator's children, who were American citizens, were not seized or demanded by the custodian. By its acts the trustee placed itself in the position of a seller

of those two interests at the auction sale of January 17, 1919. While the trustee was authorized by the will to sell the property entrusted to its care it failed in its duty in assenting to the sale of the interests of these two children jointly with the interests of others without such acts of segregation at the sale as would identify the proceeds of these two particular interests.

TRUSTS—*breach of duty by trustee in selling property—measure of damages.*

The measure of damages for the default of the trustee in connection with the sale of the two interests that were not seized by the custodian is the difference between the price realized at the sale and the full market value of the property at the time of the sale, with interest on that difference from the date of the sale to the date of the decree.

SAME—*duty of trustee to hold no conflicting position.*

It is one of the duties of a trustee to accept and hold no office or position imposing upon him interests or duties in conflict with his interests as trustee or his duties to the beneficiaries under the trust or which will in any wise embarrass him in the performance of his duties as trustee.

SAME—*duty of trustee to consult counsel.*

In important matters involving doubt trustees should consult counsel.

SAME—*duties of trustees—acceptance of liberty bonds below par.*

An agreement in advance by a trustee in selling trust property at auction to accept in part payment liberty bonds whose market value at the time was below par is not a breach of trust. It constitutes one proper method of admeasuring the proceeds of the sale and increasing the amounts of the bids.

EVIDENCE—*findings of fact—market value of shares.*

Upon the evidence in this case it is found that shares of Kekaha stock reported by the trustee to have been sold at the auction sale of January 17, 1919, at $158.30 per share (an "average price," with other stocks, arrived at by an agreement made in advance) were of the market value on that day of $193.50 per share.

TRUSTS—*corporations—apportionment of extraordinary dividends between life-tenant and remaindermen.*

Following rules of law established in *Carter* v. *Crehore*, 12 Haw. 309, in *Estate of Thomas Cummins*, 16 Haw. 185, and in *Evans* v. *Garvie*, 23 Haw. 651, it is found upon the evidence that 314 shares out of the 500 shares of Kekaha stock known as the widow's

portion were principal of the estate and that the remaining 186 shares were income belonging to the widow personally.

EVIDENCE—*findings of fact—surcharge against trustee.*

Upon the evidence in this case the trustee is surcharged with the sum of $2455.90, being the difference between the "average price" realized at the sale and the market value as found by the court, and interest thereon from January 17, 1919, to date of decree.

SAME—*fixing of a master's fee.*

The fee of the master appointed by the court below is fixed upon the evidence at the sum of $5000.

TRUSTS—*costs—master's fee and other expenses of litigation—surcharge against trustee.*

A reasonable master's fee, the payment of which is made necessary by the default of the trustee, may properly be charged against the trustee as a part of the expenses of the litigation. The same is true of expenses incurred in the employment of a stenographer by the master, of the cost of a transcript of the evidence taken before the master and of the fees of the witnesses who appeared before the master.

TRUSTS—*trustees—commissions—disallowance.*

Commissions are provided for the faithful and proper execution of trusts and when a trustee does not comply with the duties devolving upon him by his appointment commissions may be disallowed in whole or in part. Under the circumstances of this case all commissions are disallowed.

OPINION OF THE COURT BY PERRY, J.

(Peters, C. J., dissenting.)

Otto Ernst Isenberg died on November 4, 1902, leaving surviving him a widow, Helen L. Isenberg, and the following nine children: Anna Pauline, at that time 26 years of age; Hans Carl Otto, 23 years of age; Helen Dearest Wilhelmina, 19; Abigail Darling Gretchen, 19; Agnes Cunningham, 16; Carl Heinrich Wilhelm, 14; Bertha Julita, 12; Dorothea Gertrude, 10, and Paul Otto, 7. At the time of his death he was the owner of property situate in this Territory and left a will dated April 16, 1901, which was duly admitted to probate on December 29, 1902, in the circuit court of the first cir-

cuit of this Territory. William Pfotenhauer and Hermann Schultze were named in the will as executors and trustees and later qualified and served in those capacities. The will contained certain devises in favor of the widow and of each of the nine children. Without going into detail, at this point, into the provisions of the will, it is sufficient to say, in order to an understanding of the later history of the case, that the general scheme of the will was that from one-third of the decedent's property the widow should receive the income for life and that in the principal of that one-third and in the principal and the income of the remaining two-thirds the nine children (and under certain stated circumstances the issue of possibly some of those children) would have certain rights.

On February 24, 1903, an inventory was filed by the executors showing that the property of the decedent consisted of 730 shares of the capital stock of Kekaha Sugar Company, Limited, of the par value of $100 each, 454 shares of the capital stock of the Pioneer Mill Company, Limited, of the par value of $100 each, certain other personalty and certain real estate in Honolulu.

On July 31, 1905, the executors filed their final accounts as such, together with a petition for their discharge. This petition showed, *inter alia,* that the executors still held the 730 shares of Kekaha Sugar Company stock and the 454 shares of Pioneer Mill Company stock and that, although they had secured leave of court for the sale of the real estate in Honolulu, the same had not, for reasons stated, been sold. By order dated September 18, 1905, the final accounts of the executors were approved and they were discharged as such and were directed to deliver all of the property of the estate remaining in their hands to themselves as trustees under the will. This order was complied with, the trustees'

formal receipt, showing that they had received from the executors the 730 shares of Kekaha stock, the 454 shares of Pioneer Mill Company stock and $4,249.09 in cash, being filed on February 1, 1906.

Upon petition of the widow filed January 22, 1903, William Pfotenhauer and Hermann Schultze were on January 28, 1903, appointed guardians of the persons and estates of Agnes Cunningham Isenberg, Carl Heinrich William Isenberg, Bertha Julita Isenberg, Dorothea Gertrude Isenberg and Paul Otto Isenberg, being five of the nine children of the testator, all of whom were minors and were respectively at the time seventeen, fifteen, thirteen, ten and seven years of age, and duly qualified as such guardians.

On September 20, 1905, Pfotenhauer and Schultze, as trustees under the will of the decedent Otto Ernst Isenberg, filed a petition in the circuit court of the first circuit, in equity, alleging that they had been duly discharged as executors under the will and had received the property of the estate as trustees; that the beneficiaries under the will were the widow and the nine children above named; that the trust estate consisted solely of the Kekaha and Pioneer stocks above mentioned and of certain real estate situate in Honolulu; that the children, Anna Pauline and Hans Carl, had reached the age of twenty-five and "are at this time entitled to their respective distributive shares of and in two-thirds of said trust estate;" that the children, Abigail and Helen, were under the age of twenty-five (but evidently already of the age of majority) ; that the children, Agnes Cunningham, Carl Heinrich, Bertha Julita, Dorothea Gertrude and Paul Otto were under the age of twenty-five and under guardianship; that the petitioners were the duly appointed and acting guardians of the persons and estates of the five minor children; that "the char-

acter of the real property belonging to said trust estate is such as to make it impracticable for a distribution in kind at this time of the distributive portions to which the said" Anna Pauline and Hans Carl "are now entitled;" that Helen and Abigail and Anna Pauline in the lifetime of their father, the testator, did each receive from him certain sums of money as advancements which the three agreed should be charged against their respective shares in the estate; that the widow and the four children who were of age "have agreed with your petitioners to a plan of apportionment and distribution of said trust estate;" that by order of court duly had and obtained on September 20, 1905, the guardians of the persons and estates of the five minor children "were authorized and empowered to accept and consent to the plan of apportionment heretofore agreed upon between your petitioners" and the widow and the four children who were of age and that, acting under said authority, the guardians, on behalf of their wards, had agreed to the same plan of apportionment and distribution.

On September 18, 1905, Pfotenhauer and Schultze as guardians of the persons and estates of the five minor children of the testator filed a petition reciting, *inter alia*, that all of the estate of Otto Ernst Isenberg had been distributed and was now in the hands of the trustees named in the will; that "an apportionment thereof is necessary in order to ascertain the property to be held in trust for the widow as well as specific property to be turned over to the beneficiaries entitled at this time to a distribution;" that the property of the estate of the testator consisted of the Kekaha and Pioneer stock and the land, all above named; that the beneficiaries under the will were the widow and the nine children; that "a plan of apportionment of said estate

now in the hands of said trustees has been agreed to"
by the widow and the four children who were of age;
and that "it is advisable and in the interests of such
minors and beneficiaries under said will * * * that
said plan of apportionment be consummated and carried
out." To this petition of the guardians and as a part
thereof were attached the five original agreements signed
by the trustees and respectively by the widow and each
of the four children who were of age, whereby the
parties signing agreed to the plan of apportionment and
distribution therein set forth subject only to the due
joinder therein of the minors. By order dated and filed
September 20, 1905, the court authorized and directed
the guardians "to consent to and enter into on behalf
of said minors the plan of apportionment and distri-
bution so as aforesaid outlined in said petition and
specifically at this time to consent and agree with the
trustees under the will of Otto Ernst Isenberg, deceased,
that the estate of said deceased may be so apportioned
and so distributed in the hands of said trustees that
the present several interests therein of said respective
minors shall be" in accordance with said plan of appor-
tionment.

On the same day (September 20, 1905) the court,
by formal order filed, authorized and directed the trus-
tees "to make an apportionment of said estate" (being
the estate of the testator) as follows:

"To the widow of the said Otto Ernst Isenberg as her
one-third of said trust estate, the income from which said
widow is entitled under said will for life,
236 shares of the Kekaha Sugar Company, Limited, stock,
149 shares of the Pioneer Mill Company, Limited, stock,
and the land in Honolulu;

"To Anna Pauline Wiehen (nee Isenberg),
62 shares of Kekaha Sugar Company, Limited, stock,
38 shares of the Pioneer Mill Company, Limited, stock;

"To the beneficiary Hans Carl Otto Isenberg,
68 shares of Kekaha Sugar Company, Limited, stock,
42 shares of the Pioneer Mill Company, Limited, stock;

"To the beneficiary Abigail Darling Gretchen Zedler (nee Isenberg),
24 shares of the Kekaha Sugar Company, Limited, stock,
15 shares of Pioneer Mill Company, Limited, stock;

"To the beneficiary Agnes Cunningham Isenberg,
68 shares of the Kekaha Sugar Company, Limited, stock,
42 shares of the Pioneer Mill Company, Limited, stock;

"To the beneficiary Carl Heinrich Wilhelm Isenberg,
68 shares of the Kekaha Sugar Company, Limited, stock,
42 shares of the Pioneer Mill Company, Limited, stock;

"To the beneficiary Bertha Julita Isenberg,
68 shares of the Kekaha Sugar Company, Limited, stock,
42 shares of the Pioneer Mill Company, Limited, stock;

"To the beneficiary Dorothea Gertrude Isenberg,
68 shares of the Kekaha Sugar Company, Limited, stock,
42 shares of the Pioneer Mill Company, Limited, stock;

"To the beneficiary Paul Otto Isenberg,
68 shares of the Kekaha Sugar Company, Limited, stock,
42 shares of the Pioneer Mill Company, Limited, stock."

The same order further directed the trustees to "forthwith distribute to the beneficiaries Anna Pauline Wiehen (nee Isenberg) and Hans Carl Otto Isenberg the distributive shares of said trust estate to which they are respectively entitled under this apportionment."

The order and direction to the guardians, already referred to, related to and authorized a joinder by the guardians in the same plan of apportionment just herein recited in detail.

The total of the shares of Kekaha stock thus mentioned and apportioned by these orders of apportionment was 730 shares, being the same total of that stock reported by the executors and trustees in their inventories and accounts.

On April 25, 1913, upon the petition of Hermann Schultze, which recited that William Pfotenhauer had died on April 14, 1913, Georg Rodiek was appointed trustee under the will of the testator in place of Pfotenhauer "with all of the powers, authority, duties and obligations specified in said will."

On January 11, 1918, the Trent Trust Company, Limited, the present petitioner, was appointed depositary in Hawaii by the alien property custodian in Washington, D. C., and on January 22, 1918, received a cablegram from the custodian informing it of its appointment as depositary and stating some of its powers and the procedure to be followed. On January 22, 1918, the Trent Trust Company, Limited, published in one of the daily papers in Honolulu a notice of its appointment as depositary, calling upon all persons holding enemy property to forward to the depositary at Honolulu a sworn report of such property.

On January 31, 1918, H. Schultze as "trustee, Otto Isenberg Trust Estate" filed with the depositary in Honolulu a sworn report showing that he held, with other property, "1353 shares of Pioneer Mill Company, Limited," and "500 shares Kekaha Sugar Company, Limited," and that the "beneficiaries under the trust," as to these stocks, were "Mrs. Helen L. Isenberg," this name being written in a column headed "Names of those known or thought to be enemies or allies of an enemy, who are beneficially interested in property held by, or to whom debts are owing." He also reported holding "381 shares Pioneer Mill Company, Limited," and "170 shares Kekaha Sugar Company, Limited," for (written under the same column denoting enemies beneficially interested) "Dorothea Gertrud Isenberg." He also reported holding 381 shares Pioneer Mill Company, Limited," and "170 shares Kekaha Sugar Company, Limited," for (under

same heading of enemy beneficiaries) "Paul Otto Isenberg." This has been referred to in this case as an informal report, because it was not on the printed forms used by the custodian for that purpose and later furnished by him to the depositary in Honolulu for use by persons reporting enemy property. At the time of the filing of this report by Schultze, Rodiek, his co-trustee, was without the Territory and on the mainland of the United States.

On the same day, January 31, 1918, Schultze delivered to the Trent Company, depositary, the following certificates of Kekaha Sugar Company stock: Certificate No. 36 for 236 shares, certificate No. 143 for 31 shares and certificate No. 284 for 233 shares, or a total of 500 shares, all in the name of Pfotenhauer and Schultze as trustees of the estate of Otto Isenberg; also certificate No. 42 for 68 shares, certificate No. 80 for 22 shares and certificate No. 288 for 80 shares, or a total of 170 shares, all in the name of Pfotenhauer and Schultze, the first one in their name as trustees of the estate of Otto Ernst Isenberg, the second in their name as trustees for Paul Otto Isenberg and the third in their name as trustees of the estate of Otto Isenberg. At or about the time of the delivery of these certificates to the depositary (before February 2, 1918) two new certificates were obtained from the Kekaha Sugar Company, issued in the name of the Trent Trust Company, Limited, as depositary for the alien property custodian, one being certificate No. 435 for 500 shares in place of certificates Nos. 36, 143 and 284, and the other being certificate No. 434 for 170 shares in place of certificates Nos. 42, 80 and 288. While the evidence does not directly show this, the inference is that the six old certificates were endorsed by Schultze for the trustees as a preliminary step towards the issuance of the two

new certificates which were issued by the corporation. The evidence does show that the new certificates were issued at the request of the Trent Trust Company, Limited, as depositary for the alien property custodian and that they were delivered to the depositary.

Under date of February 2, 1918, the Trent Trust Company, Limited, as depositary, forwarded an inventory to the custodian in Washington showing, under the title of "Inventory of Property of Trust Estate Otto Isenberg," "amount deposited by H. Schultze, Trustee, 2-2-18, $12,019.89;" under dates of January 31 and February 2, 1918, and under the title of "Inventory of Property of Otto Isenberg Trust Estate" an inventory showing that it had received from H. Schultze, Trustee, 1353 shares Pioneer Mill Company stock, 500 shares Kekaha Sugar Company stock and other property; under date of January 31, 1918, and under the title of "Inventory of Property of Mrs. Helen L. Isenberg" an inventory showing that it had received from H. Schultze 1353 shares Pioneer Mill Company stock and 500 shares Kekaha Sugar Company stock and other property; under date of January 31, 1918, and under the title of "Inventory of Property of Dorothea Isenberg" an inventory showing that it had received from H. Schultze 381 shares Pioneer Mill Company stock and 170 shares Kekaha Sugar Company stock and other property; under date of January 31, 1918, and under the title "Inventory of Property of Paul Otto Isenberg" an inventory showing that it had received from H. Schultze 381 shares Pioneer Mill Company stock and 170 shares of Kekaha Sugar Company stock and other property.

All of the foregoing occurred before any formal demands were made by the alien property custodian in Washington for the property of any of the beneficiaries

under the will or that passed under the will of Otto Ernst Isenberg.

Under date of March 9, 1918, H. Schultze made formal report to the custodian in Washington through the depositary in Honolulu of enemy property, using printed forms received for that purpose from the office of the custodian in Washington. The first of these reports was by "H. Schultze, Trustee, Estate Otto Isenberg" naming Georg Rodiek as being associated with him in the trust and giving the following information as to the names of enemies for whom property was so held, their last known residence or address and their nationality, to wit: "Helen Isenberg, Berlin, German; Mrs. Wiehen, Leipzig, German; Mrs. Gretchen Zedler, Lueben, German; Mrs. Helen zur Helle, unknown, German; Agnes von Massenbach, Berlin, German; Berlita Laschinzky, Neualtmannsdorf, German; Dorothea Isenberg, Berlin, German; and Paul Otto Isenberg, Berlin, German." To this report was attached a certified copy of the will of Otto Ernst Isenberg. Under schedule "D" calling for the "Nature of interests of persons named at B hereon in said estate or property" Schultze specified: "Helen Isenberg income during life  All others 1/9th interest each in principal after death of Helen Isenberg." Under schedule "E" calling for "Nature of property comprising estate or trust fund" Schultze reported 1353 shares of Pioneer Mill Company, Limited, stating that they stood "in the name of Geo. Rodiek and H. Schultze, Trustees Estate Otto Isenberg," and 500 shares Kekaha Sugar Company stock, "in the name of Geo. Rodiek and H. Schultze, Trustees Estate Otto Isenberg," and other property. In a similar formal report as "Guardian Dorothea Isenberg" Schultze reported as the enemy beneficiary "Dorothea Isenberg, Berlin, German;" in schedule "D" reported that Doro-

thea was the "sole beneficiary" and was of the "age 26 years" and in schedule "E" that the property comprising the estate or trust fund was 381 shares of Pioneer Mill Company, Limited, and 170 shares of Kekaha Sugar Company, Limited, both "in the name of Dorothea Isenberg;" in a third similar formal report as "Guardian Paul Otto Isenberg," Schultze reported as the enemy beneficiary "Paul Otto Isenberg, Berlin, German," and that he was the "sole beneficiary" and of the "age 23 years" and as the property comprising the estate 381 shares of Pioneer Mill Company, Limited, and 170 shares of Kekaha Sugar Company, Limited, "in the name of Paul Otto Isenberg." These reports were all forwarded to the office of the custodian in Washington and were there received on March 27, 1918.

Under date of May 7, 1918, the alien property custodian in Washington signed and issued certain formal demands, upon the regular printed forms ordinarily used for such purposes, and forwarded them to the depositary in Honolulu for service. One of these was addressed "To H. Schultze, Trustee Est. Otto Isenberg, Address Hackfeld Bldg., Honolulu, T. H.," contained the declaration that the alien property custodian had after investigation determined that "Helen Isenberg whose address is Berlin, Germany, is an enemy (not holding a license granted by the President), and has a certain right, title, and interest in and to the estate of Otto Isenberg" and required "that every right, title, and interest of said enemy in and to the estate above described, including every power and authority thereover, shall be by you conveyed, transferred, assigned, delivered, and paid over to me, as alien property custodian, to be by me held, administered, and accounted for as provided by law, and that any money or property now or hereafter held by you which the enemy may at

any time or times, now or hereafter, be entitled to receive either upon. or without demand, shall at such time or times be conveyed, transferred, assigned, delivered, and paid over to me, as alien property custodian," and further required that "you shall give to me, as alien property custodian, every notice in respect to the said estate to which the said enemy may be entitled," and provided that the Trent Trust Company "is hereby designated as depositary, and is authorized to receive, for and on behalf of the alien property custodian, the property herein mentioned and upon the service of this demand on you by said depositary, you are directed. to deliver the said property to it forthwith." This demand was served on "H. Schultze, Trustee Estate Otto Isenberg" at the Hackfeld building in Honolulu on June 28, 1918.

A second demand on the same printed form was addressed "To H. Schultze, Trustee Est. Otto Isenberg, Address Hackfeld Bldg., Honolulu, T. H.," contained a determination that "Paul Otto Isenberg whose address is Berlin, Germany," was "an enemy, not holding a license," etc., and that he had "a certain right, title, and interest in and to the estate of Otto Isenberg" and required, in the same language as in the preceding demand, the transfer and delivery to the custodian of every right, title and interest, etc., of Paul Otto Isenberg. This second demand was served upon "H. Schultze, Trustee Estate Otto Isenberg" at the Hackfeld building in Honolulu on June 28, 1918. A third demand, upon the same printed form, was addressed "To H. Schultze, Guardian Paul Otto Isenberg, Address Hackfeld Building, Honolulu, T. H.," contained a determination that "Paul Otto Isenberg whose address is c/o H. Schultze, Hackfeld Bldg., Honolulu, T. H.," was an enemy not holding a license, etc., and had "a certain right, title and interest in and to the estate Paul Otto Isenberg"

and required the transfer and delivery to the alien property custodian, in the same language as in the other cases, of every right, title and interest, etc., of Paul Otto. This third demand was served on "H. Schultze, Guardian Paul Otto Isenberg" at the Hackfeld building in Honolulu on June 10, 1918. A fourth demand was addressed "To H. Schultze, Trustee Est. Otto Isenberg, Address Hackfeld Bldg., Honolulu, T. H.," contained a determination that "Dorothea Isenberg whose address is Berlin, Germany," was an enemy not holding a license, etc., and had "a certain right, title and interest in and to the estate of Otto Isenberg," and, in the same language as in the other instances, required a transfer and delivery to the alien property custodian of every right, title and interest, etc., of Dorothea Isenberg. This fourth demand was served on "H. Schultze, Trustee Estate Otto Isenberg" at the Hackfeld building in Honolulu on June 28, 1918. A fifth demand, upon the same printed form, was addressed "To H. Schultze, Guardian Dorothea Isenberg, Address Hackfeld Building, Honolulu, T. H.," contained a determination that "Dorothea Isenberg whose address is c/o H. Schultze, Hackfeld Bldg., Honolulu, T. H.," was an enemy not holding a license, etc., and had "a certain right, title, and interest in and to the estate of Dorothea Isenberg" and required, in the same language as in the preceding instances, the transfer and delivery to the alien property custodian of every right, title and interest; etc., of Dorothea. This fifth demand was served upon "H. Schultze, Guardian Dorothea Isenberg" at the Hackfeld building in Honolulu on June 10, 1918. A sixth, a seventh, an eighth, a ninth and a tenth demand, all upon the same printed form and all addressed to "H. Schultze, Trustee Est. Otto Isenberg Address Hackfeld Bldg., Honolulu, T. H.," contained respectively the determination that "Agnes

von Massenbach whose address is Berlin, Germany," "Mrs. Wiehen whose address is Leipzig, Germany," "Bertha Laschinzky whose address is Neuraltmannsdorf, Germany," "Mrs. Gretchen Zedler whose address is Lueben, Germany," and "Mrs. Helen zur Helle whose address is unknown," was an enemy not holding a license, etc., and had a certain right, title and interest in and to the estate of Otto Isenberg and required, in the same language as in the other instances, the transfer and delivery to the alien property custodian of every right, title and interest, etc., of the beneficiaries named. All of these five demands were likewise served upon "H. Schultze Trustee Estate Otto Isenberg" at the Hackfeld building in Honolulu on June 28, 1918. An eleventh demand was addressed "To Kekaha Sugar Co., Address Hackfeld Bldg., Honolulu, T. H.," contained a determination that the "Estate of Otto Isenberg whose address is Berlin, Germany," was an enemy not holding a license, etc., and had "a certain right, title, and interest in and to 840 shares of common stock standing on your books in the name of Estate of Otto Isenberg" and required that "you shall convey, transfer, assign, and deliver to me as alien property custodian, to be by me held, administered and accounted for as provided by law, every right, title and interest of the said enemy in said stock, including in respect to the said stock the right which the said enemy may have, (a) to receive all notices issued by you to the holders or owners of similar stock, shares, or certificates; (b) to exercise all voting power appertaining to such stock, shares, or certificates; (c) to receive all subscription rights, dividends, and other distributions and payments, whether of capital or of income, declared or made on account of such stock, shares, or certificates." This demand was served on the Kekaha Sugar Company, Limited, on June 12, 1918. A twelfth

demand, upon the same printed form as was used in the eleventh demand above referred to, was addressed to "Pioneer Mill Co., Ltd., Address Hackfeld Bldg., Honolulu, T. H.," contained a determination that "Geo. Rodiek & H. Schultze, Trustees for the Est. of Otto Isenberg whose address is Berlin, Germany, is an enemy not holding a license," etc., and had "a certain right, title and interest in and to 1353 shares of common stock standing on your books in the name of Otto Isenberg" and contained the same requirements as in the last preceding demand. This twelfth demand was served upon the Pioneer Mill Company, Limited, on June 12, 1918. A thirteenth demand, upon the same printed form as in the cases of the eleventh and twelfth, was addressed "To Pioneer Mill Co., Ltd., Address Hackfeld Bldg., Honolulu, T. H.," contained a determination that "Geo. Rodiek & H. Schultze, Trustees for Dorothea Isenberg whose address is Berlin, Germany, is an enemy not holding a license," etc., and had "a certain right, title and interest in and to 381 shares of common stock standing on your books in the name of Dorothea Isenberg" and contained the same requirements as in the eleventh and twelfth demands. This thirteenth demand was served upon the Pioneer Mill Company, Limited, on June 12, 1918. A fourteenth demand, upon the same printed form as in the cases of the eleventh, twelfth and thirteenth, was addressed to "Pioneer Mill Co., Ltd., Address Hackfeld Bldg., Honolulu, T. H.," contained a determination that "Geo. Rodiek & H. Schultze, Trustees for Paul Otto Isenberg whose address is Berlin, Germany, is an enemy not holding a license," etc., and had "a certain right, title, and interest in and to 381 shares of common stock standing on your books in the name of Paul Otto Isenberg" and contained the same requirements as in the cases of the eleventh, twelfth and thirteenth demands.

This fourteenth demand was served upon the Pioneer Mill Company, Limited, on June 12, 1918.

After the service of these various demands there were no further surrenders or deliveries of property by the demandees named, all of the property demanded having been theretofore surrendered and delivered to the depositary in Honolulu as above narrated.

On July 19, 1918, H. Schultze and George Rodiek as "trustees under the last will and testament of Otto Ernst Isenberg, deceased," filed in the circuit court of the first circuit in equity their final accounts and a petition for the approval of those accounts and for their discharge as trustees. This petition was signed by H. Schultze personally and by "Geo. Rodiek, by Thompson & Cathcart, his attorneys," and was sworn to by H. Schultze "for and on behalf of said trustees." In the petition it is alleged that Schultze "is the surviving testamentary trustee under said will" of Otto Ernst Isenberg "and that petitioner Geo. Rodiek, appointed by this honorable court to succeed William Pfotenhauer, deceased, the testamentary co-trustee under the will, is now absent from the Territory and is at present residing in the City and County of San Francisco, State of California;" that "in conformity with the said will, one-third of all of the remaining property of this estate was set apart and is now held in trust for the use of Helen L. Isenberg, widow of the said Otto Ernst Isenberg, deceased, the accruing income thereof being paid to her during her lifetime, said one-third to be distributed from and after the death of the widow to the nine children or their respective heirs; that as to the other two-thirds of all of the remaining property of this estate, same was alienated from the trust and distributed to the nine children of the testator as appears more fully by the records of this court;" that "up to the last account

of your petitioners, there remained but two of the nine children of said testator who had not become of age, viz.: Dorothea Isenberg and Paul Otto Isenberg;" and that "since the filing of said last mentioned account the said Dorothea Isenberg has now become of age." In the same petition it is further alleged by the trustees that "the said Helen L. Isenberg, Dorothea Isenberg and Paul Otto Isenberg are alien enemies within the provisions of the Act of Congress entitled 'An Act to define, regulate and punish trading with the enemy and for other purposes,' approved October 6, 1917; and that all property held by the undersigned trustees was on the 31st day of January, 1918, turned over to the alien property custodian, Trent Trust Company, Limited, depository, as appears by inventories hereto attached and made a part hereof marked Exhibit D to which reference is hereby made;" and the accounts submitted with the petition are there said to be for the period from January 1, 1917, up to and including January 31, 1918, "when said property was turned over to the alien property custodian." The further allegation is made that "Geo. Rodiek, one of the trustees, is not now a resident of the Territory of Hawaii and that H. Schultze, the other trustee, is a citizen of the Empire of Germany and not a citizen of the United States of America." In schedule "D," which is made a part of the petition and is entitled "Inventory of property under Otto Ernst Isenberg Trust Estate turned over by trustees to alien property custodian (Trent Trust Company, Limited, depository) on January 31, 1918," are reported with other property 381 shares of Pioneer Mill Company, Limited, and 170 shares of Kekaha Sugar Company, Limited, "for account of Paul Otto Isenberg" and with other property 1353 shares Pioneer Mill Company, Limited, and 500 shares Kekaha Sugar Company, Limited, "for account of Helen L.

Isenberg" and with other property 381 shares Pioneer
Mill Company, Limited, and 170 shares Kekaha Sugar
Company, Limited, "for account of Dorothea Isenberg."
These accounts were referred to a master whose report
to the court indicates that he thought that there were
still certain duties to be performed by the trustees and
that trustees should be continued in office. The court
evidently was not of the same opinion, for an order was
filed on October 1, 1918, approving the accounts and
discharging the trustees from all further responsibility
and liability and canceling their bond and making no
reference to a continuation of the trust. In this order
it is recited that "the beneficiaries of said trust created
under the will, to wit:  Helen L. Isenberg, widow of
the said Otto Isenberg, deceased, Dorothea Isenberg and
Paul Otto Isenberg, are alien enemies within the provi-
sions of the Act of Congress entitled 'An Act to define,
regulate and punish trading with the enemy and for
other purposes' approved October 6, 1917, and that all
of the property held by the said trustee ·was on the
31st day of January, A. D. 1918, turned over to the alien
property custodian, Trent Trust Company, Limited, de-
pository, and that said depository receipted therefor"
and that "Geo. Rodick, one of the trustees aforesaid,
is now absent and no longer a resident of the Territory
of Hawaii and that H. Schultze, the other trustee, is a
citizen of the Empire of Germany." By the same order
the court directed that the "trustees be paid the sum
of $2,303.91 as commissions herein, that Messrs. Thompson
& Cathcart be paid a fee of $500.00 and that Henry
Smith, master, be paid the sum of $200.00 in this be-
half." Subsequently Mr. John W. Cathcart, one of the
members of the legal firm of Thompson & Cathcart, rep-
resented to Mr. R. H. Trent, president of the Trent
Trust Company, Limited, that certain fees due to his

firm in connection with the estate of Otto Ernst Isenberg and certain other legal expenses of the estate remained unpaid and that it would be necessary to have a new trustee appointed for the estate in order to secure payment of these claims and asked Mr. Trent if the Trent Trust Company, Limited, would consent to be the new trustee if appointed. Mr. Trent consented. A petition dated and sworn to on September 4, 1918, was filed in the circuit court of the first circuit in equity on October 17, 1918, by the Trent Trust Company, Limited, praying for the appointment of itself as trustee under the last will of Otto Ernst Isenberg, alleging that on January 31, 1918, all of the property held by the trustees under the will of Otto Isenberg "was turned over to the alien property custodian, Trent Trust Company, Limited, depository," under the provisions of the Trading with the Enemy Act and that "said property is still held by said alien property custodian;" that Rodiek was no longer a resident of the Territory and that Schultze was a citizen of the Empire of Germany; that the two former trustees had been discharged by the court and that "all of the trusts referred to in said will are not yet fully performed and it is desirable under the terms of said will that some one be appointed trustee in place of the said Geo. Rodiek and H. Schultze;" and that "petitioner is desirous and willing to be appointed trustee under said will in the place and stead" of said former trustees. In response to this latter petition the Trent Trust Company, Limited, was on October 31, 1918, appointed trustee under a bond of $120,000, which bond was filed on November 19, 1918.

On October 25, 1921, the Trent Trust Company, Limited, as trustee under the will and of the estate of Otto Ernst Isenberg, filed its accounts, with a petition for their approval. To these accounts Helen L. Isenberg,

the widow, and Helen zur Helle, one of the daughters of the testator, filed objections on March 4, 1922, and similar objections were filed on September 18, 1922, on behalf of Anna Wiehen, Hans Otto Carl Isenberg, Darling Pohlmann, Countess Agnes von Koenigsmarck, Carl Heinrich Wilhelm Isenberg, Countess Dorothea von Koenigsmarck and Carl Laschinzky. To these objections the Trent Trust Company, Limited, filed an answer.

Returning now to the further history of the case, relating to correspondence between and acts of the custodian in Washington, the depositary in Honolulu and others:

Under date of May 10, 1918, the custodian in Washington issued to the Trent Trust Company, Limited (hereinafter referred to as the Trent Company), a "Designation of Depositary" reciting that "by virtue of the authority vested in me by order of the President, dated October 29, 1917, and pursuant to the provisions of the 'Trading with the Enemy Act'" the Trent Company was thereby designated as "depositary of the property of Estate Otto Isenberg of Germany, an enemy, to be held and administered by you, with the authority and powers, and subject to the conditions and limitations, contained in the designation of you as depositary hitherto made by me, and dated January 11th, 1918;" under date of May 13, 1918, a similar "Designation" was issued to the Trent Company designating it as "depositary of the property of Paul Otto Isenberg of Berlin, an enemy," etc.; under date of May 13, 1918, a similar "Designation" was forwarded to the Trent Company designating it as "depositary of the property of Dorothea Isenberg of Berlin, an enemy," etc.; and under date of May 27, 1918, a similar "Designation" was issued to the Trent Company designating it as "depositary of the property of see list attached, an enemy," etc., the attached list con-

taining the following names and addresses of enemies: "Helen Isenberg, Berlin, Germany; Mrs. Wiehen, Leipzig, Germany; Mrs. Gretchen Zedler, Lueben, Germany; Mrs. Helen zur Helle, unknown; Agnes von Massenbach, Berlin, Germany; Berlita Laschinzky, Neuraltmansdorff; Dorothea Isenberg, Berlin, Germany; Paul Otto Isenberg, Berlin, Germany."

Under date of January 21; 1918, the custodian in Washington sent a radiogram to Mr. Trent from which the following extracts are taken: "Scott New York representative Hackfeld Company urges need of supervision and control of Hackfeld Company by alien property custodian to facilitate transmission of cablegrams and transactions of its business * * * following Hackfeld corporations have made informal reports here * * * Pioneer Mill * * * Kekaha Sugar;" and making certain suggestions as to how that supervison might be brought about.

In a letter dated April 4, 1918, from the custodian to Mr. Trent a complete reorganization of the Hackfeld Company is suggested by the writer, with a somewhat lengthy discussion of possible courses of action in that respect. In this letter the custodian expresses his own inclination to favor the course of having the corporation "sell its entire property and business as a going concern, to a new corporation to be organized under the laws of Hawaii for that purpose" and says, *inter alia*: "The present company holds shares in various subsidiary corporations. Unless there is some reason to the contrary, I suggest that these shares be sold with the other assets of the company, to the new corporation. In some of these same subsidiary corporations, however, I have taken shares belonging to individual enemy owners. I suggest that these shares be sold, and that they may be purchased either by the new corporation or by other powers,

as may be most expedient in the interest of the public of Hawaii."

Answering a question from Trent as to whether there was any objection to the Trent Company or himself subscribing to shares of stock in the proposed new corporation to take the place of Hackfeld & Company and which later became known as American Factors, Limited, the custodian on August 9, 1918, by cablegram and on August 16, 1918, by confirmatory letter informed Trent that there was "no objection to your subscribing for yourself or for Trent Trust Company up to 2500 shares."

On August 30, 1918, the custodian forwarded to the depositary in Honolulu a letter reading as follows: "Enclosed herewith you will find formal acquittance, which we shall ask you to deliver to the reporter named therein, for the property that has been turned over to you by said reporter and which you now hold under your designation as depositary for the alien property custodian." The "acquittance" which was enclosed acknowledged the "payment, conveyance, transfer, assignment and delivery by H. Schultze, address Hackfeld building, Honolulu, Territory of Hawaii," of the following money and property: "1353 shares Pioneer Mill Company stock" (giving the number of certificates of same) "replaced now by Ctf. No. 4589 in name of depositary" and "500 shares Kekaha Sugar Company stock" (giving numbers of certificates) "replaced now by Ctf. No. 435 in name of depositary" and other property; and proceeded as follows: "Which money or property has been so paid, conveyed, transferred, assigned and delivered to said alien property custodian, as the money or property of an enemy or ally of enemy, or one who there may be reasonable cause to believe an enemy or ally of enemy, to wit: Mrs. Helen L. Isenberg, address Berlin, Germany,— to be by said alien property custodian held, administered

and accounted for as provided by law." This acquittance bore date of August 15, 1918.

With a letter dated September 25, 1918, Trent forwarded to the custodian in Washington "a table showing in detail the shares held by the alien property custodian in corporations whose agencies constitute the principal business of American Factors, Limited. The table specified, with other details, the "name of enemy," the "names of corporations" and the "number of respective shares held for each enemy" and included the following entries under these heads: "Dorothea Isenberg, 170 shares Kekaha; Mrs. Helen L. Isenberg, 500 shares Kekaha and Paul Otto Isenberg, 170 shares Kekaha." The letter continued: "The question of selling these shares will doubtless have to be taken up in time and it would be to the advantage of American Factors, Limited, to acquire them if possible. We shall await with interest your advices in this connection."

By letter dated September 26, 1918, Trent wrote to the custodian in Washington as follows: "Under date of February 28th, Trent Trust Company, Ltd., reported as having been deposited with them 'Feb. 2, 1918—Undistributed balance in trust estate, deposited by H. Schultze, trustee—$12,019.89;' and under date of June 12th Trent Trust Company, Ltd., remitted you the amount, less certain deductions as shown on remittance report.

"It now develops that this estate is in probate here and subject to orders of our probate court; and that there are certain legal fees and claims which are chargeable against and payable out of the aforesaid balance of $12,019.89, after which the balance is distributable to Mrs. Helen L. Isenberg, life beneficiary (Trust No. 17862). Will it be possible for you to send back to us our aforesaid remittance of June 12th, so that the matter may take its usual course in probate here?" In another

letter bearing the same date Trent wrote to the custodian, referring to "Trust 14010, Otto Isenberg Trust Estate, and Trust 17862, Mrs. Helen Isenberg" as follows: "These two trusts have been so mixed up by the trustee heretofore acting (Mr. H. Schultze, a German subject) that we are writing this in duplicate so that you may have a copy for each trust (but inclosures will not be in duplicate).

"We are inclosing for your information the following papers:

1—Certified copies, in one binding, of
   (a) Trustees' final account, with petition for approval and discharge of trustees;
   (b) Master's report, (Henry Smith, Master);
   (c) Master's supplemental report;
   (d) Order approving final account and discharging trustees.
2—Petition for appointment of Trent Trust Co., Ltd., as trustee to succeed H. Schultze and Georg Rodiek, resigned (copy)."

Copies were also enclosed of certain letters that passed between Trent and the treasurer of Trent Trust Company, Limited, from which papers it would be easily apparent that Helen L. Isenberg had only a life interest in the 500 shares of Kekaha stock and that the remainder was devised to others. In this last mentioned letter the writer proceeded:

"These inclosures will explain the situation so fully that further comment is hardly necessary. You will also find enclosed 'Corrected Inventories' as to both of these trusts (14010 and 17862). If you can accept these corrections and will authorize us to change our records accordingly, please return to Trent Trust Co., Ltd., the inventories which were sent to you in the first instance." No authority to change the records as thus requested was ever sent by the custodian to the Trent Company.

The letter of Trent to the treasurer of the Trent Com-

pany, dated September 26, 1918, a copy of which was enclosed as above stated in the letter of Trent to the custodian on the same day, referred to "Trust—14010—Otto Isenberg Trust Estate" and "17862—Mrs. Helen Isenberg" and read as follows: "Because Mr. H. Schultze, trustee, mixed and confused these accounts in his reports to the alien property custodian and deposited the proceeds incorrectly as to ownership, it will be necessary for us to make certain corrections; and we will thank you to prepare new inventories for submission to the alien property custodian as follows:

"Otto Isenberg Trust Estate—Trust No. 14010
1353 shares Pioneer Mill Company stock
500 shares Kekaha Sugar Company stock"
and other property;
"Mrs. Helen L. Isenberg—Trust No. 17862
$15,500.00. Oahu Sugar Company 6% bonds.

"At the same time please give me a memorandum of what adjustments will have to be made with respect to income which has come to your company from these respective properties.

"I have had to make a study of our local probate records to determine the ownership of these properties and find the segregation as above given to be correct."

On October 16, 1918, the custodian wrote to the Trent Company as follows:

"Trust 14010   Otto Isenberg Estate

"In your letter of September 26th you state that under date of February 28th the Trent Trust Company reported as having been deposited with them

" 'Feb. 2, 1918—Undistributed balance in Trust Estate, deposited by H. Schultze, Trustee—          $12,019.89 ;'
and under date of July 12th the Trent Trust Company remitted the amount, less certain deductions which reduced the remittance check to $11,874.19, that check

being received on July 8, 1918, in the office of the alien property custodian at Washington.

"This letter of yours of September 26th calls our attention to the fact that the remittance was made in error, as the estate was being administered by. the probate court and that there were chargeable against it certain legal fees and claims of the probate administrator.

"As the Otto Isenberg estate is still in the hands of the probate court, this office is only entitled to the enemy's interest when liquidated; we are therefore returning to you the check for $11,874.19 for account of the trustee appointed by the probate court, whom you will direct to file his account in the probate court showing the exact amount due the enemy, and when that account is approved he should send check covering the full amount due to the enemy to this office."

The check was returned to the Trent Company. Subsequently the claims mentioned were paid and the corrected balance again remitted to the custodian in Washington.

On November 15, 1918, Trent cabled to the custodian as follows: "Referring to my letter of September twenty-fifth with reference to enemy owned shares in certain Hawaiian corporations enumerated therein, have you formulated plans yet for the sale of these shares? American Factors Limited is ready to submit a proposition to purchase the entire lot. Shall I forward their proposition to you by cable or await your further instructions?" This cablegram was confirmed by letter of the following day. The custodian replied, on November 19, 1918, "Forward by cable proposition mentioned your cable of November fifteenth for purchase of stock in subsidiary corporations."

Pursuant to this cabled request Trent on November 20, 1918, sent the following cablegram to the custodian in Washington: "On subject matter of my letter of Sep-

tember twentfifth American Factors have filed written request I cable you as follows quote if you are now prepared to sell these stocks American Factors Limited will undertake to bid at auction an upset price of par provided the entire stock of each corporation is put up for sale in one block stop statement shows average market prices of these stocks for seven years to December 31 1917 Oahu 20.90 Pioneer 25.10 Koloa 125.41 Kekaha 146.11 others not quoted stop We believe that in view of narrow local market par as an upset price is fair stop Similar holdings in these corporations stood on the books of F H Hackfeld and Company when American Factors Limited was formed at following price Oahu 19.15 Pioneer 12.30 Kekaha 70.97 Koloa 98.88 Lihue 200.00 Pacific Guano 105.74 in order to assist American Factors Limited in financing this purchase would you be willing to accept a payment of five hundred thousand dollars on acceptance of bid and take their note for the balance bearing interest at five percent per annum payable semiannually note being payable within three years from date in equal annual installments with privilege to them to make larger or final payment on any interest bearer date stop The note to be secured by the foreign stocks and in additional if you desire by two hundred thousand dollars liberty bond and three hundred fifty thousand dollars high class mainland bonds stop If satisfactory to you American Factors Limited will be glad to turn in the two hundred thousand dollars liberty bonds at par as a payment on account in addition to five hundred thousand dollars stop as it is quite essential that American Factors Limited should have these stocks as a protection to their business we trust that the foregoing may be agreeable to you and that speedy action will be authorized unquote I recommend acceptance of this proposition with this possible modification namely that entire stock of each

company be put up in one block with privilege on the part of successful bidders to take all or any part of the block comma then continue to offer the remainder if any until all the shares are sold stop  In accounting to various enemies whose shares make up a block I would use the average price obtained for the whole lot stop  For your information comma sales of American Factors shares have been made at two hundred twenty five."

On November 25, 1918, the custodian sent the following letter to Trent:

"I received your cable concerning the proposed purchase of all the enemy-owned stock in the corporation of which the old Hackfeld Company had agencies which have been transferred to the American Factors, Limited.

"On looking over the list of these stocks sent by you to us, we find the following which could not be sold by the alien property custodian:

First:    Stock of Mrs. Elizabeth Renjes, who is an American and now in this country.

Second:  Stock in name of Hauptmann Vollmer. That stock appears to be owned by his widow and two children, born in America and such loyal Americans that they have had their names changed, the widow using her maiden name and giving that name to the two children.

Third:   Stock held by the Trent Trust Company as trustee for J. F. Hackfeld. This stock is not to be sold by the alien property custodian, but sold by the J. F. Hackfeld Company, a corporation in liquidation.

"Your proposition was submitted to Mr. Palmer, but by him referred to the advisory committee of our sales organization in New York, of which Mr. Otto Bennard is chairman. When I get his answer I will cable you. In the meanwhile, I call your attention to the fact that the difference between the outside price which the American Factors offers and the market price is $1,887,134.00

and is so large a sum that I doubt that a bid so much under could be accepted.

"The alien property custodian will not be able to sell on the time which the American Factors asks, 90 days would be the limit; but there should be no difficulty in financing this purchase considering the cash payment which the American Factors proposes to make and the additional security which it proposes to offer. While it is true that so large a sum could not be got in Honolulu, I believe that it could be had in San Francisco."

On November 26, 1918, the custodian cabled to Trent as follows: "Answering your radio November nineteenth in which you say American Factors will bid at public auction an upset price of par for the entire individual enemy owned stock in companies in which Hackfield Company formerly held stock or with which it had contracts stop without fixing any upset price you are authorized to sell at public auction on three weeks advertisement these entire enemy held stocks but the stocks of each company to be sold separately though in block stop I cannot sell on longer time than ninety days but you should have no difficulty in financing this purchase in San Francisco because of amount of cash payment and other security you offer stop stockholding by J. C. Hackfeld must be sold separately by action of that corporation in liquidation stop stocks hauptman volmer and rejes not to be sold."

This was followed by a cablegram from the custodian to Trent, November 27, 1918, reading: "The advertisement for sale of the enemy stockholdings should state that all bids shall be subject to the approval of the alien property custodian, who reserves the right to reject any and all bids. Also that only citizens of the United States and American corporations can be purchasers."

These cablegrams of November 26 and November 27, 1918, were confirmed by letter of November 27 in which

the custodian added: "When the offering at public auction takes place you will transmit the names of the highest bidders to this office, with the amount of their bids, in order that the alien property custodian may make his decision; but, it will have to be understood that he will take sufficient time to have the matter considered by the advisory committee of our sales organization and get its opinion as to whether the price offered should be accepted and the bidders be approved of. Of course, we would like to see the American Factors get this stock because it is a corporation of our creation, but as the sale is at public auction anyone is at liberty to bid and the highest bidder will be considered, provided the character of the person or corporation bidding is satisfactory to the alien property custodian."

Under date of December 6, 1918, Trent wrote to the custodian in Washington as follows:

"Re: Sale of Enemy Shares

"Answering my radio to you dated November 27th, in which I asked:

"'First, do you mean total shares of each company to be sold separately in unbroken block?'

I have received your radio dated December 2nd reading, in part, as follows:

"'I mean, first, total shares of each company to be sold separately and in unbroken blocks if possible.'

"Now, referring to my letter to you dated September 25th, and the tabulated list of stocks sent you along with that letter, I take it that you mean that I may sell

"23,542 shares Oahu Sugar Co. in one unbroken block, and

20,698 shares Pioneer Mill Co. in one unbroken block, etc., *if possible.*

"It would be possible to sell these stocks in unbroken

blocks, for the American Factors, Ltd., has agreed to bid par for the whole bunch if they are put up in blocks. But par represents only about fifty per cent. of the market value in some cases; and persons here with ability to handle large blocks are so few in number that if the stocks were put up in this way there would probably be no competitive bidding, and the principal blocks would have to be knocked down at prices which could hardly be considered. as representing their reasonable values.

"For instance, at par a bidder would have to be able to finance the blocks in the following respective sums:

"Oahu Sugar Co. ........................ $470,840.00
Pioneer Mill Co. ........................ 413,960.00
Lihue Plantation Co. .................... 902,500.00
Kekaha Sugar Co. ....................... 241,400.00
Koloa Sugar Co. ........................ 161,900.00
Pacific Guano & Fertilizer Co. ........... 296,400.00

(and in each case a reasonable value is away above par).

"It is evident then that to offer these shares in unbroken blocks would eliminate practically all bidders other than the American Factors, Ltd., with only one or two possible exceptions, and would not result in procuring a reasonable price for the property being sold.

"Knowing it to be your policy to demand reasonable values for the property you sell, I think you will approve my conclusion that it is not possible to sell these stocks in unbroken blocks and at the same time get reasonable values, and I trust that you will approve of and O.K. the following plan of sale, that is to say:

"I would offer 23,542 shares of Oahu for bid, with the privilege on the part of the first highest bidder to take the entire block or any *unit* or number of units as represented by individual enemy ownership. For example, in condensed form:—

"Trust 12606 has 2,916 shares
Trust 12387   "      799     "

| | | | |
|---|---|---|---|
| Trust 7739 | " | 326 | " |
| Trust 12600 | " | 124 | " |
| Trust 12702 | " | 50 | " |
| Trust 12391 | " | 24 | " |
| Trust 12612 | " | 12 | " |
| Trust 12610 | " | 6 | " |

Total (representing the whole)—4,257     "

"The first high bidder might take the whole block or any single unit as shown, or any combination of units. Then I would put up the remainder again, the high bidder this time to take all that is left or any remaining unit or number of units—and so on until the entire block was disposed of.   With this modification, however:   I would allow the 2,916 shares to be broken up into three units, of 916, 1,000 and 1,000 shares respectively, and would so handle all unit blocks of over one thousand shares.

"Another thing:   The average man on the street here is strongly prejudiced against the 'sugar barons,' and doesn't hesitate to say that the sugar men 'hog' everything that is any good.   The way that the American Factors, Ltd., shares were put on the market did more to abate this prejudice and to disarm the suspicion in which the 'big interests' have been held than anything that has ever happened before in Hawaii.   And already, from the little publicity that has been given the matter so far, inquiries are coming in from all quarters as to whether or not the 'small man' will be 'given a show' when these important holdings are offered for sale.   Some of the leading financiers and business men in Honolulu, hearing that there might be a possibility that the shares would be offered in unbroken blocks, have volunteered the opinion that it would be bad public policy so to do, and that it would undoubtedly produce in the public mind

a suspicion that the whole business was conducted in the interests of a favored few.

"I am not writing this as an argument to you, but simply to acquaint you with conditions as they exist here as affecting such a sale as we have in hand. I am now preparing advertisements to be run in our two English-language daily papers, and am planning to conduct the sale along the lines hereinbefore explained, which I shall proceed to do unless in the meantime you cable me instructions to the contrary. If I can get the ads. started in time I will hold the auction sale on Monday, December 30th; otherwise sometime in the second week in January.

"I should be very glad indeed if you would cable me on receipt of this whether or not you agree with my conclusions, and will approve the sale conducted along the lines I have suggested. Of course, I am going to take all bids subject to your approval, and will make full report as soon as possible after the sale is over. I presume, however, that you will not care to be bothered with a large number of small-lot sales in which there may be no question as to the reasonableness of the price bid and the eligibility of the bidder to become a purchaser."

On December 14, 1918, the Trent Company, signing itself as "Trustee, Estate of Otto Ernst Isenberg, Deceased," and acting without solicitation by the custodian, wrote to the custodian as follows: "As trustee of the Estate of Otto Isenberg, Deceased, by appointment of Hon. C. W. Ashford, Judge of the Circuit Court of the First Judicial Circuit, Territory of Hawaii, we hereby consent to the sale by you at public auction to the highest bidder or bidders, of 500 shares of the capital stock of Kekaha Sugar Company, Ltd., and 1353 shares of the capital stock of Pioneer Mill Company, Ltd., belonging to the said estate of Otto Ernst Isenberg, deceased." In an accom-

panying letter he wrote: "Owing to an error on the part of the reporter in the first instance, these shares were turned in to us and inventoried as the property of Mrs. Helen Isenberg (Trust No. 17862), who has only a life interest in the income derived or to be derived therefrom.

"As matter of fact, the shares belong to the Estate of Otto Ernst Isenberg, which estate is now in probate here and subject to our local laws. My idea is that when the shares are sold the proceeds should be turned over to Trent Trust Company, Limited, as trustee by appointment of the probate judge and that Trent Trust Company should then invest the same in liberty bonds and carry the bonds as an estate asset. I will appreciate your advices in this connection."

On December 19, 1918, the custodian cabled to Trent, "Proceed with advertisement and sale as per your letter December sixth and mail me copy advertisements." This was confirmed by letter of the same day in which the custodian added, among other things: "I am glad that you have taken this view * * * that all parties with small or large capital be given opportunity to purchase some or all of these shares."

On January 2, 1919, the custodian wrote to the Trent Company as follows:

"We are in receipt of your letter of December 14th regarding Trust 17862, Mrs. Helen Isenberg, enemy.

"In regard to the proceedings by you as Trustee of the Estate of Otto Ernst Isenberg, you of course appreciate the fact that we are not in a position to dictate as to how you invest the proceeds of the shares that are to be sold, which pertain to that estate, but we approve the investment of the same in Liberty Bonds, if you so desire.

"We beg to call your attention particularly to our letter of October 16th, 1918, in regard to Trust 14010, Estate of Otto Isenberg. As soon as possible we will have these:

two trusts consolidated in order that there might be no more confusion such as heretofore existed and will advise you of the consolidation as soon as it has been accomplished."

This last mentioned letter was not received by Trent or the Trent Company until after the sale at auction of the stock of the Kekaha Sugar Company, Limited.

On January 15 and 16, 1919, 20663 shares of Pioneer Mill Company stock were sold at public auction in Honolulu and on the day following 2414 shares of Kekaha Sugar Company stock were sold at auction. These sales were liberally advertised for three weeks, or more in advance in two of the daily newspapers published in Honolulu, papers of general circulation, and by printed posters and handbills. The newspaper advertisement commenced with the statement that "the stock shares here advertised are being offered for sale by order of the alien property custodian of the United States who reserves the right to reject any and all bids and to whose approval all sales will be subject," prescribed the "terms and conditions of sale" and bore the signature of "Richard H. Trent, Special Representative Alien Property Custodian, 305-306 Kauikeolani Building, Honolulu, Hawaii." We infer that copies of these advertisements were promptly mailed to the custodian in Washington in accordance with his request of December 19, 1918, above noted.

The total of 2414 shares of Kekaha Sugar Company stock sold at the auction included the 500 shares in which Helen L. Isenberg had a life interest, the 170 shares, speaking generally, said to belong to Dorothea Isenberg and the 170 shares, also speaking generally, said to belong to Paul Otto Isenberg, these three items of shares being listed in the "table" above referred to forwarded to the custodian by Trent by letter dated September 25, 1918.

By letter of January 16, 1919, the Trent Company reported to the custodian in Washington the results of the auction sale of 20663 shares of Pioneer Mill Company stock and by letter of January 18, 1919, reported to the custodian the results of the auction sale of 2414 shares of Kekaha Sugar Company. In each instance newspaper clippings giving accounts of these sales were enclosed.

On February 22, 1919, the custodian cabled to Trent as follows: "Sale of stock made by you at public auction in Honolulu of the shares of enemy-owned stock in Kekaha Sugar Company Pacific Guano & Fertilizer Company Koloa Sugar Company Pioneer Mill Company Oahu Sugar Company is approved."

The proceeds of the sales of 500 shares of Kekaha Sugar Company were taken charge of by the Trent Trust Company, Limited, as trustee under the will of Otto Ernst Isenberg and are still held by it in that capacity. The proceeds of the sale of 170 shares known as the Paul Otto shares were likewise taken charge of by the Trent Company in the same capacity of trustee but were later forwarded to the custodian in Washington in consequence of a letter written by the custodian to the Trent Company, dated November 8, 1920, stating the position of the custodian's office to be that these proceeds (of the Paul Otto shares) should be transferred to the custodian in Washington. The theory of this letter was that Paul Otto had a vested interest in the principal, as well as in the income, of one-ninth of the property left by the decedent, and that all of that vested interest was seized by the custodian and was later sold by him at the auction.

Under date of January 4, 1921, the custodian notified the Trent Company that the attorney general of the United States, acting under section 9 of the Trading with the Enemy Act, had decided that Helen Lewis Isenberg was entitled to the return of the property seized under

that Act and further notified the company to deliver to her "all the property which you hold in this trust and any income which you have received thereon and are still holding." This letter was received by the Trent Company in January, 1921. The decision of the attorney general was dated December 4, 1920.

On August 17, 1921, Helen Lewis Isenberg made demand upon the Trent Company for restoration to the estate of 500 shares of Kekaha Sugar Company, Limited, and 1353 shares of Pioneer Mill Company, Limited, with all of the issues and profits thereof and with legal interest thereon.

On September 20, 1921, the "managing director" of the custodian's office in Washington wrote to certain attorneys representing Helen L. Isenberg: "You are advised that our records show the following facts: That the Trent Trust Company as substituted trustee of the estate of Otto Isenberg, deceased, held the right of title to certain securities as belonging to said estate among which securities were certain shares of the Kekaha Sugar Company and of the Pioneer Mill Company; that in connection with the sale of certain shares other than those of Mrs. Isenberg, the alien property custodian sold with the express consent of the Trent Trust Company as trustee shares of Mrs. Isenberg. The proceeds from the sale of the shares of Mrs. Isenberg belonged to the Trent Trust Company as trustee and were delivered to the trustee and by the trustee reinvested without instruction or limitation by this office." On October 11 following they further wrote: "In connection with the estate of Otto Ernst Isenberg, deceased, we demanded the respective enemy interests in that estate among which is the interest of Mrs. Helen L. Isenberg. As to Mrs. Helen Isenberg, the effect of our demand was to acquire the income payable to her as provided in the will of the decedent and in

accordance with the trust established thereby. By error of the former trustee, H. Schultze, and the Trent Trust Company, acting as our depositary, the corpus was delivered to the Trent Trust Company. This error was subsequently corrected by the Trent Trust Company as substituted trustee of the estate of Otto Ernst Isenberg. The Trent Trust Company held the corpus as trustee.

"In connection with the sale of certain shares of stock held by the Trent Trust Company as trustee of such estate and the subsequent sale thereof and the reinvestment of the proceeds, we submit that the sale and reinvestment was the act of the Trent Trust Company as trustee and not that of the alien property custodian."

After referring to certain enclosures, the letter proceeded: "We likewise enclose copy of our letter to the Trent Trust Company dated January the 2nd, 1919, which was in answer to the letter of Richard H. Trent dated December the 14th, 1918, photostat copy of which we are enclosing as above stated. This letter, from this office, of January the 2nd, 1919, clearly shows that the alien property custodian did not exercise any control over the sale or of the stocks referred to or the reinvestment of the proceeds from such sale."

Briefly stated, the present contest consists in this: The objectors, above named, claim that the 500 shares of Kekaha Sugar Company stock in which Helen L. Isenberg owned a life interest and the 170 shares of the so-called Paul Otto stock in the Kekaha Sugar Company were sold by the Trent Trust Company, Limited, the trustee under the will of Otto Ernst Isenberg, in disregard of its duty as trustee under the will and that therefore the Company should be decreed to restore to the estate the stock (or its value at the date of the decree), together with the dividends paid by the com-

pany thereon since the date of the sale and interest and costs; and the present petitioner, the Trent Trust Company, Limited, contends that these 670 shares of Kekaha Sugar Company stock were sold by the alien property custodian after seizure from enemy owners, and that the present trustee is not liable to the estate for any loss or damage caused to the estate or its beneficiaries by said sale.

In our view of the case one of the fundamental issues to be determined, without which other and succeeding issues cannot properly be understood or decided, is as to what is the correct construction of the will of Otto Ernst Isenberg and what were the devises contained in that will.

After an introductory clause and one relating to the appointment, succession and powers of the trustees, the testator devises and bequeaths all of his property to two trustees, William Pfotenhauer and Hermann Schultze, "in trust however, for the following uses and purposes, that is to say:

"*First*: To pay my just debts and funeral expenses.

"*Second*: To set apart one-third of the remainder, after paying such debts and expenses, for the use and benefit of my wife Helen L. Isenberg, and annually or oftener, to pay to her the net income, issues and profits thereof so long as she shall live. And at her death to hold and apply the principal of said one-third (or so much thereof as shall then remain) together with all unapplied income thereof, as hereinafter set forth.

"*Third*: To divide the remaining two-thirds into as many equal portions as I shall have children then living, and pay over one such portion (or the proceeds thereof) to each of said children who has then arrived at the age of twenty-five years, and hold one of such portions for each of the remaining children respectively and annually

or oftener pay the net income, issues or profits thereof to the child for whom the same is so held as aforesaid. And as such remaining children shall each successively arrive at the age of twenty-five years to pay to him or her the portion so held for him or her respectively (or so much thereof as shall remain) together with the unapplied income thereof.

"Provided, however, that should any of my said children die before my decease leaving lawful issue surviving, such issue shall be deemed to represent the deceased parent·and shall be entitled to the same portion as the parent would have been entitled to had he or she survived me, and such remaining two-thirds of the trust property shall be divided accordingly. And such issue shall annually or oftener receive the net income of such portion or portions, respectively, until the youngest of my surviving children shall reach the age of twenty-five years, when the portion or portions (or the proceeds thereof) so held for the issue of any deceased child or children shall thereupon be paid over to such issue.

"*Fourth*: Upon the death of my said wife, the principal of the one-third of the trust property so set apart for her as aforesaid, or so much thereof as shall then remain, together with the unapplied income thereof, shall be divided in the manner and held upon the same trusts as hereinbefore directed to be done with the other two-thirds of the trust property, provided always, that none of my said children shall receive his or her portion of the principal trust property until arriving at the age of twenty-five years, and the issue of any deceased child shall not receive any of such principal until my youngest child shall reach such age." The only clause following these is one relating to the power of the trustees to

sell, invest and reinvest,—a clause which will be herein-after quoted..

The words of gift in the third clause clearly import a vesting of the title in the beneficiaries immediately upon the death of the testator. The injunction to the trustees is to "divide the remaining two-thirds into as many equal portions as I shall have children then living, and pay over one such portion * * * to each of said children who has then arrived at the age of twenty-five years, and hold one of such portions for each of the remaining children." There is nothing to indicate in the slightest degree a postponement of the effectuation of the devise to the children. "To divide" necessarily means, standing alone, to divide when this will goes into effect, which is when the testator dies; "to pay over" necessarily means, standing alone, to pay at the testator's death; and to "hold" with equal clearness means to so hold from the time of the testator's death. Thus far there is a complete devise, intended to take effect upon the death of the testator.. The statement "and annually or oftener pay the net income * * * thereof to the child for whom the same *is so held* as aforesaid" is a confirmatory declaration that from the time of the division above mentioned, to wit, from the testator's death, each portion *is held* for the child. Still continuing, the testator says: "And as such remaining children shall each successively arrive at the age of twenty-five years to pay to him or her the portion *so held* for him or her * * * together with the unap-plied income thereof." Here, again, he refers to each portion as being already *held* for the child,—not to be given to the child in the future, not to be devised in trust in the future, but to be held for the child from the effective date of the will.

The only proviso is that "Should any of my said

children die *before my decease* leaving lawful issue surviving, such issue shall be deemed to represent the deceased parent." There is no similar provision as to what shall happen should any of the testator's children survive the testator and die before arriving at the age of twenty-five. If the devise of each one-ninth portion was intended to be contingent upon the child's reaching the age of twenty-five it would naturally be expected that the testator would make a supplementary or alternative devise directing to whom that particular ninth should go if the child mentioned in the first devise failed to reach the prescribed age. The omission of the testator to make such an alternative provision is most significant in this connection. It indicates that he felt that no such provision was necessary because he was giving by the devise as made one-ninth to each child (surviving him) absolutely, irrespective of whether such child should reach the age of twenty-five, merely prescribing that he did not wish the principal paid to the child until it should reach twenty-five. This failure to add an alternative devise is regarded by most, if not all, of the authorities as indicative of an intention that the devise as made was to vest upon the death of the testator and was not to be contingent upon the happening or the non-happening of any event. In the third clause the testator also says that said issue "shall be entitled to the same portion as the parent would have been entitled to had he or she survived me,"—by these words, again clearly recognizing that upon his, the testator's, death each surviving child would immediately become entitled to a one-ninth portion.

Again, the will declares that "annually or oftener" the "net income, issues or profits thereof" shall be paid "to the child for whom the same is so held as aforesaid" and that "such issue shall annually or oftener receive

the net income of such portion or portions, respectively, until the youngest of my surviving children shall reach the age of twenty-five years, when the portion or portions (or the proceeds thereof) so held for the issue of any deceased child or children shall thereupon be paid over to such issue." The fact that the testator by the same instrument and in the same clauses donates the income of each one-ninth to the child or issue named as the beneficiary of the principal of that one-ninth is strongly confirmatory of the view that it was the intent of the testator to give a vested and not a contingent interest in the principal to said child or issue. Under the view that the devise of each one-ninth is vested at the death of the testator, the "issue" of any child predeceasing the testator is provided with maintenance in the form of (a) the income of the one-ninth given to each such predeceasing child until the youngest child of the testator shall reach the age of twenty-five and (b) the principal when that time comes; whereas, under the view that the gift to the youngest child of the testator like the gifts to the other surviving children of the testator is contingent, the issue of each non-surviving child of the testator (meaning not surviving him, the testator) is left without permanent maintenance in the form of principal and even without income from the time when it becomes apparent that the youngest child will never reach the age of twenty-five. The testator has nowhere in his will shown a disposition to leave such issue unprovided for; on the contrary they seem to be the object of his care and bounty quite as much as are his own children of the first degree. Under the view that the one-ninth interest vested at the death of the testator, the issue of children surviving the testator, irrespective of whether their parent reached the age of twenty-five, could very properly be regarded

by the testator as being amply provided for because they would in all probability receive each surviving child's share either by descent or by the last will of such child; and even in the event that the child had in his lifetime, either before or after reaching the age of twenty-five, alienated his one-ninth interest, such alienation would ordinarily leave the child as well able financially to provide at death for his issue from the proceeds of the alienation.

The testator has himself said that the one-third of the remainder of the principal set apart by the second clause of the will to provide income to the widow for life shall, upon the death of the wife, "be divided in the manner and held upon the same trusts as hereinbefore directed to be done with the other two-thirds of the trust property." That language is so clear as to leave no room for construction. Whatever the manner of division specified for the two-thirds in the third clause and whatever the trusts created with reference to the two-thirds in the third clause, that same manner of division applies and those same trusts are created with reference to the one-third mentioned in the second and fourth clauses. Nor is there anything in the provisos in the fourth clause that in any way modifies the earlier language of that clause. One proviso is "that none of my said children shall receive his or her portion of the principal trust property until arriving at the age of twenty-five years,"—which is precisely what the testator had already said with reference to the devises contained in the third clause. The other proviso is that "the issue of any deceased child shall not receive any of such principal until my youngest child shall reach such age,"—which likewise is exactly what the testator had already said in the third clause relating to the devises therein made. Any contention to the effect that by

the expression "any deceased child," in this last quoted part of the proviso of clause four, the testator meant any child dying prior to the death of the widow and not any child dying prior to the death of the testator, would be obviously met by the fact that the testator has nowhere in his will defined "any deceased child" as meaning any child dying before its mother; whereas, in the third clause of the will, he has used that expression as clearly referring to any child dying before him. If he had intended to use this one expression in two senses so widely divergent, he would have furnished in the fourth clause of the will a second definition. Moreover, the result of the adoption of the construction for the words "any deceased child" as used in the fourth clause of any child who died before the widow would necessarily be that the estates created in the nine children under the fourth clause with reference to the one-third of the remainder would have to be held to be contingent and not vested—a devise of a nature radically different from that of the devises clearly created by the third clause. But the testator himself has said that the trusts created by the fourth clause are exactly the same as those created by the third clause.

It is obvious from a study of the third and fourth clauses of the will that the testator when he referred to the age of twenty-five was not thinking of the attainment of the specified age by the nine legatees as an uncertain event but was thinking of that specified age merely as marking a period of time. There is no indication anywhere in the language of these two clauses that he contemplated failure on the part of any of the nine to reach twenty-five. He does not anywhere use the conjunction "if" or any other equivalent word. He does not say that this payment to each of the nine shall be made "if and when" twenty-five shall be reached.

What he says is that *"as* such remaining children shall each successively arrive at the age of twenty-five years to pay to him or her" the portion created for him or her; and as to the issue of a child dying before the testator the provision is that they shall "annually or oftener receive the net income of such portion or portions, respectively, *until"* the youngest of his children shall reach the age of twenty-five. The provisos of the fourth clause with reference to the one-third are that "none of my said children shall receive his or her portion of the principal  *  *  * *until* arriving at the age of twenty-five years" and that the "issue" shall not receive any of such principal *"until* my youngest child shall reach such age." The testator must be deemed to have known and to have been conscious of the uncertainty of human life and of the possibility of each of his nine children failing to reach twenty-five and yet the only reasonable inference from his words is that he meant the age of twenty-five to be and to mark a definite period of time at which the right of possession would accrue, to the child if living or to his heirs or devisees if not living or to his assigns whether living or not living. The failure, already commented upon above, of the testator to say what should happen—to whom the property should go—if a surviving child should fail to reach twenty-five very strongly emphasizes the correctness of this inference. So, also, is the correctness of the inference further emphasized by the fact that the testator did specify how the property should go in the case of a child of his dying before him, the testator. In other words, at the moment of writing or signing the will he recognized the ever present possibility of death but, recognizing it, decided and so declared that as to a child dying before him a partial intestacy would result if he did not make an alternative provision such

as he did make (in favor of the issue); while as to a child surviving him and dying thereafter before reaching twenty-five, no partial intestacy would result, because he was devising to such child a vested interest which carried with it the usual qualities of alienability, devisability and descendibility.

If the devise of the nine portions in favor of the nine children of the testator were to be deemed contingent and not vested, that is to say, that it was not intended to take effect until and unless each such child should attain the age of twenty-five, it would necessarily follow that the issue of any deceased child would not take anything under the fourth clause in the event of the youngest of the testator's children (Paul Otto was such youngest) not attaining to the age of twenty-five; and this result would follow whether in clause four "any deceased child" should be held to mean any child who died before the testator or should be held to mean any child who died before the widow. There is no indication in the will of any intention on the part of the testator to leave the issue of any of his children unprovided for. Under the theory of a vested estate given to each of the nine children, estates vesting immediately upon the death of the testator, all the issue of deceased children, whether of children dying before the testator or of children dying after the testator, would be provided for,—as to the issue of children dying before the testator, by the express provision of the will that they should take the share which their parent would be entitled to if he or she had survived the testator and as to the issue of any child dying after the testator and before reaching the age of twenty-five by the vested gift to the parent, the testator having the confidence that provision would come from such surviving child to the child's issue, either by descent or by devise and

whether such descent or devise be of the property itself or of its money proceeds, and as to the issue of children surviving the testator and surviving the age of twenty-five, by descent or devise from such parent whether of the property itself or of its money proceeds. Had the testator lacked confidence in the natural desire of his surviving children to provide out of their own means for the support and maintenance and well being generally of their issue, he doubtless would have given his surviving children a life estate only, with remainder over to the issue.

In clause four of the will, the only *devising* part is that preceding the provisos. The provisos themselves contain no words of devise or gift, but only limitations as to *when* the beneficiaries were to receive their portions. Both provisos are purely *negative*: (a) none of the children shall receive their portions before twenty-five and (b) none of the "issue" shall receive their portions before the youngest child is twenty-five. Neither proviso contains any positive provision as to who the devisees are,—as to who are the "children" beneficially interested or as to who are the "issue" beneficially interested. All the definitions and information which the testator gives in this respect are contained in the part of the clause (No. 4) preceding the proviso, and that definition is that the beneficiaries are the same as those of clause three.

The Supreme Court of the United States has said that "for many reasons, not the least of which are that testators usually have in mind the actual enjoyment rather than the technical ownership of their property, and that sound policy as well as practical convenience requires that titles should be vested at the earliest period, it has long been a settled rule of construction in the courts of England and America that estates, legal or equitable,

given by will, should always be regarded as vesting immediately, unless the testator has by very clear words manifested an intention that they should be contingent upon a future event." *McArthur* v. *Scott,* 113 U. S. 340, 378. See also *Chess' App.,* 87 Pa. 362, 364, 365.

"In general there is a strong presumption in favor of early vesting. * * * There is a strong presumption against intestacy as to a portion of the estate." *Bertelman* v. *Kahilina,* 14 Haw. 378, 382.

"This view is supported by the presumption against partial intestacy, which is a strong one." *Magoon* v. *Kapiolani Estate,* 22 Haw. 510, 515.

"A provision in a will * * * is prima facie regarded as conferring a vested and not a contingent interest * * *. The law favors the vesting of estates and in the absence of words expressing a clear intent to the contrary an estate will be construed as vested rather than contingent and, consistently with the testator's intention, the estate will be construed to vest at the earliest possible time, so that, unless otherwise clearly expressed, it will vest immediately upon the testator's death." *Deacon* v. *Trust Company,* 197 S. W. (Mo.) 261, 265. To the same effect are: *Winslow* v. *Rutherford,* 114 Pac. (Ore.) 930, 931, 932; *Cammann* v. *Bailey,* 103 N. E. (N. Y.) 824, 826; *Smith's Estate,* 75 Atl. (Pa.) 425-427; *Trust Company* v. *Noyes,* 58 Atl. (R. I.) 999, 1002; *Cropley* v. *Cooper,* 19 Wall. 167, 174-177; *Staples* v. *D'Wolff,* 8 R. I. 74, 118; *Daughters* v. *Lynch,* 48 Atl. (Md.) 1055, 1057; and 28 R. C. L. 231-233.

Courts have often held that if the construction of a will admits of doubt the estates are to be deemed vested and not contingent. It is not necessary, however, in the case at bar to resort to that rule for the language of the testator does not, in our opinion, admit of doubt.

The words of gift which he uses denote gifts vesting immediately and there is nothing in the subsequent language of the will manifesting that they should be contingent upon a future event. There is much in the remaining language of the will as above pointed out and in the general scheme of the will to support the view that all of the one-ninth interests were intended by the testator to vest at his death, those of the surviving children to become so vested in such surviving children and so far as there might be non-surviving children those shares to vest immediately at the testator's death in the issue of such non-survivors.

"Another canon of construction in cases of this kind is that if the grantor does not annex the time to the grant or gift itself, but merely to the payment, possession, or enjoyment, or, in other words, if he first makes a grant or devise unconnected with any particular age and then by a distinct sentence or member of a sentence directs that the beneficiary be let into possession or enjoyment when he shall attain a given age, the grant or devise confers an interest immediately vested in right, but not to take effect in possession until the attainment of the age or period specified." *Winslow* v. *Rutherford,* 114 Pac. (Ore.) 930, 931, 932. Such is the case under consideration. The time named is not annexed to the gift itself but merely to the possession or enjoyment of the principal.

If it be said that the construction of an early vesting tends to frustrate the desire of the testator that the beneficiaries should not have the benefit of the principal of their shares prior to reaching the age of twenty-five, four considerations present themselves by way of answer: one is that the very expression of the desire of the ancestor might well be deemed to have a large influence upon the beneficiaries against an early alienation

of their interests; the second is that the limitation against possession and enjoyment before reaching the age of twenty-five constitutes somewhat of an impediment against a profitable alienation and that that, in its turn, would have its influence against an early alienation; the third is that it is now too well settled to admit of doubt that when a gift is made which is clearly intended to be absolute and to vest at the death of the donor, the mere specification or limitation that the possession and enjoyment must be postponed until a specified time does not in any wise qualify the absolute nature of the gift or militate against the complete alienability, devisability and descendibility of the property devised; and the fourth is that while each child's interest is alienable, "it does not follow that, because the testator has not imposed all possible restrictions, the restrictions which he has imposed should not be carried into effect." *Claflin* v. *Claflin*, 149 Mass. 19, 23. The limitation against early possession and enjoyment could still be carried out. Neither the beneficiaries nor their alienees, devisees or heirs could compel the trustee to surrender possession of the principal before the date named. That which is alienable is what the alienor had, and that is the right to receive the income until the prescribed date and the right to receive the principal at the prescribed date. That which one owns he can sell or devise or allow to pass under the law to his heirs in the absence of a will. *Lewisohn* v. *Henry*, 72 N. E. (N. Y.) 239, 242. Equitable interests are alienable and their assignment will be enforced in equity. *McCandless* v. *Castle*, 19 Haw. 515, 517. There is no doubt of the power of a testator to make a devise of his property to his child or to anyone else contingent upon the happening of a certain event but if he does not expressly or by clear implication make the devise contin-

gent and if the language used is reasonably susceptible of the construction that a vested gift was intended, the gift will be deemed to be vested and not contingent.

"Equitable estates are governed by the same rules as legal estates, otherwise inextricable confusion would ensue." 1 Perry Trusts (6th ed.) §357. See also *Heath* v. *Bishop*, 55 Am. Dec. (S. C.) 654.

So-called rules of construction devised by courts in the past in construing wills are to be applied, of course, only when they aid in carrying out the intention of the testator as he has expressed it in the particular document under consideration. They are not to be applied when to do so would thwart the intention of the testator. With these limitations in mind the following principles of testamentary construction are nevertheless applicable in this instance: (1) The absence of an alternative gift over is indicative of an intention to make the gift vested and not contingent. (2) The absence of an expressed reversion in favor of the testator's heirs is indicative of the same intention. (3) The fact that the statement of time is annexed to the possession or enjoyment and not to the words of gift tends the same way. (4) The mere postponement of the time of possession or enjoyment does not make contingent a gift otherwise vested. (5) When it is apparent that the testator was not thinking of the attainment of the specified age by the legatee as an uncertain event but merely as marking a period of time the devise or gift is not contingent. (6) When the language used is susceptible of two constructions, one producing and the other avoiding a partial intestacy, the latter is to be favored. (7) A gift of the intermediate use or income to or for the benefit of the legatee is a strong circumstance going to show that the gift is not contingent upon the attainment of the specified age. (8) If the enjoyment of the gift of the principal

is postponed in order to let in some other interest, as
for example, a life interest in the income, the gift is
vested, "the presumption being that the testator post-
poned the distribution or payment for the purposes of
the prior bequest and not to prevent the ulterior legacy
from vesting." L. R. A., 1915C, p. 1049.    (9)   The
fact that a legacy is given to trustees until the attain-
ment of a certain age by the beneficiaries of the trust
does not militate against its vesting, where they hold it
solely for the benefit of the persons ultimately entitled.
(10) The construction of a testamentary gift as vested
is sometimes "materially assisted by reference to other
gifts which were clearly vested, to persons standing
in the same relation to the testator." L. R. A., 1915C,
p. 1063.

All of the nine children of the testator survived him.
All of them except Paul Otto reached the age of twenty-
five.    Paul Otto died November 16, 1918, and had he
lived would have been twenty-five on November 10, 1920.
In our opinion each of these nine children was given by
the will a vested one-ninth interest in the two-thirds
of the property referred to in the third clause of the
will and also in the one-third of the property referred
to in the second and fourth clauses.    By this we mean
that each, immediately upon the death of the testator,
became definitely and certainly the owner of a one-ninth
interest in the property, vested in right, with merely
the possession and the enjoyment of the principal itself
deferred until the time stated, that is, when each became
twenty-five or would arrive at the age of twenty-five if
living.    The same was as true in the case of Paul Otto
as in the cases of the others.    Paul Otto's interest as
well as the interest of each of the others was descendible,
devisable and alienable.

It need scarcely be added that the devise to Helen

L. Isenberg, the widow, was of the income of the one-third, referred to in the second and fourth clauses, during her lifetime. The language of the will in this respect is not ambiguous and does not admit of doubt. The reference to "unapplied income" in the second clause does not detract from the completeness and certainty of the gift to her of all of the income which accrued and was collected or collectible in her lifetime. At best it can refer to income which was accrued and uncollected at her death and uncollectible until after her death. The right of the widow to the income of one-third for her life although not descendible or devisable was, of course, alienable.

Under the provisions of this will the legal title to the property of the testator was in the trustee or trustees. The interests which we have been considering of the children in the principal were equitable. They were, under the provisions of the Act of Congress of October 6, 1917, known as the Trading with the Enemy Act, demandable and seizable by the alien property custodian. Section 7 (c) of that Act reads: "If the President shall so require, any money or other property owing or belonging to or held for, by, on account of, or on behalf of, or for the benefit of an enemy or ally of enemy not holding a license granted by the President hereunder, which the President after investigation shall determine is so owing or so belongs or is so held, shall be conveyed, transferred, assigned, delivered or paid over to the alien property custodian." Acting under the authority given him by that Act the President by Executive Order dated October 12, 1917, vested "in an alien property custodian, to be hereafter appointed, the executive administration of all the provisions of section 7 (a), section 7 (c) and section 7 (d) of the Trading with the enemy Act, including all power and authority to

require lists and reports, and to extend the time for filing the same, conferred upon the President by the provisions of said section 7 (a) and including the power and authority conferred upon the President by the provisions of said section 7 (c), to require the conveyance, transfer, assignment, delivery or payment to himself, at such time and in such manner as he shall prescribe, of any money or other properties owing to or belonging to or held for, by, or on account of, or on behalf of, or for the benefit of any enemy or ally of an enemy not holding a license granted under the provisions of the Trading with the enemy Act, which, after investigation, said alien property custodian shall determine is so owing, or so belongs, or is so held."

Under the same authority and by Executive Order dated February 26, 1918, the President further declared and ordered as follows:

"(a) The alien property custodian may make demand for the conveyance, transfer, assignment, delivery, and payment of any money or other property owing or belonging to or held for, by, on account of, or on behalf of or for the benefit of an enemy not holding a license granted by me or in the exercise of my power and authority which the alien property custodian after investigation shall determine is so owing or so belongs or is so held, together with every right, title, interest, and estate of the enemy in and to such money or other property and every power and authority of the enemy thereover, including (but without limiting the generality of the foregoing) the power and authority to affirm, ratify, approve, revoke, repudiate or disapprove, in whole or in part, and at any time or times, any power, agency, trust or other relation at the time existing, and also any act or omission theretofore done in the exercise of or pursuant to any power, agency, trust or other relation

which the enemy could or might lawfully revoke, repudiate, disaffirm, affirm, ratify or approve, and also including (but without limiting the generality of the foregoing) the power and authority to direct, supervise, and control the future exercise of any power, agency, trust or other relation over such money or other property to the extent that the enemy could or might lawfully direct, supervise, and control the same. Or the alien property custodian may qualify or limit any such demand in such manner to such extent as he may in any case see fit and (without limiting the generality of the power to qualify and limit demands) he may in any case demand all or only such power and authority over the money or other property as he may see fit without demanding any conveyance, transfer, assignment, delivery or payment of such money or other property or any other right, title, interest, or estate therein or thereto except such as may be included within the power and authority demanded in the particular case over such money or other property. A demand for the conveyance, transfer, assignment, delivery and payment of money or other property unless expressly qualified or limited shall be deemed to include every right, title, interest, and estate of the enemy in and to the money or other property demanded as well as every power and authority of the enemy thereover."— Section 2 (a) of said Executive Order.

"(c) The words 'right,' 'title,' 'interest,' 'estate,' 'power,' and 'authority' of the enemy as used herein, shall be deemed to mean respectively such right, title, interest, estate, power, and authority of the enemy as may actually exist and also such as might or would exist if the existing state of war had not occurred, and shall be deemed to include respectively the right, title, interest, estate, power and authority in law or equity or otherwise of any representative of or trustee for the enemy or other

person claiming under or in the right of, or for the benefit of, the enemy. (d) Any requirement made by the alien property custodian pursuant to section 7, subsection 'c' of the 'Trading with the enemy Act' may be known as and called a demand and will be hereinafter referred to as a demand."—Section 1(c) of the same Order.

"(c) When demand shall be made and notice thereof given as hereinbefore provided, such demand and notice shall forthwith vest in the alien property custodian such right, title, interest, and estate in and to and possession of the money or other property demanded and such power or authority thereover as may be included within the demand, and the alien property custodian may thereupon proceed to administer such money and other property in accordance with the provisions of the 'Trading with the enemy Act' and with any orders, rules, or regulations heretofore, hereby, or hereafter made by me or heretofore or hereafter made by the alien property custodian."—Section 2(c) of same Order.

Giving to the language its ordinary meaning the words of the Executive Order "every right, title, interest and estate" certainly include equitable interests as well as legal interests. In *Keppelmann* v. *Palmer*, 108 Atl. 432 (91 N. J. Eq. 67), the argument was made on behalf of attorney-in-fact of the enemies that "it is only property the legal title to which is in the alien enemy that is subject to seizure by the alien property custodian;" but the court said: "This contention as it seems to us is in the face of the very language of the statute," quoting the provisions of section 7 (c). "The manifest purpose of Congress was that the statute should operate, not only upon property the legal title to which is in the alien, but on all property held for him, or for his benefit, whether the legal title be in him or in the person who holds it for his benefit. In the present case, the prop-

erty is held in trust by the complainants solely for the benefit of these three daughters of the testator, and comes within the very words of the statute, for, although they are not the holders of the legal title to the trust estate, they are the equitable owners thereof, the whole beneficial interest being lodged in them."

The custodian was entitled to demand vested legacies, even though not payable until after the passage of the Resolution of Peace. *In re Miller,* 288 Fed. 760.

To what extent, if at all, were these interests, created by the will, seized by the alien property custodian? In this connection a distinction must be observed, between the acts done at the time of the attempted seizures and the subsequent declarations, views or expressions of opinions by the parties, custodian and trustee alike, or their attorneys or other assistants as to the legal effect of those acts which had already become a part of the past. The latter, of course, can be of no materiality or assistance in this case. It is the former only that should be examined in determining whether or not there was a seizure.

No claim is made by the objectors for the return of the 1353 shares of Pioneer Mill Company stock which were sold at auction in January, 1919, or for damages by reason of the sale. The stock sold at that auction at prices higher than any obtainable since that date and the parties, in consequence, are satisfied with the results of the sale. The sole claim for restoration or demand is with reference to the sales of the stock of the Kekaha Sugar Company, Limited.

The demand addressed by the custodian in May of 1918 to the Kekaha Sugar Company for 840 shares of common stock therein said to stand on its books in the name of "Estate of Otto Isenberg" did not operate to transfer to the custodian any title either of the trustees

or of the beneficiaries under the will because the Kekaha Company did not hold any property belonging either to the trustees or to the beneficiaries. The corporation was not, as was the corporation in *Miller* v. *Schutte*, 287 Fed. 604, 605, in any wise the trustee for the owner of the stock. In the *Miller* case "for a number of years the certificate" (of stock) "had been left for safe-keeping at the company's office in this country subject to the owner's orders and it remained there at the time of his death." In the case at bar there was no deposit of any one of the certificates of stock with the Kekaha Sugar Company for safe-keeping or for any other purposes. The corporation was not the agent either of the trustees or of the beneficiaries. It had the power, under proper circumstances, to issue new certificates to take the place of old certificates and it may be that, under the notice and demand given to the corporation by the custodian, the corporation was compellable to issue new certificates, in aid of a seizure or seizures otherwise properly made by the custodian, of shares of the stock of the corporation belonging to enemies (*Stoehr* v. *Wallace*, 255 U. S. 239) ; but this particular demand was not sufficient in and of itself to accomplish the seizure of the property of others which the corporation did not hold or control in any way. Stock certificates, it need hardly be said, are not themselves the shares in a corporation but are merely one form of evidence of the ownership of the shares. *Miller* v. *Kaliwerke*, 283 Fed. 746, 755; *Jellenik* v. *Huron Copper Mining Co.*, 177 U. S. 1.

No demands were made by the custodian, either upon the trustees under the will or upon the two beneficiaries themselves, for the right, title and interest of either Hans Carl Otto Isenberg or Carl Heinrich Wilhelm Isenberg, children of the testator. There was no deter-

mination by the custodian that either of them was an enemy and the° parties to the present controversy are in accord that both of them were American citizens and not enemies.

As appears from the above detailed recitals of the contents of the formal demands of the custodian upon the trustees and guardian, demand was made on May 7, 1918, for the property of the widow, Helen L. Isenberg, and of the seven children, Anna Pauline (Mrs. Wiehen), Helen Dearest Wilhelmina (Helen zur Helle), Abigail Darling Gretchen (Mrs. Gretchen Zedler), Agnes Cunningham (Agnes von Massenbach), Bertha Julita (Berlita Laschinzky), Dorothea Gertrude and Paul Otto. More specifically, the demand in each of these eight instances was that "every right, title and interest of said enemy in and to the estate above created, including every power and authority thereover, should be transferred and delivered to the custodian" and that "any money or property now or hereafter held by you which the enemy may at any time or times, now or hereafter, be entitled to receive either upon or without demand, shall at such time or times" be transferred and delivered to the custodian. These demands were clearly authorized by the terms of the Act and of the Executive Orders thereunder. What was demanded was clearly expressed to be *every* right, title and interest of the enemy,—not only some of those rights or some of those interests but all of those rights and all of those interests. The definition given in section 1 (c) of the presidential order of February 26, 1918, is that the words "right, title, interest, estate, power and authority" shall be deemed to mean respectively "such right, title, interest, estate, power and authority of the enemy as may actually exist and also such as might or would exist if the existing state of war had not occurred and shall be deemed

to include respectively the right, title and interest, estate, power and authority in law or equity or otherwise of any representative or trustee for the enemy or other person claiming under or in the right of or for the benefit of the enemy." These demands included demands for all of the equitable rights, titles and interests which were vested in the eight beneficiaries named (the widow and seven children). They constituted a demand for all of the right of the widow to receive the income upon the 500 shares of Kekaha stock during the remainder of her life. They constituted a demand for all of the right of each of the seven enemy children to receive the income from their portions of the two-thirds of the property as well as from their portions of the one-third of the property after the widow's death. They included the right of the seven enemy children, which right had long prior to the demand become vested in them, definite, certain and undeniable rights, to receive at a designated time the principal of their portions of the two-thirds as well as the principal of their portions of the one-third,—the time as to their portions of the two-thirds being when they each respectively reached twenty-five or would have reached twenty-five if they had lived to that age, and as to their portions in the one-third, being the same periods, with the modification that the time must not in any event be prior to the death of the widow who was assured of the income for her life.

Having in mind the provision of section 1 (c) of the Executive Order of February 26, 1918, that the words "right, title," etc., "shall be deemed to include respectively the right, title, interest, estate, power and authority in law or equity or otherwise *of any representative of or trustee for the enemy*" and the provision of section 2 (a) of the same Executive Order that the custodian may make demand for the transfer and delivery of any

money or other property "owing or belonging to or held for, by, on account of, or on behalf of or for the benefit of an enemy," it may be that a correct construction of the law would justify and require ruling that the demands made by the custodian on the trustees with respect to the widow and the seven enemy children were demands for, and operated to pass to the custodian, not only the equitable interests of these eight beneficiaries but also the legal title of the trustees in and to the principal of the property of the estate in so far as it was owned by the eight beneficiaries. It is not necessary, however, to decide this point, for, by reason of other considerations, the same result is reached.

The Trading with the Enemy Act provided in section 7 (c) that "if the President shall so require, any money or other property owing or belonging to or held for, by, on account of, or on behalf of or for the benefit of an enemy or the ally of enemy not holding a license granted by the President hereunder, which the President after investigation shall determine is so owing or so belongs or is so held, shall be conveyed, transferred, assigned, delivered or paid over to the alien property custodian." In other words, Congress declared that the mere requirement or demand of the President, or the custodian under him, for property should operate as a transfer and delivery of that property to the custodian. The same provision was made, although in different words, in section 2 (c) of the Executive Order of February 27, 1918, when the President said that "when demand shall be made and notice thereof given * * * such demand and notice shall forthwith vest in the alien property custodian such right, title, interest and estate in and to and possession of the money or other property demanded and such power or authority thereover as may be included within the demand." That the statute and

the Executive Order mean exactly what they say in providing that demands duly served shall operate to "forthwith vest" in the custodian the titles or property demanded is well settled. See, for example, *Re Miller,* 288 Fed. 760; *Kohn* v. *Kohn,* 264 Fed. 253.

Notice of the eight demands was duly given to the demandees. The demands themselves were served upon them. The only question raised in argument in this respect is whether the service upon Schultze alone and not upon his associate trustee (Rodiek) was sufficient. The law says that it was. In addition to the requirement in the Act itself of reports of enemy-owned property from "any person in the United States who holds or has or shall hold or have custody or control of any property beneficial or otherwise, *alone or jointly with others,* of, for, or on behalf of an enemy" (section 7 (a), par. 3), and of the general authority to require the transfer and delivery of property "owing or belonging to or held for, by, on account of or on behalf of or for the benefit of an enemy" (section 7 (c)), it was expressly declared in the Executive Order of February 26, 1918, (section 2 (b)), that "notice of any demand made by the alien property custodian may be given to any person who, *alone or jointly with others,* may hold or have the custody or control of or may be exercising any right, power or authority in or over or may be performing any duty concerning the money or other property mentioned in the demand." The purpose of the Act and of the Executive Orders thereunder was to enable the executive department of the government to demand and seize, promptly, efficiently and effectually, all of the property of enemies, since such property or its proceeds might be used by the enemy owners to assist or render aid and encouragement to the nations at war with us. It was not the purpose nor the intention of Congress

to favor some enemy owners as against others or to leave loopholes of escape from seizure for some of the enemy-owned property. A practical, easily workable method of seizure was intended and was created. If one of two or more trustees could alone be easily found, service upon him was intended to be sufficient. There was no injustice or undue harshness in so providing. The second trustee in this case was beyond the Territory of Hawaii, paying no particular attention, so far as appears in the evidence, to the affairs of the estate of his testator. The one trustee within the jurisdiction had in his possession the certificates of stock, the indicia of ownership. The corporation itself was a Hawaiian corporation and its property was situated in Hawaii. It was natural and proper and within the terms of the Act and of the Executive Orders that notice should be given to the trustee in Hawaii and that the demands should be served upon him alone.

In our opinion, therefore, the eight demands, immediately upon the service thereof, vested in the custodian every right, title and interest of the widow and the seven children. Thereafter the widow had no right to the income of the one-third and none of the seven children had any right to either the income or the principal of the two-thirds or to the income (after the widow's death) or the principal of the one-third.

The determination by the custodian that the widow and the seven children were enemies within the meaning of the Trading with the Enemy Act is not disputable in this court or proceeding. We do not understand that it is in fact disputed by any of the parties in the case. Moreover, the undisputed evidence shows that they were in truth enemies within the meaning of that Act. They were all residing in Germany at the time of the determinations, demands and seizures. It is immaterial

whether they were American citizens or German citizens.
The Act defines for its purposes as an enemy *"any* indi-
vidual * * * *of any nationality* resident within the
territory * * * of any nation with which the United
States is at war." *United States* v. *Chemical Foundation,*
294 Fed. 300, 322; *Juragua Iron Co.* v. *United States,*
212 U. S. 297, 308.

Upon an appeal in an equity case, this court is not
limited to the question of law whether there is sufficient
evidence to support the findings of the trial court but
may weigh the evidence and make its own findings of
fact as well as rulings of law.    This is well settled.
See, for example, *Peacock* v. *Lovejoy,* 5 Haw. 231; *Vierra*
v. *Hackfeld,* 8 Haw. 436; *Sumner* v. *Jones,* 22 Haw. 391,
394; *Wilder* v. *Pinkham,* 23 Haw. 571; *McCandless* v.
*Castle,* 25 Haw. 22, 33.

A much controverted issue is whether it was the alien
property custodian or the present trustee who con-
ducted the sale at auction on January 17, 1919.    Upon
the evidence adduced we find that it was the alien prop-
erty custodian who sold all of the interests, which were
demanded and seized, of the widow and the seven enemy
children.    On April 4, 1918, after the informal sur-
renders but before the formal seizures the custodian
wrote to Mr. Trent as follows: "The present company"
(meaning Hackfeld & Company) "holds shares in various
subsidiary corporations.    Unless there is some reason
to the contrary I suggest that these shares be sold with
the other assets of the company, to the new corporation.
In some of these same subsidiary corporations however
I have taken shares belonging to individual enemy owners.
I suggest that these shares be sold, and that they may
be purchased either by the new corporation or by other
buyers, as may be most expedient in the interests of
the public of Hawaii."    When he wrote this he had

before him information to the effect that, in addition to other enemy property surrendered, Schultze, the trustee, had surrendered to the depositary in Honolulu as early as January, 1918, 840 shares of Kekaha Sugar Company stock which included the 670 shares now in controversy and that the certificates for the same had been re-issued in the name of his depositary in Honolulu. On September 25, 1918, the custodian in Washington received a table from the depositary in Honolulu showing that these 840 shares had been surrendered and seized. On November 15, 1918, Trent cabled to the custodian: "Referring to my letter of September twenty fifth with reference to enemy owned shares in certain Hawaiian corporations enumerated therein, have you formulated plans yet for the sale of these shares?" In a letter of November 25, 1918, the custodian discussed an offer transmitted to him from American Factors, Limited, for enemy-owned stocks and said "the alien property custodian will not be able to sell on the time which the American Factors asks, ninety days would be the limit; but there should be no difficulty in financing this purchase;" and on November 26, 1918, cabled to Trent as follows: "Without fixing any upset price you are authorized to sell at public auction on three weeks advertisements these entire enemy held stocks," adding certain other instructions relating to the sale. On the following day this was followed by a cablegram instructing Trent that, "the advertisements for sale of the enemy stockholders should state that all bids shall be subject to the approval of the alien property custodian who reserves the right to reject any and all bids" and also that "only citizens of the United States and American corporations can be purchasers." These cablegrams of November 26 and 27, 1918, were confirmed by a letter of November 27 in which the custodian said: "When

the offering at public auction takes place you will transmit the names of the highest bidders to this office, with the amount of their bids in order that the alien property custodian may make his decision; but it will have to be understood that he will take sufficient time to have the matter considered by the advisory committee of our sales organization and get its opinion as to whether the price offered should be accepted and the bidders are approved of. Of course, we would like to see the American Factors get this stock because it is a corporation of our creation but as the sale is at public auction anyone is at liberty to bid and the highest bidder will be considered, provided the character of the person or corporation is satisfactory to the alien property custodian." On December 19, 1918, the custodian cabled to Trent, "Proceed with advertisements and sale as per your letter December sixth and mail me copy advertisements." On January 2, 1918, the custodian, it is true, wrote to the Trent Company, "You of course appreciate the fact that we are not in a position to dictate as to how you invest the proceeds of the shares that are to be sold, which pertain to that estate, but we approve the investment of the same in liberty bonds if you so desire;" but of this letter it is to be noted, first, that it did not reach Trent until after the sale had taken place and, second, that nowhere in the letter does the custodian cancel the order of sale. The newspaper advertisement was forwarded to the custodian showing on its face that the sale purported to be held by order of the custodian. By letter of January 18, 1919, the Trent Company reported to the custodian the results of the auction sale of 2414 shares of Kekaha stock, which included the 670 shares now in dispute, and on February 22, 1919, about three weeks after the reports of the sale should have reached him in ordinary course and doubtless did reach

him, the custodian cabled to Trent, "Sale of stock made by you at public auction in Honolulu of the shares of enemy-owned stock in Kekaha Sugar Company * * * is approved."

We entertain no doubt that the custodian understood that he was conducting the sale on January 17, 1919, of these 670 shares of Kekaha stock and that he did actually sell that stock in so far as it lay in his power to do so.

If the legal title of the trustees to the stock was included in the demands and in the seizures made by him in the cases of the widow and of the seven children, the sale conducted by the custodian was a sale of all of the 170 shares belonging to Paul Otto and seven-ninths of the 500 shares (including the widow's life interest therein) together with the widow's interest in the remaining two-ninths of the 500 shares. Assuming, however, that the demands as made did not operate to transfer to the custodian the legal title of the trustees, still it follows that the seven children are not entitled to any relief as against the present trustee. The demands operated to transfer to the custodian the whole of the life interest of the widow in one-third. They operated to transfer to the custodian the whole of the equitable interest of each of the seven enemy children and that equitable interest, so demanded and seized, was the whole essence of the 170 shares known as the Paul Otto shares and of the seven-ninths of the 500 shares constituting the one-third which was subject to the widow's life income. After the seizure of the beneficial interests, the legal title of the trustees, both as to the 170 shares and as to the 500 shares, was practically a hollow shell. "In equity it is the cestui que trust, and not the trustee, who is to be regarded as the owner." *Meriwether* v. *United States*, 13 Ct. Cl. 259, 266; *Stoddart* v. *United*

*States,* 6 Ct. Cl. 340, 354. At most, the powers remaining in the trustee at the time of the sale (assuming still that their legal title was not seized) were the power to withhold delivery of possession of the principal until the dates named in the will and the power to change the form of the investment from time to time. Still upon this assumption, the sale which purported to be of the 670 shares themselves (meaning legal title plus equitable title) certainly operated in law as a sale of all of the right, title and interest which the custodian had and that included, as above noted, all of the equitable interests of the seven enemy children and of the widow. The purchasers at the sale acquired from the custodian all that the widow and the seven enemy children owned at the time of the service of the eight demands. The trustee would have been compellable, as to the seven ninths of the 500 shares, upon the death of Helen L. Isenberg, which took place prior to March 26, 1924 (the date of the filing herein of a formal suggestion of her death), and as to the 170 shares, when Paul Otto if he had lived would have reached the age of twenty-five, to wit, on November 10, 1920, to deliver possession of the principal of these shares to the purchasers at the sale. It was one of the rights of the seven enemy children to have demanded and to have received possession of the principal at the times specified. It was one of the rights of the purchasers acquired through the custodian at the auction sale to have demanded and received the possession of the same shares at the times specified. What the seven children could have done at the times named if they had not been enemies or if their property had not been seized the purchasers at the auction sale could lawfully do at the same times.

Under these circumstances a court of equity will not now require this trustee to repurchase and produce in

court 170 shares of Kekaha stock plus seven-ninths of 500 shares of Kekaha stock, every equitable right to which, including the right of possession, now belongs to the purchasers at the auction sale. If such an order of restoration and production in court were made, it would have to be followed up by another order that the trustee or the clerk of the court deliver the stock to the purchasers at the auction sale,—a vain performance in its essence. That which a court of equity would have compelled the trustee to do when Paul Otto would have reached twenty-five or when Helen L. died, a court of equity will not condemn it for doing without a compulsory order of the court. *Foscue* v. *Lyon,* 55 Ala. 440, 450; *Gray* v. *Lynch,* 8 Gill (Md.) 403, 426. A court of equity will not exact damages from a trustee for having done voluntarily what he would have been judicially compellable to do.

It is contended that the rights and interests of the seven enemy children were in "the estate of Otto Ernst Isenberg" and not in the 670 shares of Kekaha Sugar Company stock; that under the will it was within the power of the trustees to sell the stock and to change the form of the investment; that "the estate" is an expression having a well known legal meaning and that an "estate" constitutes a legal entity; and that the custodian in demanding every right, title and interest, etc., of the enemies did not demand or seize and consequently did not later sell at the auction the interests of the enemies in this particular stock. The "estate of Otto Ernst Isenberg," as we understand the law, is not a separate legal entity. When such an "estate" is referred to, what is meant is "the aggregate of property of all kinds which a person leaves to be divided at his death." Webster's Int. Dict., p. 751. In demanding the interests of the enemies "in and to the estate" of Otto Isenberg,

what the alien property custodian demanded and seized was the property which at the time constituted the estate. The Trading with the Enemy Act must be given a practical construction. The alien property custodian. had a right to seize the right, title and interest of enemies in the property of an estate, whatever the form of the property might be at the time. The mere fact that a trustee, if the Act had not been passed and if a seizure had not been made, would have had the power of sale and of reinvestment would not defeat the power of seizure lodged in the custodian. Assuming, however, that the "estate" is a separate legal entity and does not mean the particular property in which the capital is invested at the time of seizure but does mean such property subject to the trustee's right of sale and reinvestment, still the right, title and interest of each of the eight enemies in and to "the estate" of Otto Isenberg was exactly what the custodian, in those very words, demanded. And if he demanded it, he seized it. And if he seized it, nothing has happened since to revest it in any of the enemies. Either the custodian sold it to the purchasers at the sale or else he still has it. Whether he has it or the purchasers have it, is immaterial in so far as these present objectors are concerned. They have no right, title or interest left in them. There could be no order of delivery to or restoration for the benefit of any of the eight enemies because all of their right, title and interest passed by the seizure to the custodian. Since November 10, 1920, as to Paul Otto's 170 shares, and since the death of the widow, which was prior to March 26, 1924, the trustee has had no power to sell the stock or to change the form of the investment, for on those dates the duty to deliver the principal of the property accrued in favor of those who were then the assignees and rightful owners of the entire equitable interest of the enemies. There.

is no contention that after January 17, 1919, and until November 10, 1920, or the death of the widow, as the case may be, any sale of the stock was made or should necessarily have been made by the trustee or any change in the form of the investment. The whole insistence is that the Kekaha stock should now be held by it in kind.

So, also, it is contended that the equitable title of the enemy beneficiaries could not be seized or sold prior to final accounting by the trustee and distribution by the court in an appropriate proceeding in probate or equity. We do not understand such to be the law. The rights, title and interests of the enemies as created by the will of the testator became definitely vested in them at his death. No accounting or order of distribution was necessary in order to perfect that title. The fact that the trustee ordinarily would have a right to claim commissions for its services or that the enemy owners prior to seizure had the right to demand an accounting by the trustee in court does not militate against these views. The same right which the trustee had to ask for commissions against the enemies he now has against the custodian or the latter's assignees although he could not "sue the custodian for an accounting, without recognizing the title of the custodian" (*Kahn* v. *Garvan,* 263 Fed. 909); the same right which the enemies had to require an accounting from the trustee the custodian or his assignees now have as against the trustee. Neither the custodian nor his assignees are now asking for any relief against the trustee. Both are evidently satisfied with and approve the sale and the purchase at auction.

Nor is there any room for the theory that the trustee should be compelled to restore the stock or its value because it failed to proceed against the alien property custodian under section 9 of the Trading with the Enemy

Act in an effort to prevent the holding of the sale,—we are still referring to the seven-ninths of the stock. While section 9 prescribes certain methods in court and out of court for securing restoration of property improperly seized by the custodian, none of those remedies were available by the terms of the Act to persons who were in fact enemies. *United States* v. *Chemical Foundation*, 294 Fed. 300, 323; *Salamandra Ins. Co.* v. *Trust Co.*, 254 Fed. 852, 860; *Sigg-Fehr* v. *White*, 285 Fed. 949, 952; *Junkers* v. *Chemical Foundation*, 287 Fed. 597, 600. Any thought that if the effort had been made the custodian might have yielded to persuasion, restored the stock and abandoned the sale would be pure conjecture. The seven children and the widow were enemies within the meaning of the Act and no effort of the trustee could have lawfully resulted in a restoration of the interests of the eight beneficiaries to the trustee. The custodian would have had no authority and no justification in law for surrendering those interests under the circumstances as they existed. After the seizures were made it was the custodian's duty to hold the property or its proceeds on behalf of the United States government to be disposed of subsequently as Congress might direct. In proper cases the attorney general of the United States or a court of competent jurisdiction would have had authority to order a surrender of property seized; but the custodian had no such authority. It was the duty of the trustee as well as of all other persons to respect any seizures or other acts of the custodian lawfully done in cases of enemy-owned property in obedience to the law.

The same views apply in the matter of the 381 shares of Pioneer Mill Company stock known as the Paul Otto shares. All of Paul Otto's vested equitable interest, both in the income and in the principal of these shares, was seized and sold by the custodian and the purchasers

became entitled to receive the income from time to time as it accrued and the principal in November, 1920, and the proceeds were properly remitted to the custodian to be by him disposed of according to the provisions of the Trading with the Enemy Act.

No controversy is submitted to this court with reference to the 1353 shares of Pioneer Mill Company stock known as the widow's portion.

As to the interests of Hans and Carl the case stands differently. The custodian made no demand whatever for these interests and did not seize them. The custodian was not authorized to make a sale of these interests. The trustee failed to make any effort whatsoever to prevent the sale of the interests of Hans and Carl. It failed to proceed under section 9 of the Trading with the Enemy Act either in court or out of court to recover complete possession and control of these two interests. The trustee was not an enemy and Hans and Carl were not enemies. There was never any adjudication by the custodian that any of them was an enemy. While Hans and Carl did have the right to endeavor under section 9 to assert ownership of their interest and to prevent a sale thereof it was also the undoubted right of the trustee to make efforts of that nature. And it was clearly the duty of the trustee to make those efforts whether the beneficiaries did or did not make them. One of the primary duties of a trustee, doubtless, is to protect and preserve the property entrusted to it. But more than that, the Trent Trust Company, Limited, as trustee, we find from the evidence adduced, expressly consented to the sale of these two interests in the 500 shares, the consent being expressed by its cablegram to the custodian of December 14, 1918. The trustee conducted the sale of the 500 shares as agent of the custodian and in every way possible participated actively in promoting

and conducting the sale. It was in the position of seller and, by virtue of its powers under the will, the sale by it was effective to transfer to the purchasers the title to two-ninths of 314 shares. (For the distinction between 500 shares and 314 shares, see hereinafter.) In so far as loss may have resulted to Hans and Carl from the sale the trustee is liable and must respond in damages.

The fundamental cause of the failure of duty on the part of the trustee was the fact that at that time it was holding inconsistent and conflicting positions. It was depositary for the alien property custodian and it was trustee under the will and of the estate of Otto Ernst Isenberg. As depositary it was its duty to promote in every way the seizure and sale of all enemy-owned interests in the estate. As trustee it was its duty to preserve and protect from seizure and sale as many interests in the estate as were not properly the subject of seizure or sale. The dividing line at times between the two may have appeared confusing, particularly to one who was not an attorney. Courts cannot emphasize too strongly the duty of trustees to accept or hold no office or position imposing upon them interests or duties in conflict with their duties to the beneficiaries whom they represent as trustees or which will in any wise embarrass them in the performance of such duties as trustees. The Trent Company clearly should have refused to accept the one or the other of the two offices. If it chose to be a trustee, it should have resigned the office of depositary and that, too, irrespective of whether the custodian in Washington was willing that it should occupy both positions.

The evidence shows that advice of counsel was not sought by the Trent Trust Company, Limited, in the days when the transactions in question were being carried out, as to the legal effect of any of the steps that were being taken or proposed to be taken or as to its duty in the

premises. In this respect, also, it failed in its duty, in a matter of such importance. We believe from the evidence that Mr. Trent, the president and the controlling force in the Trent Trust Company, Limited, was moved during all of the period in question by great zeal in the enforcement of the Trading with the Enemy Act. We also believe that that zeal unconsciously overshadowed in him the requirements of his duty as trustee. We find no conspiracy or motive of wrongful gain on his part in his acts or omissions under review. Much has been charged against him during the course of the trial in the court below and in the arguments in this court in the way of conspiracy and ulterior designs. Very much as in the case of *United States* v. *The Chemical Foundation,* decided by the United States circuit court of appeals for the third circuit at the October term, 1924 (No. 3160), we read the record very differently from the way in which counsel for the objectors read it. The correspondence between the custodian and the depositary and what each of these officials did or omitted to do is not a subject of dispute. The controversy centers, as the court said in the case last cited, on the inferences properly to be drawn from the evidence otherwise undisputed. For instance the objectors claim that the idea and purpose to sell the Kekaha stock at auction originated with Mr. Trent. The record hereinabove recited indubitably shows quite the contrary. It was the custodian who first mentioned the subject of a sale, in his letter of April 4, 1918. "Unless there is some reason to the contrary, I suggest" said the custodian "that these shares be sold;" and when Mr. Trent cabled on November 16, 1918, "Have you formulated plans yet for the sale of these shares?" he was merely following the suggestion of the custodian and inquiring whether the latter had formulated plans for the carrying out of his own, the custodian's, suggestion. It

was not a novel thing for the custodian to sell enemy-owned property which he had seized. It was impracticable for him to hold in kind all seized property. It was unwise for him to act as an efficient and unpaid manager of the property of enemies on behalf of those enemies. It was unwise for him to obtain for those enemies in the case of some classes of property and certainly in the case of a sugar growing and manufacturing corporation high war prices and to reap for them large war profits from their property. There was no obligation, legal or moral, for our nation to make such profits on behalf of enemies. And there were many other considerations, which are well stated in the opinion of the circuit court of appeals for the third circuit in the case just referred to of *United States* v. *The Chemical Foundation* and in the opinion of the district judge in the same case (294 Fed. 300, 308, 311, 312), why property should not be held by the custodian in kind but should be sold. The Trading with the Enemy Act and the Executive Orders thereunder authorized him to sell seized enemy property and contemplated that at his discretion he would sell it. Another instance of an unfounded specification of a charge against Trent is that in reality, in furthering a sale of the Kekaha stock, the Lihue stock and the Pioneer Mill Company stock, he was acting in order to forward the interests of the American Factors, Limited. This latter corporation was designed and formed by the custodian and his advisers in Washington, with perhaps some assistance, which was asked for, from Trent and his associates in Honolulu. It is charged that Trent recommended the adoption of an offer made by American Factors, Limited, for the purchase of the whole or large blocks of these stocks upon terms highly advantageous to American Factors, whereas the fact is clearly shown by the evidence to have been that Trent cabled, in quotation marks, the offer of the

American Factors and then in the same cablegram recommended acceptance not of the offer as made but of the offer with modifications that were clearly against the interests of the American Factors and in the interests of small purchasers who might wish to buy at the sale.

No useful purpose can be served by protracting this already lengthy opinion by a detailed reference to the other charges of wrong motives made against Trent and his company by the objectors. Our finding on the subject is as above stated.

In our opinion, the correct measure of damages for the default of the trustee with reference to the two interests of Hans and Carl, being one-ninth each of 500 shares (or as much thereof as was principal), is the difference between the price realized at the sale and the full market value of the property at the time of the sale, with interest on that difference from the date of sale to the date of the decree. *Manville Co.* v. *Babcock,* 14 L. R. A., N. S., (R. I.) 900, 906; *Adair* v. *Brimmer,* 74 N. Y. 539, 550; *Peters* v. *Abbott,* 94 Conn. 363, 377; *Prondzinski* v. *Garbutt,* 10 N. D. 300, 308; *Dorsett* v. *Frith,* 25 Ga. 537, 541; *Cleghorn* v. *Love,* 24 Ga. 590, 604; *Austin* v. *Michiels,* 6 Haw. 611; *Silva* v. *Homen,* 9 Haw. 14, 17; *Est. of Cummins,* 16 Haw. 185.

There is no room for the application of the rule that the measure of damages is the difference between the price realized at the sale and the value of the property at the time of the decree. There was no duty on the part of the trustee to keep the Kekaha shares of stock in kind unsold until the time of the decree. On the contrary the express provision of the will of Otto Ernst Isenberg was that "my trustees shall have the power and authority from time to time and at all times in their discretion to sell and dispose of any or all of the trust property and convert the same into money and hold such money upon

the same trusts, and invest the same, with power to vary such investments." The language of the testator is unambiguous. The trustees could have lawfully sold the same stocks in January, 1919. It cannot be conjectured and the court cannot proceed now upon the theory that if these stocks had not been sold at the sale of January 17, 1919, they would not have been sold by the trustee in the exercise of a proper discretion a few days thereafter or at any time thereafter. While the courts of original jurisdiction in this Territory have in some instances permitted trustees to invest the capital of their trusts in sugar plantation stocks, it does not follow that it would be necessarily injudicious or improper for trustees to sell such stocks when held by them and vary the form of the investment. Investments of trust funds in such stocks are not ordinarily greatly favored by courts. They involve rather more of risk than do investments in bonds or in real estate mortgages. When safer investments can be found trustees are to be lauded rather than condemned for changing their investments from stocks to safer securities, even though the latter may bring a lower rate of income. Moreover, in the case of the Kekaha Sugar Company, Limited, there was at the time of this sale (January 17, 1919) much to justify the determination by a trustee to sell stocks of that corporation and to invest otherwise. The corporation was growing all of its cane on lands leased from the government of Hawaii under a lease which had commenced in 1890 and which was to terminate on June 1, 1920. An extension had been secured for the term of one year from June 1, 1920, to June 1, 1921. Under the laws of Hawaii as they then stood no other or further extension was possible to be secured. Under the law as it then stood, upon petition of a small number of citizens, the officials of the Territory were compellable to devote these lands to the purposes of

homesteading and such petitions had been filed and the machinery of the government had been set in motion towards a division of the lands and their transfer to homesteaders. "Homesteading was in the air," as one witness expressed it; and the general understanding of the community was that the lands would be homesteaded. It was not until some time after the sale had been made that steps were taken looking towards a possible amendment of the Organic Act so as to prevent the homesteading of the lands and to secure a renewal of the lease to the corporation; and it was not until some time after the sale had been had that the trustee or its officers, or any one else for that matter, had any thought or hope that the Organic Act would be so amended or that the lands would be secured to the further use of the plantation. It cannot be said under these circumstances that a trustee deciding to sell Kekaha stock in January, 1919, was not exercising good judgment or reasonable prudence.

Nor was there, as charged, a breach of duty in consenting to the sale upon the understanding that part of the payment of the purchase price could be made in liberty bonds which at that time had a market value of about five dollars below par. It was one proper method of encouraging prospective bidders and increasing the amounts of the bids.

We think, however, that there was poor judgment and neglect and breach of duty in not differentiating at the sale between the unseized stocks belonging to the two beneficiaries and the other stocks of the same corporation which were sold. It was unjustifiable to assent to an arrangement that the results of the various Kekaha stocks sold should be averaged amongst the owners and thereby run the chance of having the particular stocks under consideration contribute value or purchase price to other stocks not subject to the trust. It would seem that in all

probability if the particular unseized stocks under consideration had been sold separately they would have realized more than the average price of $158.30 which was allotted to them as the result of the sale of all of the Kekaha stocks. Some of the Kekaha stocks, to wit, 189 shares and being the last batch of stocks sold on that day, brought $193.50 per share. While it is impossible to say with absolute certainty what the shares constituting the two interests of one-ninth each would have brought if sold separately on that day or within a few days thereafter (there is room for the thought that a sale wholly detached from a sale of so many other shares on the same day would have been more profitable to the owners) the doubt must, we think, be resolved in favor of the beneficiaries. Our finding from the evidence is that if sold separately these shares would have commanded a price of $193.50 and that the trustee is chargeable with the proceeds of the sale at that price in place of $158.30. There is some evidence of experts tending, perhaps, to support a finding of a higher market value as of January 17, 1919, and there is also some other evidence in the case tending to support a finding of a somewhat lower market price. We think that the strongest evidence of what such stocks would have brought on that day is evidence of actual sales on that day. That the market value was not more than $193.50 is emphasized by the evidence before us that all of the sales made for some months following January 17, 1919, were at prices lower than $193.50.

Some minor questions remain to be considered.

Evidence was introduced before the master (to whom certain questions were referred by the trial court) and received by him and later stricken out, which is claimed to show that of the 170 shares of Kekaha Sugar Company stock referred to as the Paul Otto shares a part

only was principal and the remainder income. There is no contention but that whether principal or income it all belonged in equity to Paul Otto. Under the view which we take of the case on the main issues it is immaterial what part, if any, of the 170 shares was income and what part principal. The custodian effectually demanded and seized the whole beneficial interest in the 170 shares, both. in the principal and in the income. The whole equitable title therefore to both the income and the principal of these 170 shares became vested in the custodian and subsequently passed to his assignees.

Similar evidence was introduced before the master tending to show that a part only of the 500 shares of Kekaha Sugar Company stock known as the widow's shares was in reality principal and that the remainder was income belonging to Helen L. Isenberg. This evidence was at first admitted by the master and then stricken out but was reported by him to the court for such action as might seem appropriate. In the trial court a second effort to reintroduce the evidence failed. In our opinion the evidence should have been received and is now properly before us for consideration. The question to which the evidence refers is material because while the part, if any, of the 500 shares which was income was seized in the seizure of all of the widow's right, title and interest, nevertheless out of the part which was principal only seven ninths were seized and two ninths were not seized. The evidence on this point shows that in 1905 at the time of the distribution made by the parties with the sanction of the court 236 shares of Kekaha Sugar Company stock were set aside as capital the income from which was to go to the widow under the terms of the will and 68 shares were apportioned to Paul Otto. Subsequently, (a) through purchase (out of income belonging to the widow) of new stock issued by the Kekaha Sugar Company to

stockholders at par, and (b) as a result of stock dividends declared by the corporation, additional shares were acquired which brought the total in the possession of the trustees up to 500 shares.   (In the same way, Paul Otto's 68 shares were increased to 170 shares.)   The shares (out of the 500) purchased with moneys that were income were the sole and distinct property of the widow, demandable by her at any time.   As to the shares received as stock dividends, the law is well settled in this jurisdiction and needs no reconsideration.

In *Carter* v. *Crehore,* 12 Haw. 309, decided in 1900, "a testator bequeathed, as part of the residue of his estate, shares of stock in a corporation to trustees in trust to pay the income thereof to certain persons for life with remainder over.   The corporation afterwards issued a stock dividend of two shares of new stock for every three shares of old stock and appropriated as payment therefor at par an equal amount of its net earnings all of which had accumulated since the death of the testator.   The old stock before the issue of the new stock was at a premium of over $400 a share and after the new issue the stock was at a premium of over $200 a share."   It was held "that so much of the new stock held by the trustees as represented earnings, that is, up to the par value of the new stock, should go to the life tenants and that the balance representing the right to take the new stock at par or the depreciation in the value of the old stock should be held as part of the corpus of the trust."

In *Estate Thomas Cummins,* 16 Haw. 185 (1904), the court, following *Carter* v. *Crehore, supra,* ruled that "a stockholder's right to purchase at par new shares issued by a corporation is not 'income, profits or gain' of the shares held by him, but belongs to the principal as an incident of its ownership accruing to the remainderman

and not to the life tenant or beneficiary, the new shares being issued for payment of corporation debts."

In *Evans* v. *Garvie,* 23 Haw. 651 (1917), *Carter* v. *Crehore* was again followed with approval. The court, further developing the law, said: "Where shares in a corporation are left in trust for the benefit of remaindermen, the annual income therefrom being payable to another, an extraordinary stock dividend declared upon accumulated earnings of the corporation which accrued partly before and partly after the institution of the trust should be apportioned between the respective interests, so much of the dividend as represents earnings which accrued after the creation of the trust, less any premium on the shares in the market immediately after the declaration of the dividend, being distributable to the person entitled to receive the income, the remainder belonging to the corpus."

The undisputed evidence shows that, applying these well defined principles, of the 500 shares of Kekaha Sugar Company 314 shares were principal and 186 shares were income. The 186 shares therefore were seized and sold by the custodian as a part of the property of Helen L. Isenberg. The whole beneficial interest in seven-ninths of 314 shares was seized by the custodian from the seven enemy children and was sold by him and thereafter at the appropriate times the right to the possession of the principal of the same accrued in favor of the purchasers at the auction sale. Neither the legal nor the equitable title to two-ninths of the 314 shares was seized by the custodian, this latter portion being the equivalent of 69.77 shares in all or 34.88 shares for each of the two one-ninth interests.

The difference per share between the price of $158.30 realized at the auction sale (under the method pursued, of averaging the proceeds) and $193.50, the market value

at that time as found by us, is $35.20, or a total differ-
ence for the 69.77 shares of $2455.90. With this amount
the trustee should be surcharged, in favor of Hans and
Carl in equal portions.

We see no legal difficulty in regarding separately the
shares of Kekaha stock belonging to the two non-enemies
from those belonging to the seven enemies or in admeasur-
ing the damages suffered by the two non-enemies in
accordance with their proportion of the 314 shares. In
*Wirth* v. *Wirth,* 286 Fed. 289, 291, under somewhat simi-
lar circumstances, no difficulty was encountered by the
court.

The interest chargeable against the trustee on this sum
of $2455.90 should be, we find upon the evidence, at the
rate of six per cent per annum, this being the rate which
would have been reasonably available for the investment
of trust funds in such an amount as this.

The enemy status of Helen L. Isenberg was terminated
or removed on December 4, 1920, and notice thereof was
received in January, 1921, by the Trent Company as trus-
tee. The widow was entitled to receive from the trustee
(a) the income collected or reasonably collectible by the
trustee from the net proceeds of the auction sale of the
314 shares plus (b) interest at six per cent on the amount
of $35.20 per share on 314 shares (being the difference
between the price realized at the auction and the market
value at that time),—both classes of income dating from
the date of receipt of said notice by the trustee until the
date of the widow's death.

The court below allowed the master a fee of $7500 for
his services. The master's evidence shows that the hear-
ings before him aggregated thirty-four in number and
extended, approximately, over a period of two months,
the sessions ordinarily being of two or three hours' dura-
tion each and sometimes longer; and that in all the time

devoted by him to the case was the equivalent of "five or six months of solid work." During all of the time of these hearings and consideration of the case the master was the duly appointed and acting district attorney of the United States in the Territory of Hawaii and performed all of the duties of that office. His salary as district attorney was at the rate of $4500 per annum. His engagement with the United States, it should be added, left him at liberty to perform other duties as attorney or master not inconsistent with those of his office. Under all of the circumstances and without detracting in the least from the excellence of his services, it seems to us that a fee of $5000 is ample.

While it is true that the extent of the services required of the master was due in part to the error of the trial court in referring to the master the question, deemed by us immaterial, as to the value of Kekaha Sugar Company stock at the date of the decree or reference, nevertheless it is also true that the present litigation arose in large measure in consequence of the conflicting positions in which the trustee allowed itself to be placed and the other failures of duty above mentioned. The burden, therefore, of paying the master's fee and other costs in the case should be borne by the trustee and not by the innocent beneficiaries under the will. "A reasonable master's fee, the payment of which is made necessary by the default of the administrator, may properly be charged against the administrator as a part of the expenses of the litigation." *Re Est. of Alina,* 13 Haw. 388, 391. The case of a trustee is analogous to that of an administrator. The same view is applicable to the expenses incurred by the employment of a stenographer by the master, the transcript of the evidence before the master and the fees of the witnesses before the master. The cost bill of $1481 as decreed by the trial court is allowed.

As to commissions. The proceeds of the sale of (a) the 170 shares (Paul Otto's), (b) the 186 shares (the widow's), and (c) the seven-ninths of the 314 shares should not have been retained by the Trent Trust Company, Limited, as trustee but should have been delivered to the alien property custodian to be by him disposed of according to law,—because the sale of these three items of property was by the custodian and not by the trustee. In the eyes of the law the trustee as such did not receive these proceeds. The trustee, therefore, would not be entitled to commissions upon the proceeds of these three items. So, also, the trustee should not be allowed commissions upon the proceeds of the two-ninths of 314 shares, because of its breach of duty in connection with the sale of the property. It has often been held in this jurisdiction that "commissions are provided for the faithful and proper execution of trusts and where an administrator" (or trustee) "does not comply with the duties devolved upon him by his appointment, he is not entitled to commissions." See *Estate of Akana,* 11 Haw. 420, 422; *Estate of Lalakea,* 26 Haw. 243, 274; and *Trask Minors,* 27 Haw. 343, 361. The confusion in this case and the consequent controversies and litigation have been due to the failure of the trustee to observe its duty not to represent conflicting interests, its duty to consult counsel at critical stages of the transactions under review and its duty to sufficiently regard and protect the interests of the non-enemy beneficiaries. We think that, under all of the circumstances, the requirements of justice will be best subserved by a disallowance of all commissions.

The removal of the Trent Trust Company as trustee and the appointment of Mr. Charles S. Davis in its place is approved.

The decree appealed from is reversed and set aside. A

decree in conformity with these views will be entered in this court upon application.

E. M. Watson and A. G. M. Robertson (Watson & Lymer and Robertson & Castle on the briefs) for the trustee.

B. S. Ulrich (J. F. Neylan and J. L. Coke with him on the briefs) for the objectors.

### DISSENTING OPINION OF PETERS, C. J.

This is a suit in equity brought by the Trent Trust Company, Limited, to settle its accounts as trustee under the will and of the estate of Otto Ernst Isenberg, deceased. The issues involve the liability of the trustee to account for 670 shares of the capital stock of the Kekaha Sugar Company, Limited, an Hawaiian corporation, alleged to be the property of the trust estate and reported by the trustee to have been sold by the alien property custodian of the United States as property of enemy beneficiaries of the estate pursuant to the provisions of the Act of Congress of October 6, 1917, known as the Trading with the Enemy Act (40 Stat. L., c. 106, p. 411, as amended) and to the Executive Orders of the President of the United States supplementary thereto. The trial court found that the stock was a part of the trust estate; that at the time of the accounting it should have been in the possession of the trustee; that it had been lost to the estate through the negligence of the trustee in failing to reduce it to possession and the trustee was obligated to restore to the estate 670 shares of the capital stock of the Kekaha Sugar Company or in default thereof pay to the estate the value thereof at the time of trial together with dividends which had accrued on said stock with interest and referred the case to a master. The report of the master indicates the subjects of reference. On March 12, 1924, the master reported to the court the value per share

of the capital stock of the Kekaha Sugar Company, Limited, at the time of reference; the dividends that would have accrued and become payable on 670 shares of said stock upon and from December 3, 1918, to and including the 1st day of August, 1923, together with interest on said dividends from the respective dates on which they would have become due and payable, that is to say: Upon all cash dividends accrued upon 500 shares between December 3, 1918, and February 1, 1921, the master charged the trustee with interest from the respective dates upon which they became due and payable until February 1, 1921, at the rate of four per cent per annum and thereafter until August 31, 1923, at eight per cent per annum; upon all cash dividends that accrued upon 500 shares between February 1, 1921, and August 1, 1921, the master charged the trustee with interest from the date they were respectively due and payable until August 31, 1923, at the rate of eight per cent per annum; upon all cash dividends that accrued upon the 170 shares of Kekaha stock between December 3, 1918, and August 1, 1920, the master charged the trustee with interest from the date they respectively became due and payable to August 31, 1923, at the rate of eight per cent per annum; upon all cash dividends that accrued upon the said 170 shares between August 1, 1921, and August 1, 1923, the master charged the trustee with interest at the rate of six per cent per annum from the date that they respectively became due and payable to August 31, 1923 (August 31, 1923, having been adopted by the master for convenience in computation and upon the theory that interest would be computed by the court from that date to the date of its decree); that the value of the estate as it would have been at the time of reference had it contained 670 shares of the capital stock of the Kekaha Sugar Company, Limited, together with the dividends and interest which

the trustee should have then possessed (not including disbursements) was $455,029.24; that the value of the estate as it was on August 24, 1923 (including disbursements), was $127,532.85, disclosing a difference in value of $327,496.39, which, less income disbursements properly allowable to the trustee of $44,799.10, resulted in the sum of $282,697.29 as the difference in value of the estate as it was on August 24, 1923, and as it would have been if properly administered. The master in his report also recommended that the trustee be surcharged in the sum of $4,626.11 commissions actually received and that all trustees' commissions be disallowed, and reported the expenses of the reference, made up of the charge of the official reporter for attendance and preparation of a transcript of the evidence and mileage and witness fees of a witness called by the master. Upon return to the court the report of the master was, over the objections of the trustee, approved and his recommendations adopted, and on the 7th day of April, 1924, a decree entered accordingly. By the decree it was ordered that the Trent Trust Company, Limited, be and it was thereby removed as trustee and Charles S. Davis, Esq., appointed in its place and stead, and that the Trent Trust Company, Limited, forthwith restore and transfer to the estate and to its successor trustee 670 shares of the capital stock of the Kekaha Sugar Company, Limited, and in addition thereto forthwith pay into the estate the sum of $32,723.40 with interest at the rate of six per cent per annum from August 31, 1923, or, failing to forthwith transfer to said estate said 670 shares of the capital stock of the Kekaha Sugar Company, Limited, together with interest as stated, that it pay to said estate and transfer over and unto its successor trustee the sum of $287,323.40 together with interest at the rate of six per cent per annum from August 31, 1923; that it pay to the master for his serv-

ices rendered as such the sum of $7,500 and the costs reported in the sum of $1,414; that it be surcharged with all commissions claimed or charged by it as trustee and that it pay the costs of the proceeding taxed in the sum of $1,481. From this decree the trustee appealed to this court.

The trust of which the appellant was trustee was created by the will of Otto Ernst Isenberg which was admitted to probate by a judge of the circuit court of the first circuit of the Territory of Hawaii on December 29, 1902. The testator appointed William Pfotenhauer and Hermann Schultze executors and trustees of his will. The trustees were directed to set aside after the payment of debts and funeral expenses one-third of the remainder of the estate for the use and benefit of the wife of the testator and annually or oftener to pay the rent, issues and profits thereof to her for life. The trustees were further directed to divide the remaining two-thirds of the residue of the estate into as many equal portions as there should be children of the testator then living and pay over one such portion or the proceeds thereof to each of said children who should have then arrived at the age of twenty-five years and hold one of such portions for each of the remaining children respectively and annually or oftener pay the net income, issues or profits thereof to the children for whom the same were so held and as such remaining children should successively arrive at the age of twenty-five years pay to him or her the portion so held for him or her respectively (or so much thereof as should remain) together with the unapplied income thereof. The trustees were also directed upon the death of the wife to divide the principal of the one-third of the trust property set apart for her, or so much thereof as should then remain, together with the unapplied income thereof and hold the same upon the same trusts as

directed to be done with the other two-thirds of the trust property, provided that no child should receive his or her portion of the principal trust property until arriving at the age of twenty-five years. The trustees were given full power to sell any or all of the trust property and to invest the proceeds. The testator was survived by his wife and nine children, five of whom, including the son Paul Otto, were minors. On January 26, 1903, William Pfotenhauer and Hermann Schultze, the same men who were appointed executors and trustees by the will, were by a judge of the circuit court of the first circuit sitting in probate appointed the guardians of the respective persons and estates of the said minors. On September 18, 1905, the administration upon the estate of Otto Ernst Isenberg was closed, the executors discharged and the remainder of the estate ordered delivered to the trustees named in the will. This was done. The receipt of the trustees is dated January 1, 1906. On September 20, 1905, upon petition by the trustees made in that behalf the circuit court of the first circuit in equity by its decree of even date approved the apportionment by the trustees of the trust estate of said decedent in accordance with the terms of the trust. On April 25, 1913, George Rodiek, Esq., was appointed in place of William Pfotenhauer, deceased. On October 6, 1917, the date of the approval of the Act of Congress known as the Trading with the Enemy Act, the widow and children of the testator, with the exception of two sons Hans and Carl Isenberg, were residents of Germany. The two sons excepted were at that time adult American citizens residing in the United States. On January 31, 1918, all the property of the trust estate including certificates Nos. 36, 153 and 284 for 236, 31 and 233 shares respectively of the capital stock of the Kekaha Sugar Company, totaling 500 shares, theretofore held by the trustees as a part of the one-third

of the remainder of the estate of Otto Ernst Isenberg for the use and benefit of the wife of the testator, and certificates Nos. 42, 80 and 288 for 68, 22 and 80 shares respectively of the capital stock of the Kekaha Sugar Company, totaling 170 shares, theretofore included in that portion set apart by the trustees to be paid to Paul Otto Isenberg when he should arrive at the age of twenty-five years was delivered to the Trent Trust Company, Limited, appellant herein, then the depositary in Hawaii of the alien property custodian. All of said certificates of stock when so delivered were in the names of "William Pfotenhauer and Hermann Schultze, Trustees under the Will and of the Estate of Otto Ernst Isenberg, Deceased." The evidence nowhere discloses that said certificates were indorsed prior to delivery. On February 8, 1918, H. Hackfeld & Company, Limited, agent of Kekaha Sugar Company, and the Kekaha Sugar Company, pursuant to the requirements of section 7 of the Trading with the Enemy Act, made reports to the Trent Trust Company, Limited, as depositary of the custodian touching the estate of Otto Ernst Isenberg. On March 9, 1918, Hermann Schultze, as one of the trustees of the estate of Otto Ernst Isenberg, pursuant to the provisions of section 7 of the Trading with the Enemy Act, made the reports referred to in the majority opinion. Hans and Carl Isenberg were not referred to therein. Mr. Schultze at the same time also made the report to the custodian as guardian of the estate of Paul Otto Isenberg referred to in the majority opinion. Mr. Schultze included the 170 shares of the capital stock of the Kekaha Sugar Company in his report as trustee as well as in his report as surviving guardian. No reports were made by any one declaring Hans and Carl Isenberg to be enemies and nowhere in the history of the case does it appear that they were other than loyal citizens of the United States and residents thereof. On

March 11, 1918, the Trent Trust Company, Limited, as depositary in Hawaii of the alien property custodian, surrendered to the Kekaha Sugar Company the certificates of stock in said company theretofore delivered to it by Hermann Schultze and caused the company to issue to it in its name as such depositary in lieu of said pre-existing certificates two certificates, namely, Nos. 434 and 435 for 170 and 500 shares respectively. It does not appear from the record that the Trent Trust Company, Limited, as such depositary was previously or at all authorized by the alien property custodian to make such transfer. In June, 1918, the alien property custodian made the demands which are set forth in detail in the majority opinion. All of those demands in respect to the estate of Otto Ernst Isenberg, deceased, were addressed to Hermann Schultze as trustee of the estate of Otto Isenberg although Mr. Schultze in both his informal and formal reports to the alien property custodian notified the latter that George Rodiek was one of the trustees of the estate and gave his business address in San Francisco. On July 2, 1918, Hermann Schultze as the surviving guardian of Paul Otto Isenberg petitioned the court for the allowance of his final accounts and discharge as guardian, assigning as reasons therefor that Paul Otto Isenberg was an alien enemy within the meaning of the Trading with the Enemy Act; that all the property of the ward had on January 31, 1918, been turned over to the alien property custodian; that petitioner was a citizen of Germany. No citation was issued nor did Paul Otto Isenberg appear in person upon the hearing of the petition. On August 23, 1918, the petition was granted and the accounts of the guardian approved and the guardian discharged. Paul Otto Isenberg at the time of the filing of the petition had attained his majority. On July 2, 1918, Hermann Schultze and George Rodiek as trustees under the will

and of the estate of Otto Ernst Isenberg, deceased, petitioned the court that their accounts with said petition filed be settled and allowed and that they be discharged as trustees, reciting as grounds therefor that George Rodiek was absent from the Territory and residing in the State of California; that of the two-thirds of the estate set aside for the children of the testator all had been distributed to them except the respective portions deliverable to Dorothea and Paul Otto Isenberg, and that Helen L. Isenberg, the widow, Dorothea and Paul Otto Isenberg, being enemies, the property held by the trustees was on January 31, 1918, turned over to the "Alien Property Custodian, Trent Trust Company, Limited." None of the beneficiaries of the trust estate were cited to appear or appeared upon the hearing either in person or by attorney. Upon hearing had the court on August 23, 1918, approved the accounts and discharged the trustee. The trustees of the estate of Otto Ernst Isenberg, deceased, and the guardians and surviving guardian of the estate of Paul Otto Isenberg had previously filed annual accounts but the respective hearings had thereon were without notice to any of the parties in interest nor did they appear therein personally or by counsel. On October 31, 1918, the Trent Trust Company, Limited, upon its *ex parte* petition in that behalf and without notice to the widow or any of the children of the decedent was appointed trustee under the will and of the estate of Otto Ernst Isenberg, deceased, the order to take effect upon its giving a bond in the sum of $120,000. A bond pursuant to the order was filed on November 8, 1918. On August 30, 1918, the alien property custodian forwarded through the Trent Trust Company, Limited, a formal acquittance to Hermann Schultze in which the alien property custodian acknowledged "the payment, conveyance, transfer, assignment and delivery to him of the 500 shares of Kekaha

Sugar Company, Limited." On November 11, 1918, Paul Otto Isenberg died intestate, unmarried and without leaving issue and such proceedings were thereafter had in the circuit court of the first circuit in respect to the estate of said deceased intestate that on, to wit, the 14th day of August, 1922, the Henry Waterhouse Trust Company, Limited, an Hawaiian corporation, was appointed administrator and qualified as such on August 31, 1922. The administrator entered its appearance herein. On January 17, 1919, the alien property custodian through his special representative, Richard Trent, the then president of the Trent Trust Company, Limited, sold at public auction the 670 shares of the capital stock of the Kekaha Sugar Company represented by certificates Nos. 435 and 434 for 500 shares and 170 shares respectively.

The accounts of the trustee which precipitated the controversy were filed October 26, 1921. These were the only accounts filed by it. They cover the period from the date of its appointment to and including August 19, 1921. The receipts and disbursements are segregated according to beneficiary—those pertaining to Helen L. Isenberg being contained in Exhibit A and those pertaining to Paul Otto Isenberg being contained in Exhibit B. The items are also segregated accordingly as they reflect the receipt or disbursement of principal or income. In Exhibit A, Schedule A (Helen L. Isenberg "Receipts," "Principal Account"), the trustee charged itself with the receipt from the alien property custodian of cash and securities in the sum of $120,121.32, stated therein to be the "proceeds of sale by Alien Property Custodian of 500 shares Kekaha Sugar Company stock and 1353 shares Pioneer Mill Company stock." By Exhibit A, Schedule C (Helen L. Isenberg "Disbursements" "Principal Account"), it appears that these proceeds of the sale of Kekaha and Pioneer stock were retained by the trustee and never

transferred to the alien property custodian but reinvested by the former and constituted a part of the trust estate of Otto Ernst Isenberg, deceased. By Exhibit B, Schedule A (Paul Otto Isenberg "Receipts" "Principal Account"), the trustee charged itself with the receipt of cash and securities in the sum of $38,445.58, stated therein to be the "proceeds of sale by Alien Property Custodian of 170 shares Kekaha Sugar Company stock and 381 shares Pioneer Mill Company stock." By Exhibit B, Schedule C, it appears that part of the cash received from the sale of the Kekaha and Pioneer stock was invested in Victory Loan Bonds and in Exhibit B, Schedule F (Paul Otto Isenberg "Recapitulation"), appears the note "All property of Paul Otto Isenberg turned over to the Alien Property Custodian as per receipt filed with voucher." In Exhibit B, Schedule D (Paul Otto Isenberg "Income Disbursements"), appears the item "1921, Feb. 24 Paid Alien Property Custodian being balance of accumulated income as of Feb. 24, 1921, $11,061.55." To these accounts the widow and the surviving children of the testator, including Hans and Carl Isenberg and Carl Laschinzky, husband and sole heir at law and devisee of the deceased daughter Berlita Isenberg Laschinzky, filed objections. The objectors at first claimed that there were 840 shares of Kekaha stock involved including 170 shares alleged by them to be held by the trustee for the benefit of Dorothea Isenberg von Koenigsmarck, who prior to demand had arrived at the age of twenty-five years. The objections in respect to these latter shares, however, were specifically withdrawn. The trustee filed a reply to the objections. Repetition of the allegations thereof is unnecessary. It is worthy of note, however, that the trustee herein denied that it knew of the status of Hans and Carl Isenberg as friends of the United States. Both parties by the pleadings filed and evidence adduced dur-

ing the progress of the trial treated the 670 shares of the capital stock of the Kekaha Sugar Company involved in this controversy as corpus of the trust estate of Otto Ernst Isenberg, deceased. It was only upon the hearing before the master that any question was raised as to whether the stock was in part income. By the answer of the trustee to the objections of the respondents it was alleged upon oath of its president that the 840 shares of the capital stock of the Kekaha Sugar Company, the subject of the answer, which included the 670 shares in dispute, were corpus of the trust estate. During the progress of the trial the parties so treated it. Likewise the court in its decision. Upon the hearing before the master, however, evidence was adduced showing a different situation, and although subsequently stricken by the master his ruling was made the subject of objections by the trustee to the adoption of the master's report. The court sustained the master and refused to consider the evidence. Refusal of the trial court to consider this evidence was assigned by the appellant as error. Considering this evidence in for the purposes of this appeal it would appear that of the one-third of the estate of Otto Ernst Isenberg apportioned and set aside by the trustees for the use and benefit of the widow Helen L. Isenberg there were originally but 236 shares of the capital stock of the Kekaha Sugar Company, and of the portion set aside by the trustees to be paid over to Paul Otto Isenberg when he should arrive at the age of twenty-five years there were originally but 68 shares of said stock; that on September 18, 1907, the capital stock of the Kekaha Sugar Company was increased from 600,000 to 800,000 shares by the issuance of 2000 shares of the par value of $100 each and offered to the stockholders at par (the stockholders of record were entitled thereby to purchase at par value one share for every three shares held); that

on December 3, 1907, the trustees availed themselves of the privilege and purchased on account of Helen L. Isenberg 78 shares and on account of Paul Otto Isenberg 22 shares (these purchases were effected by the trustees' borrowing the necessary funds from H. Hackfeld & Company, deducting the cost thereof from the respective incomes subsequently accruing to Helen L. Isenberg and Paul Otto Isenberg); that in 1909 the trustees sold 47 of the shares purchased for Mrs. Isenberg; that on October 14, 1912, the capital stock of the Kekaha Sugar Company was increased from 800,000 to 1,500,000 shares by the issuance of 7000 paid-up shares of the capital stock of the company to the stockholders of record as of that date (this entitled each stockholder to seven shares for every eight shares owned by him); that of the income represented by this stock dividend $15,347.55 had been earned by the corporation prior to the inception of the trust created by the will of Otto Ernst Isenberg; that rights to the stock dividend sold at a premium of $57.50; that after the issuance of this stock dividend the trustees bought on account of Paul Otto Isenberg 1.25 shares. Fractional shares were disposed of. It does not appear that the investments made by the trustees of income in stock of the Kekaha Sugar Company on behalf of Helen L. Isenberg were made at her request or subsequently ratified by her. Nor does it appear that any accounting was ever had between the trustees on the one hand and the guardian of the estate of Paul Otto Isenberg on the other in respect to the purchases of Kekaha stock made by the trustees on account of Paul Otto Isenberg or that any accounting has ever been had between the guardian and ward or his legal representatives as to the investment of income payable to the ward in shares of the capital stock of the Kekaha Sugar Company.

The trustee contends that by and upon the voluntary

surrender of Hermann Schultze, one of the trustees under the will and of the. estate of Otto Ernst Isenberg, deceased, to the Trent Trust Company, Limited, as depositary of the alien property custodian, and by the subsequent demands of the alien property custodian upon said Schultze as one of such trustees, and by the demand of the alien property custodian upon said Schultze as the surviving guardian of the estate of Paul Otto Isenberg, legal title to the 670 shares of the capital stock of the Kekaha Sugar Company was transferred and vested in the alien property custodian and that he was authorized to sell the same; but if the legal title to the 670 shares of the capital stock of the Kekaha Sugar Company were not transferred to nor vested in the alien property custodian by reason of such voluntary surrender by said Schultze as such trustee and/or by such subsequent demands of the alien property custodian and the alien property custodian was without authority to sell the same such sale should be considered as having been made by the Trent Trust Company, Limited, as trustee under the will and of the estate of Otto Ernst Isenberg, deceased, pursuant to the express authority to sell conferred upon it by the terms of the will of the testator, the sale having been made with the express prior consent and subsequent ratification of said trustee. If the trustees, the predecessors of the Trent Trust Company, Limited, had been divested of the legal title to the stock in dispute and the legal title to the same legally transferred to the alien property custodian pursuant to the provisions of the Trading with the Enemy Act so that at the time of the appointment of the Trent Trust Company, Limited, as trustee, the legal title thereto did not vest in it as such trustee, nor by appropriate proceedings against the alien property custodian or otherwise could said stock have been reduced to possession by the trustee and the legal title thereto vested in

it and the sale of said stock was in all respects a legal sale then the trustee is not liable to account for said stock. If, however, the legal title to the stock in dispute was never divested from the trustees, the predecessors of the Trent Trust Company, Limited, nor legally transferred to the alien property custodian, but on the contrary vested in the Trent Trust Company, Limited, as trustee, upon its appointment as such, and the Trent Trust Company, Limited, as such trustee, negligently failed to reduce said stock to possession, by reason of which the same became lost to the estate of Otto Ernst Isenberg, then the Trent Trust Company, Limited, is liable for its failure to account for said stock unless the sale of the stock by the alien property custodian as contended by the Trent Trust Company, Limited, may be considered as having been made by it pursuant to the power of sale conferred upon it by the terms of the trust.

The primary question, then, is whether by the voluntary delivery by Hermann Schultze, one of the trustees who were the predecessors in trust of the Trent Trust Company, Limited, to the depositary in Hawaii of the alien property custodian of the property comprising the trust estate of Otto Ernst Isenberg, deceased, including the 670 shares of the capital stock of the Kekaha Sugar Company, Limited, in dispute or by the demands of the alien property custodian upon the Kekaha Sugar Company, Limited, and upon Hermann Schultze as trustee of the estate of Otto Ernst Isenberg, and upon Hermann Schultze as guardian of the estate of Paul Otto Isenberg, or any of said demands, the then trustees Hermann Schultze and George Rodiek were divested of the legal title to said stock and the same transferred to the alien property custodian.

The alien property custodian undoubtedly was authorized under the provisions of the Trading with the Enemy

Act to sell shares of the capital stock of private corpora-
tions owned by enemies, possession of which had been
legally transferred to him by voluntary delivery in con-
formity with law and the Executive Orders of the Presi-
dent or by legal demand made by the alien property custo-
dian. But in this case neither by the voluntary delivery
of the trustees to the depositary in Hawaii of the alien
property custodian nor by the several demands made by
the alien property custodian was legal title to the 670
shares of the capital stock of the Kekaha Sugar Company
which are in dispute legally transferred to the alien
property custodian.

Under section 7 (d) of the Trading with the Enemy Act
any person not an enemy or ally of an enemy who held
any property for the benefit of an enemy not holding a
license granted by the President, although not required so
to do by the provisions of section 7 (c) of the Act, was
authorized with the consent of the President of the
United States to voluntarily transfer such property to the
alien property custodian under such rules and regulations
as the President might prescribe. On October 12, 1917,
an Executive Order of that date prescribed the conditions
under which such transfer might be voluntarily made.
The rule which applies is Rule XXX and this rule was in
effect on January 31, 1918, when the transfer of the stock
was made by the trustee to the depositary. The rights
of parties affected by demands are determined by the
law and executive orders existing at the time of the
service of demands. (*Application of Miller*, 288 Fed.
760, 767.) Equally so voluntary surrender could only be
made in accordance with the law and executive orders
existing at the time of such surrender. Rule XXX of the
Executive Order of October 12, 1917, provides that any
person desiring to make such a transfer to the alien prop-
erty custodian under section 7(d) of the Trading with the

Enemy Act of property held for an enemy not having a license, etc., should file application with the alien property custodian for consent and a permit so to do and by said Rule was conferred upon the alien property custodian the authority to exercise the power and authority conferred upon the President by the provisions of section 7(d) of the Trading with the Enemy Act including consent to issue a permit upon such terms and conditions as were not inconsistent with law or to withhold or refuse the same. It does not appear that any application was ever made by the trustees or anyone else to the alien property custodian for consent and a permit to the transfer by the trustee to the depositary or that the alien property custodian ever issued a permit so to do. The burden to prove these facts rested upon the appellant. And in view of the subsequent demands made by the alien property custodian it is apparent that neither was any application ever made to the alien property custodian to voluntarily transfer this stock to him or to the depositary nor did the custodian ever consider the delivery of the stock to the depositary to be a valid transfer under the Act or the Executive Order of the President made subsequently thereto.

Nor did the legal title to the stock in question vest in the alien property custodian by virtue of the demands made by him. The legal status of the 670 shares of the Kekaha Sugar Company held by the trustees of the estate of Otto Ernst Isenberg assumes importance. Of the 500 shares held by the trustees for the benefit of Helen L. Isenberg 314 shares were corpus and 186 shares were income. This income stock was made up partly of stock dividends distributable to the equitable life tenant under the decisions of this court in the cases of *Carter* v. *Crehore,* 12 Haw. 309, and *Evans* v. *Garvie,* 23 Haw. 651, and partly by purchases made by the trustees from income

and stock dividends thereon. Of the 170 shares held by the trustees for the benefit of Paul Otto Isenberg 90 shares were corpus and 80 shares were income. This income stock was made up in part of stock dividends distributable to the beneficiary as income under the *Carter* and *Evans* decisions, *supra,* and in part from stock purchased by the trustees from income distributable to the guardian of Paul Otto Isenberg and the stock dividends thereon. The legal title to this 670 shares of Kekaha stock at the time of the demands is of equal importance. At the time of the voluntary surrender by Schultze the 500 shares were represented by certificates Nos. 36, 153 and 284 in the names of William Pfotenhauer and Hermann Schultze as trustees under the will and of the estate of Otto Ernst Isenberg, deceased. At the time of the voluntary surrender by Schultze the 170 shares were represented by certificates Nos. 42, 80 and 288 in the names of William Pfotenhauer and Hermann Schultze trustees under the will and of the estate of Otto Ernst Isenberg, deceased. There is no showing that at the time of the surrender of the 670 shares by Schultze the certificates representing the same were indorsed as required by R. L. 1925, s. 3346. That section provides: "Whenever the capital stock of any corporation is divided into shares, and the certificates thereof are issued, transfer of the shares may be made by indorsement and delivery of the certificate. The indorsee shall be entitled to a new certificate upon surrendering the old one. And no transfer shall be valid, except between the parties thereto, until such new certificate shall have been obtained, or the transfer shall have been recorded on the books of the corporation, so as to show the date of the transfer, the parties thereto, their places of abode, and the number and description of the shares transferred." If the appellant relied upon the indorsement of these certificates by the

trustees in conformity with the provisions of the statute it was incumbent upon it to show it. It is not a subject of inference. In the absence of such a showing the presumption is to the contrary. The statute requirement must be complied with. (14 C. J., title "Corporations," 1049; *Tafft* v. *Presidio, etc., Ry. Co.,* 84 Cal. 131.) Without a legal indorsement or legal surrender of this stock the Kekaha Sugar Company was without authority to issue a new certificate or certificates therefor. At the time of the alleged demands by the alien property custodian the legal title to all of the stock was in Hermann Schultze and George Rodiek as trustees and in the absence of demands, the legal effect of which was to transfer such stock to the alien property custodian pending the appointment of the Trent Trust Company, Limited, the legal title thereto vested in it as successor in trust of Schultze and Rodiek. Under the terms of the will of Otto Ernst Isenberg, deceased, his widow and enemy children had the following interests in the trust corpus of the trust created thereby: Helen L. Isenberg had an equitable life estate in one-third of the corpus set aside for her benefit. The enemy children of Otto Ernst Isenberg, including Paul Otto, were joint remaindermen in the trust corpus set aside for the widow. Paul Otto Isenberg had the present right to the income from 2/27 of the trust estate set aside for his benefit until he should arrive at the age of twenty-five years. He also had a remainder interest in the 2/27 of the estate set aside for his benefit, possession of which was deferred until he should arrive at the age of twenty-five years. Helen L. Isenberg was also the equitable owner of such of the stock dividends issued by the Kekaha Sugar Company as were distributable to her as income. She also had the right to approve the investment in Kekaha stock by the trustees of income distributable to her as equitable

life tenant and demand from them the delivery to her of said stock. Paul Otto Isenberg was the equitable owner of such of the stock dividends issued by the Kekaha Sugar Company as were distributable to him as income. He also after attaining majority was entitled to approve the investment by the trustees in Kekaha stock of income payable to the guardian while a minor and demand delivery of the same to him.

Bearing in mind the legal status of the 670 shares of Kekaha stock in dispute, the legal title thereto at the time of the demands and the several interests of the enemy beneficiaries in the estate let us pause for the moment to again consider the demands that were actually made. The demands made in connection with the interests of Helen L. Isenberg and Paul Otto Isenberg were four: (a) Upon the Kekaha Sugar Company for all the right, title and interest of the Otto Isenberg Estate in and to 840 shares of the Kekaha Sugar Company; (b) upon Hermann Schultze, trustee of the estate of Otto Ernst Isenberg, for all the right, title and interest of Helen L. Isenberg in and to said estate; (c) upon Hermann Schultze, trustee of the estate of Otto Ernst Isenberg, for all the right, title and interest of Paul Otto Isenberg in and to said estate; (d) upon Hermann Schultze, guardian of Paul Otto Isenberg.

The demands affecting the surviving enemy children other than Paul Otto were in each instance directed to Hermann Schultze as trustee of the estate of Otto Isenberg for all the right, title and interest of the respective children in and to said estate. What was the legal effect of the demands so made? Seizure by demand and notice is analogous to garnishment and attachment. "The analogies of attachment and garnishment are directly in point." *Kohn* v. *Jacob & Josef Kohn*, 264 Fed. 253, 255. "The analogy of garnishment is directly in point." *Miller*

v. *Rouse,* 276 Fed. 715, 717. "They" (demands) "attach" the property to make sure that it is forthcoming, if finally condemned, and do no more." *Miller* v. *Kaliwerke A. A. G.,* 283 Fed. 746, 751. "It" (suit) "is analogous to the vacation of an attachment levied upon the goods of a third person. * * * To pursue the analogy of attachment, it would be as if the creditor," etc. *Simon* v. *Miller,* 298 Fed. 520, 524, 525. Sequestration and seizure is effected by demand. (*In re Miller-Schaefer,* 281 Fed. 764; *Kohn* v. *Kohn,* 264 Fed. 253.) Under section 7(c) of the Trading with the Enemy Act and Rules 2(a) and 2(c) of the Excutive Order of the President of February 26, 1918, the demand of the alien property custodian coupled with notice of the claim to the person to whom it is directed effects the seizure of and the transfer to the alien property custodian of the property demanded. (*Kohn* v. *Kohn,* 264 Fed. 253, 255; *Miller* v. *Rouse,* 276 Fed. 715, 716, 717.) The Act is directed to the sequestration and seizure of property of enemies defined as such in the Trading with the Enemy Act. (*Stoehr* v. *Wallace,* 255 U. S. 239, 243; *Commercial Trust Co.* v. *Miller,* 262 U. S. 51, 53.) A demand is no broader than the reference contained in the demand to the property or interest demanded. (See the words "mentioned in the demand," par. 2(b) Executive Order February 26, 1918.) Intangible as well as tangible property is subject to seizure. (*Garvan* v. *Marconi Wireless Tel. Co.,* 275 Fed. 486, 488.) Shares of stock in an incorporated company standing on its books in the name of an enemy may be seized by demand upon and notice to the corporation. (*Garvan* v. *Marconi Wireless Tel. Co.,* 275 Fed. 486, citing *Miller* v. *United States,* 11 Wall. 268, 296; *Columbia Brewing Co.* v. *Miller,* 281 Fed. 289, 290; *Miller* v. *Kaliwerke A. A. G.,* 283 Fed. 746, 751, affirming 276 Fed. 206.) The only demand upon Kekaha Sugar Company,

Limited, was for 840 shares of the capital stock of the Kekaha Sugar Company in the name of the "Otto Ernst Isenberg Estate." This demand was ineffective to transfer to the alien property custodian the legal title of the shares of stock in dispute. There was no stock in the name of "Otto Ernst Isenberg Estate." The estate was not an entity. The legal title to the stock was in the trustees. Nor was any demand made upon the trustees for their legal title to the stock. In order to secure the legal title to shares of stock in a corporation a demand upon the trustees must assert a right to the shares themselves or the certificates representing the shares. (*Kahn* v. *Garvan*, 263 Fed. 909, 912; *Garvan* v. *$20,000 Bonds*, 265 Fed. 477; *Garvan* v. *Certain Shares Int. Agr. Corp.*, 276 Fed. 206.) At the time of the alleged demands certificates representing the shares of stock in Kekaha Sugar Company, the legal title to which was vested in the trustees, had been surrendered to the Kekaha Sugar Company and new certificates issued in the name of the depositary. No certificates representing these shares were then in the possession of the trustees. Nor did the demand by the custodian of the right, title, interest and estate of the enemy beneficiaries, assuming such demand to have been effective to seize their respective equitable interests, operate to transfer to the custodian the legal title of the trustees. The trust created by the will of Otto Ernst Isenberg was an active and not a passive trust. The assignment by a *cestui que trust* of all his right, title and interest in a trust estate subject to an active trust does not pass legal title. (39 Cyc., title "Trusts," 237; *Rea* v. *Steamboat Eclipse*, 30 N. W. (Dak.) 159, 165; *Jordan* v. *Thomas*, 34 Miss. 72; *McWilliams* v. *Gough*, 93 N. W. (Wis.) 550, 551.) Hence a demand by the alien property custodian for the right, title and interest of an enemy *cestui* in a trust estate

subject to an active trust does not transfer to the alien property custodian the legal title. Moreover, even if the trust were a mere passive one, it being composed of personalty, an assignment of an equitable interest therein would not operate to transfer to the assignee the legal title. The legal title of a trustee of a dry trust to personalty upon the death of the trustee descends to his legal representatives and not to the beneficiaries. (*Schenck v. Schenck,* 16 N. J. Eq. 174; *Hill v. Hill,* 90 Neb. 43; *Fox v. Fox,* 250 Ill. 384.) Hence assuming that the trust as to income stock was passive an assignment by the *cestui* of all his right, title and interest therein would not operate to transfer the legal title of the stock to the assignee. No more so would a demand of the alien property custodian for the right, title and interest of the *cestui* vest in the former the legal title to the stock. Assuming that the demands of the alien property custodian were effective to sequester and seize the equitable interests of the enemy beneficiaries in the trust estate created by the will of Otto Ernst Isenberg, deceased, the alien property custodian merely stepped into the shoes of the beneficiaries and became substituted for them to the extent of their equitable interests. Equitable as well as legal interests were unquestionably subject to demand by the alien property custodian. (*Keppelmann v. Palmer,* 108 Atl. (N. J.) 432; *In re Miller-Schaefer,* 281 Fed. 764, 773; *Kahn v. Garvan,* 263 Fed. 909; *Stohr v. Wallace,* 269 Fed. 827, affirmed in 255 U. S. 239.)

The majority concludes that the seizure of the equitable estate of these enemy beneficiaries operated to seize the legal estate as well; that the equitable estate was the entire estate and the legal estate was a mere empty shell and cites in support thereof two cases, *Meriwether v. United States,* 13 Ct. Cl. 259, and *Stoddart v. United*

*States,* 6 Ct. Cl. 340.   Neither, however, has any application.   Both were cases of passive trusts.   The former held that a deed directly from a husband to his wife, in the absence of statute permitting the same to be done, was according to the common law void, but inasmuch as the courts of the State of Tennessee, in which the property subject to the conveyance was situated, recognized such conveyance in equity the wife was properly a claimant to the fund in suit derived as rentals from land subject to the conveyance.   In the latter case an agent of the claimant had invested certain funds held by him for the latter in cotton which was captured by the forces of the United States.   The claimant brought suit for the proceeds.   The court held that in looking to the loyalty of the claimant it could consider his equitable interest as the real interest.   But the trust in the instant case was an active trust—extremely active. The trustees had the right to sell and reinvest the property of the estate.   The opinion of the majority is based upon the theory that the right of the *cestui* in an active trust is a right *in rem.*   On the contrary it is a right *in personam.*

Professor Ames in one of his lectures contained in 1 Harvard Law Review 402, says:   "What is meant by an equitable estate is, strictly speaking, not an estate (*i. e.,* any ownership in the *res* itself) at all,—it is a right *in personam* as distinguished from the right *in rem* possessed by the owner of a true estate.   What is called a conveyance of an equitable estate is really only the assignment of a chose in action."   Professor C. C. Langdell in his article in 1 Harvard Law Review 55, 59, entitled "A Brief Survey of Equity Jurisdiction," says: "There are, however, true equitable rights, and also true equitable wrongs, the latter being violations of equitable rights.   A true equitable right is always derivative and

dependent, *i. e.*, it is derived from, and dependent upon, a legal right. A true equitable right exists when a legal right is held by its owner for the benefit of another person, either wholly or in part. Such a right may be defined as an equitable personal obligation. It is an obligation because it is not ownership; and because it is relative, *i. e.*, it cannot exist without a correlative duty; and it is personal because the duty is imposed upon the person of the owner of the *res* (*i. e.*, of the legal right), and not upon the *res* itself. And yet courts of equity frequently act as if such rights were real obligations, and even as if they were ownership. Indeed, it may be said that they always so act when they can thereby render the equitable right more secure and valuable, and yet act consistently with the fact that such right is in truth only a personal obligation. For example, a personal obligation can be enforced only against the obligor and his representatives; but an equitable obligation will follow the *res* which is the subject of the obligation, and be enforced against any person into whose hands the *res* may come, until it reaches a purchaser for value and without notice. In other words, equity imposes the obligation, not only upon the person who owned the *res* when the obligation arose, but upon all persons into whose hands it afterward comes, subject to the qualification just stated. But the moment it reaches a purchaser for value and without notice, equity stops short; for otherwise it would convert the personal obligation into a real obligation, or into ownership. Why is it, then, that equity admits as an absolute limitation upon its jurisdiction a principle or rule which it yet seems always to be struggling against, namely, that equity acts only against the person,—*aequitas agit in personam*? One reason is (as has already appeared) that equity has no choice or option as to admitting this limitation upon its

jurisdiction. Another reason is that if equitable rights were rights *in rem,* they would follow the *res* into the hands of a purchaser for value and without notice; a result which would not only be intolerable to those for whose benefit equity exists, but would be especially abhorrent to equity itself. Upon the whole, it may be said that equity could not create rights *in rem* if it would, and that it would not if it could." Walter G. Hart, Esq., in his admirable article in 28 Law Quarterly Review 290, entitled "The Place of Trust in Jurisprudence," at pp. 293, 294, quotes Professor Maitland as follows: "Equitable estates and interests are not *jura in rem* * * *. For reasons that we shall perceive by and by they have come to look very like *jura in rem;* but just for this very reason it is the more necessary for us to observe that they are essentially *jura in personam,* not rights against the world at large but rights against certain persons. * * * The Chancery moulded equitable estates and interests after the fashion of the common law estates and interests. * * * We may well say, therefore, that a *cestui que* trust has rights which in many ways are analogous to true proprietary rights to *jura in rem.* But are they really such? We must begin with this, that the use or trust was originally regarded as an obligation, in point of fact a contract, though not usually so called. If *E* enfeoffs *T* to his (*E's*) use the substance of the matter clearly seems to be this, that *T* has undertaken, has agreed, to hold the land to the use of *E.* * * * The law of trusts (formerly uses) begins with this, a person who has undertaken a trust is bound to fulfil it. We have no difficulty in finding the ground for this—the trustee, the feoffee to uses, is bound because he has bound himself. This is the original notion. The right of *cestui que* trust is the benefit of an obligation." In speaking of Professor Holland Mr. Hart at p. 291 says: "Professor

Holland, however, whom we may regard as the leading modern exponent of Austin's school, is quite clear and explicit. His view is that the right created by a trust is a species of primary or antecedent rights *in personam.*" In concluding his article Mr. Hart makes the following observation: "It seems, then, when we examine the matter, that those who maintain that a *cestui que* trust has *jus in rem* are confuted by their own explanations of that term; that the view expressed by Holland, Langdell, and Maitland is the true gospel, namely, that his right ought to be regarded as *jus in personam,* since, although it can be enforced against a great many people, it cannot be enforced against everybody."

In view of the rights of the enemy beneficiaries in this estate the conclusion is inevitable that none of them had any interest in specific property forming a part of the trust corpus. That property was subject to sale and investment and until accounting and discharge of the trustee no title to any specific *res* vested in them. To be sure the alien property custodian under the arbitrary powers conferred upon him by section 7 of the Trading with the Enemy Act might seize any property, irrespective of the condition of the legal title, as enemy-owned property and relegate the enemy or his legal representatives to the remedies provided by section 9 of the Act. But applying the analogy of garnishment or attachment to effect an immediate seizure of a trust *res* in which an enemy *cestui que trust* had an equitable interest the demand must be for the *res* itself. Instances of such demands may be found in *Kahn* v. *Garvan,* 263 Fed. 909, 913; *Keppelmann* v. *Palmer,* 108 Atl. (N. J.) 432; *Stohr* v. *Wallace,* 269 Fed. 827; *Garvan* v. *$20,000 Bonds,* 265 Fed. 477. A demand for the "right, title and interest" of an enemy *cestui que trust* in a trust estate does not in law change the substance or the incidents of the

right itself. It neither enlarges nor contracts the rights seized. "Upon these assumptions, it is necessary briefly to consider the nature of the 'right, title, and interest' which was the subject of the putative capture. It did not profess to be greater than the right of the enemies as *cestuis que trustent,* and it did not in law change the substance, or the incidents, of the right itself, any more than if, for example, it had been an unliquidated claim for breach of contract. Nor, indeed, could the alien property custodian under such a demand, or unless he asserted a legal right to the securities themselves, by capture change the character of the enemy's right as obligee." (It will be noticed that Judge Learned Hand, the author of this decision, is observant of the character of the right of the *cestui* as "obligee.") "* * * Such a demand neither enlarges nor contracts the rights seized." *Kahn* v. *Garvan,* 263 Fed. 909, 912. The legal effect of a demand of the "right, title and interest" of a *cestui que trust* is to place the alien property custodian in the shoes of the enemy *cestui,* vesting in the former the rights *in personam* against the trustee formerly enjoyed by the latter. "If it be a chose in action, subject to an accounting as a condition of its assertion, he must submit to some judicial determination between himself, as captor, and the trustee as obligor." (Here again Judge Hand observes the character of the obligation of the trustee.) "* * * If so, the alien property custodian, as *cestui que trust,* might pursue against the trustee all the remedies which the enemy might have pursued, if an alien friend. Among such rights is a bill to compel an accounting upon showing that the period had arrived for distribution, and as a condition of reducing the right to possession." *Kahn* v. *Garvan,* 263 Fed. 909, 912. "The other demand made on the 23d day of September, 1919, determined that the alien, Ruth Marcuse,

had 'a certain right, title, and interest as a beneficiary under the will of Callman Rouse,' and this was duly demanded, the demand operating as a capture, just as did the other of even date. However, this capture did no more than substitute the custodian in the place of the beneficiary." (Such demand did not operate upon any specific property comprising a trust *res* but is confined to the interests of the *cestuis* in the trust *res*.) "It did not profess to determine what her rights were as such, and in the absence of such determination there is no specified fund or *obligation* on which the capture can operate. The capture has put the custodian in the place of Ruth Marcuse, but he must work out his rights in accordance with the determination; he becomes entitled to all rights which she had as beneficiary under the will of Callman Rouse and no more." *Miller* v. *Rouse,* 276 Fed. 715, 716. This is especially so where as here the trustees are vested with the power of sale and reinvestment. Moreover, until the respective rights of trustee and *cestui que trust* have been judicially determined neither the *cestui* nor his privy, in this case the alien property custodian, has any present right of possession of any specific property composing the trust *res*.

In *Allen* v. *Merrill, Lynch & Co.,* 194 N. W. (Mich.) 131, 133, the trustees under a will brought a bill to remove a cloud from their title occasioned by attachment and execution levied upon the interest of a beneficiary of the trust prior to the settlement of a trust estate. The court held: "It is also contended that the designated period of the trust has long since expired, and therefore the trust should be ended, the estate vested in the beneficiaries, and the trustees discharged. With their levies under attachment and execution vacated, the defendants Merrill, Lynch & Company stand as mere judgment creditors of one beneficiary of the trust and,

as such, they are in no position to call the trustees to account, or to invoke the law for the ending of the trust and the vesting of the estate in the beneficiaries. If the trustees have not filed annual accounts, as provided by statute, the law opens the way to compel them to do so, but it would be of no advantage to the defendants in this case to have such an order herein." In *Cheyney* v. *Geary*, 45 Atl. (Pa.) 369, 370, one Adams, an equitable remainderman, assigned to one Stewart all his interest in the trust estate in and to the mortgages of which the same was composed. This assignment was recorded in the office of the recorder of deeds and the latter, in compliance with law, noted the assignment upon the margin of the record of each of the mortgages recorded in his office. The trustee brought a bill to strike from the records the entry of the assignment. The court held: "It is too plain for argument that Stewart, as assignee of the interest of Charles P. Adams in the trust estate of his grandfather, had no interest in the individual securities which constituted the trust fund in the hands of the trustee. It was the duty of the trustee to invest and reinvest the moneys of the trust, so as to keep the same invested at all times, in order to procure an income. But in the execution of the duties of the trustee the *cestui que trust* had no right to interfere, nor could his assignee do so. When, therefore, the latter caused a notice of the assignment to be written on the margin of the record of each one of the securities held by the trustee, he was interfering directly and actively in the management of the trust."

This same general principle is recognized in *Kahn* v. *Garvan*, 263 Fed. 909, at 912, where the court said: "Conversely, the trustee has the right, before distributing the *res*, to file a bill for a voluntary statement and settlement of his accounts (*Mildeberger* v. *Franklin*, 130 App.

Div. 860, 115 N. Y. Supp. 903), so that he may get a valid discharge and close up the estate." In *Miller* v. *Rouse,* 276 Fed. 715, 716, the court said: "It" (demand) "did not profess to determine what her rights were as such, and in the absence of such determination there is no specified fund or obligation on which the capture can operate."

Where as here the respective rights of trustee and *cestui que trustent* are unliquidated the alien property custodian by his demand of the "right, title and interest" of the *cestuis* in the trust estate acquired merely the rights of the *cestuis* and similarly as they must work out those rights. At the time the demands were made by the alien property custodian upon the trustee in the instant case the only existing present rights of possession were those of Helen L. Isenberg to the income accruing from one-third of the trust estate set aside for her benefit and of Paul Otto Isenberg to the income accruing from 2/27 of the trust estate set aside for his benefit. None of the enemy children of Otto Ernst Isenberg as to the one-third of the estate set aside for the benefit of the widow, in which they were joint remaindermen, nor Paul Otto, as to the 2/27 of the estate set aside for his benefit, had any present right of possession. On the contrary possession was vested in the trustees and the right of possession was deferred in the former instance until the death of the widow and in the latter instance until Paul Otto should arrive at the age of twenty-five years. The demand of the alien property custodian upon Hermann Schultze as one of the trustees (assuming such demands to have been effective) did not operate to vest in the alien property custodian any interest in the shares of the capital stock of the Kekaha Sugar Company held by the trustees as part of the corpus of the estate. None of the enemy *cestui que trus-*

*tent* had a present right of possession of said stock and the demand for the "right, title and interest" of the enemy *cestui que trustent* did not attach to any specific securities included in the trust fund. Nor did the demands of the alien property custodian (assuming them to have been legally effective) operate to vest any title in him in that portion of the shares of stock in Kekaha held by the trustees as income. The rights of the *cestui que trustent* were unliquidated. It does not appear from the record that the purchases of Kekaha by the trustees on account of Helen L. Isenberg were with her prior knowledge or consent or subsequent ratification. The purchase by the trustees of Kekaha stock from income payable to the guardians of Paul Otto Isenberg, a minor, never had the approval of the probate court which has jurisdiction of the estates of minors. All of the annual or periodical accounts were settled *ex parte* and without notice. They were interlocutory only and did not constitute a final ajudication of the rights and obligations of the parties concerned. Such accounts are only *prima facie* correct and are subject to correction for errors and mistakes. (*Estate of A. Enos,* 18 Haw. 542, 546; *Estate of D. H. Davis,* 22 Haw. 436, 439; *Estate of Lalakea,* 26 Haw. 243.) The trustees, moreover, were entitled to an accounting before distribution. (*Mildeberger* v. *Franklin,* 115 N. Y. S. 903; *Kahn* v. *Garvan,* 263 Fed. 909, 912.) The distributable interests of the beneficiaries were subject to trustees' commissions.

Active duties devolved upon the trustees until the final termination of the trust. By the demands, therefore, of the alien property custodian upon Hermann Schultze as one of the trustees of the estate of Otto Ernst Isenberg (assuming such demands to have been effective) the alien property custodian acquired the following present rights of possession of the enemy *cestui que trustent*:

(a) To receive the income payable to Helen L. Isenberg;
(b) to receive the income payable to Paul Otto Isenberg until he should arrive at the age of twenty-five years; (c) to demand of the trustees the performance of their obligation, including an accounting and a vesting order in respect to stock representing income. Whether the respective interests of the enemy children of Otto Ernst Isenberg in that portion of the trust corpus in which the widow, Helen L. Isenberg, had an equitable life interest, or the interest of Paul Otto Isenberg in the portion of the trust estate, the income from which was payable to him until he should arrive at the age of twenty-five years, were contingent or vested remainders I deem immaterial to the issues. If contingent they were not demandable. (*Farmers' Loan & Trust Co.* v. *Miller,* 2 Fed. (2d) 493, 496.) If vested, until the respective rights of the trustee and *cestuis* were judicially determined, no present rights in any particular portion of the trust *res* were distributable to the alien property custodian. Until distribution those rights were merely in the nature of the enforcement of the obligation of the trustee. The custodian was merely vested with the right, title and interest of the respective enemy *cestui que trustent* in the trust estate and not in any particular property comprising the trust. And until distribution (assuming that the custodian was entitled under section 12 of the Trading with the Enemy Act to sell the intangible equitable interests of the enemy *cestui que trustent*) he never, as I shall dwell on hereafter at more length, sold the right, title and interest of any of the enemy *cestuis* in the estate of Otto Ernst Isenberg. If seized by him, these interests remain vested in him undisturbed by the sale of 670 shares of Kekaha stock. And if this be so the trust estate and the duties of the trustee in respect to the trust *res* in all respects remain

Peters, C. J., dissenting.

the same. If the demands operated to reduce the number of beneficiaries to three where there had previously been nine, the duties of the trustee remain unaltered.

The demand upon the surviving guardian of Paul Otto Isenberg, who prior thereto had attained majority, for the "right, title and interest" of the ward in the estate of the ward did not operate to transfer to the alien property custodian the legal title of the trustees in the 170 shares of the Kekaha Sugar Company, Limited, the legal title to which was vested in the latter, although said shares of stock included undistributed investments of income distributable to the guardian during the ward's minority. The trustees made these investments charging the costs thereof against themselves as guardians. The legal title thereto was in the trustees. The trustees were entitled before delivery to an accounting with the surviving guardian of the ward. No accounting was ever had. The guardians did not have the legal title to said shares of stock. The demand upon the surviving guardian was a vain act.

It is interesting at this point to note the effect of the majority decision upon the interest of Paul Otto Isenberg. It will be remembered that Paul Otto died in November, 1918, prior to arriving at the age of twenty-five years. As I understand the decision of the majority it holds in effect that notwithstanding the fact that the enjoyment by Paul Otto of his interest in the estate was deferred until he should arrive at the age of twenty-five years, the interest, being a vested one, was transferred to the alien property custodian and hence whether Paul Otto arrived at the age of twenty-five years or not such interest vested in the alien property custodian and was transferred to his assignee by the sale of January 17, 1919. Upon the death of Paul Otto Isenberg the demand of the alien property custodian unquestionably failed

to have any further force or effect. The custodian by virtue of that demand stepped into the shoes of Paul Otto Isenberg but the latter not having arrived at the age of twenty-five years the former was not in a position to enjoy that portion of the estate which would have been delivered to Paul Otto in the event of his attaining that age. So that whether the interest of Paul Otto be vested or contingent the custodian acquired no interest therein until Paul Otto would have attained the age of twenty-five years. Upon the death of Paul Otto his interest, whatever it was, descended to his heirs. The demand of the custodian could not operate to sequester their interests.

As to the equitable life interest of Helen L. Isenberg the position of the majority is even more confusing. If her equitable life interest in the estate of Otto Ernst Isenberg was sold then she ceased to be a beneficiary in the estate and the purchaser or purchasers of her interest became beneficiaries in her place and stead. This, however, has not occurred. On the contrary the accounts of the trustee show that since her restoration Helen L. Isenberg has received all income from the proceeds of the sale of 500 shares of the capital stock of the Kekaha Sugar Company.

The Trent Trust Company was negligent in failing to reduce to possession the 670 shares of the capital stock of Kekaha Sugar Company belonging to the trust estate. The fact that the custodian was substituted in the place of the enemy *cestui que trustent* did not alter the situation. Upon its appointment the duty devolved upon it to execute the trust until terminated. It is the duty of a trustee to reduce the property of the trust estate to possession. (39 Cyc., title "Trusts," 321; *Butler v. Carter,* 5 L. R. Eq. Cas. 276, 280; *Ex parte Ogle,* 8 L. R. Ch. Ap. Cas. 711, 717; *McGachen* v. *Dew,* 15 Beav.

84, 51 Eng. Repr. 468, 469; *In re Reinboth,* 157 Fed. 672, 674; *Speakman* v. *Tatem,* 48 N. J. Eq. 136, 149.) This duty applied not only to the Kekaha stock which was corpus but also to stock dividends distributable to the life tenant as income which formed a part of the trust estate until delivered and also to the Kekaha stock purchased from income and dividends thereon. There is no showing that the investments made by the trustees from income payable to Mrs. Isenberg were with her prior consent or subsequent ratification. The stock dividends deliverable to Paul Otto as beneficiary were a part of the trust fund of the estate until delivered. Kekaha stock representing investments of income and dividends on the same was part of the trust estate until delivered. Paul Otto attained his majority in 1915. The stock was previously in the name of the trustees. If the trustee had performed its duty upon examination it would have been informed of that fact. Having been in the name of the trustees it was *prima facie* a part of the trust property. The trustees' right of possession was superior to every one but Paul Otto.

The seizure by the alien property custodian was not and was not intended to be absolute confirmation. The ultimate disposition of seized property under the terms of the Trading with the Enemy Act was subject to the subsequent determination by Congress. The substitution of the custodian for the enemy *cestui que trustent* did not mean permanent substitution. Congress might and could at any time grant to enemy *cestui que trustent* the privilege of again enjoying the rights previously seized. It was the duty of the trustee not alone to preserve the trust estate for the benefit of the custodian and the citizen *cestui que trustent* but also for the benefit of the enemy *cestui que trustent* should Congress restore to them their rights. Such duty was particularly pertinent

to the facts of the instant case. By the terms of the Act itself (Sec. 9(b) subpar. 1) a citizen who was a resident of Germany and hence under the terms of the Act an enemy upon resuming residence in a neutral country or in the United States was entitled to restoration of property seized. Paul Otto Isenberg was born in the Hawaiian Islands prior to July 3, 1894, the date of the adoption of the constitution of the Republic of Hawaii, of parents residing therein. Although Otto Ernst Isenberg, his father, was a German he was not engaged in any diplomatic or official capacity under the Emperor of Germany during his residence in the Hawaiian Islands. Hence under the decision in *Macfarlane* v. *Collector of Customs,* 11 Haw. 166, 172, Paul Otto was a citizen of the Republic of Hawaii. Under section 4 of the Organic Act he automatically became a citizen of the United States. Paul Otto was not a national of Germany and was eligible at any time of fulfilling the status of a claimant under section 9 (b), subpar. 1.

Subsequent to the passage of the Trading with the Enemy Act Congress pursuant to the provisions of section 1 thereof by amendment created new classes of enemies who might under the provisions of section 9 (b) as amended be restored in whole or in part to property seized. (See amendments of June 5, 1920 (41 Stat. L. 977); February 27, 1921 (41 Stat. L. 1147); December 21, 1921 (42 Stat. L. 351); December 27, 1922 (42 Stat. L. 1065), and March 4, 1923 (42 Stat. L. 1511).)

The daughters of Otto Ernst Isenberg, similarly as Paul Otto, were born in the Hawaiian Islands prior to July 3, 1894, and under the provisions of the constitution of the Republic of Hawaii and the Organic Act previously adverted to became citizens of the United States. It is true they married Germans. The respective dates of their marriages do not appear from the record.

Peters, C. J., dissenting.

If as the majority holds the interests of the enemy children in the one-third of the trust estate set aside for their mother were vested remainders then the money or property concerned though acquired from a subject of Germany was acquired prior to January 1, 1917, and the daughters of Otto Ernst Isenberg though married to Germans were entitled to restoration under the provisions of section 9(b), subpar. 2 of the Trading with the Enemy Act. Moreover, if neither Paul Otto nor his sisters were respectively qualified for restoration under the provisions of section 9(b), subpars. 1 and 3, they all may have been entitled to restoration according to and subject to the limitations of section 9(b), subpar. 9.

The primary obligation of the trustee was to reduce the trust corpus to possession. As previously said the beneficiaries had the right *in personam* to enforce the execution of the trust by the trustee. That right inhered in the custodian and in the event of the restoration of the enemy children also in them and whenever and by whomever called upon it was the duty of the trustee to have and hold the title and possession of the property composing the trust estate. To excuse the failure by the trustee to reduce the trust corpus to possession and to justify its failure to have the same in its possession the burden rested upon it to show a legal seizure by the custodian not only of the equitable title but of the legal title and the elimination of the enemy *cestui que trustent* absolutely as beneficiaries of the trust estate.

The duty of the trustee was clear and unqualified. The means of its execution equally so. Section 9 of the Trading with the Enemy Act provided a complete remedy for the recovery by the trustee of the legal title to the 670 shares of the capital stock of Kekaha Sugar Company. (*Columbia Brewing Co.* v. *Miller*, 281 Fed. 289, 291; *Garvan* v. *Marconi Wireless Tel. Co.*, 275 Fed. 486,

488; *Garvan* v. *Certain Shares Int. Agr. Corp.*, 276 Fed. 206; *Miller* v. *Kaliwerke A. A. G.*, 283 Fed. 746, 758; *Stoehr* v. *Wallace*, 255 U. S. 239, 246.) The Trent Trust Company, Limited, was a corporation organized and existing under the laws of the Territory of Hawaii. It was a citizen of the United States. It was therefore qualified under the provisions of section 9(b), subpar. 1, of the Trading with the Enemy Act to institute necessary proceedings for the recovery of the legal title to this stock.

The claim of the trustee that the purported sale by the alien property custodian should be considered as having been made by the trustee under and pursuant to the express authority to sell conferred upon it by the terms of the will of the testator is without merit. The purported sale of stock was made by the alien property custodian and not by the trustee. The claim is a mere pretense and an afterthought. The protestations of the trustee that the sale was made for the best interests of the estate are false in the light of the correspondence between Richard Trent, the president of the Trent Trust Company, acting in his capacity as special representative of the alien property custodian, and the custodian. Moreover, the defenses interposed by the trustee of sale by the custodian on the one hand and a denial of such sale on the other are absolutely inconsistent. If as the trustee contends the surrender or demands vested title in the alien property custodian a sale could not be made by the trustee. An analysis of the power of sale conferred upon the trustee shows the fallacy of the contention. The power as granted contemplated a discretion by the trustee. Whatever discretion was exercised was that of the custodian. A trustee of a trust estate cannot delegate his discretion to a third person. (*Graham* v. *King*, 50 Mo. 22, 24.) It is true that after the trustee exercises the discretion reposed in him and

determines to make the sale under the power reposed in him to that effect agents may execute the details of the sale. But the alien property custodian was not the agent of the trustee. Nor was any prior consent given to such sale by the trustee. It was never communicated to the custodian prior to the time the sale was ordered to be made and then it referred only to 500 shares. Holding as I do that neither the voluntary surrender by Schultze nor the subsequent demands of the custodian operated to vest in the custodian the legal title to the 670 shares of Kekaha stock in dispute, the sale by the alien property custodian was absolutely void. Being void the trustee could not ratify such sale. To say that the alien property custodian sold the "right, title and interest" of the enemy *cestui que trustent* in the estate of Otto Ernst Isenberg or the 670 shares of Kekaha stock belonging to the estate has no foundation either in law or in fact. There was no pretense of a sale of any interest in the estate. Correspondence and advertisements of sale or pretended sale all refer to stock. Moreover they refer to stock owned by Helen L. Isenberg and Paul Otto Isenberg and not to stock belonging to the trust estate. The cable of the custodian of December 19, 1918, ordering Mr. Trent to proceed with the sale, while referring to Mr. Trent's letter of December 6 previous, was predicated upon and referred to the list accompanying the letter of Mr. Trent to the custodian of September 25 previous. That list refers to stock held by certain enemies and includes as enemies Helen L. Isenberg and Paul Otto Isenberg as the owners of 500 shares and 170 shares respectively of the Kekaha Sugar Company. The list makes absolutely no reference to stock in Kekaha Sugar Company, the title to which was vested in the trustees of the estate. Hence the order of sale referred to the sale of Kekaha stock owned by the persons named.

There were no shares of the capital stock of Kekaha Sugar Company so owned. Moreover, there was no direction by the custodian to sell any Kekaha stock held by the trustees.

The best test of whether or not a sale was made of the stock in dispute is whether a purchaser at the pretended sale upon refusal of the custodian to make delivery could have successfully demanded and recovered any shares of Kekaha stock belonging to the Isenberg estate. A sale is a contract. The contract in the instant case is to be made up from the instructions of the custodian to his representative and the advertisement of sale made in compliance therewith. Nowhere does it appear that the subject-matter of the contract was 670 shares of Kekaha stock held by the trustees of the Isenberg estate. And the denial of the custodian that he sold the Kekaha stock belonging to the estate of Otto Ernst Isenberg to the contrary of being immaterial is extremely material when considered in the light of the question of intention of the alleged vendor. Facts are singularly absent upon which a contract of sale may be predicated. In the face of the denial of the custodian that he made the sale nothing remains. Moreover, the legal title of the trustee to this 670 shares of the capital stock of the Kekaha Sugar Company has never been transferred to any of the pretended purchasers. The will provides that the trustees "pay over one such portion (or the proceeds thereof) to each of said children who has then arrived at the age of twenty-five years." To "pay over" means to convey. Title does not vest in the beneficiaries by operation of law. To have transferred this stock to the beneficiaries required a conveyance by the trustee. (*Green* v. *Grant,* 32 N. E. (Ill.) 369, 371.) This equally applies to an alleged assignee of a beneficiary.

The trustee contends that if it as such trustee has been

guilty of a breach of trust and is liable to account for 670 shares of the capital stock of the Kekaha Sugar Company, in the event of its failure so to do, in the absence of proof of fraud it should not be held liable for any damages, the price obtained for the stock having been the then reasonable value thereof; and at most should it appear that the price obtained upon the sale of said stock was less than its real market value the trustee should be held liable only for 2/9 of the difference in respect to 500 shares, the legal as well as the equitable interests of all of the enemy children having been seized by the alien property custodian with the exception of the interests of the two sons Hans and Carl. Where the beneficiaries of a trust estate demand the production by the trustee of shares of stock in a private corporation in specie, and this may be done, the measure of damages upon default is the value of the stock at the time of the trial. (*Fenwick* v. *Greenwell,* 10 Beav. 412, 50 Eng. Repr. 640, 646; *In re Reinboth,* 157 Fed. 672, 674; *O'Meara* v. *N. Amer. Min. Co.,* 2 Nev. 633, 637, 647.) The objectors demanded restoration of the stock. This is not a case of conversion. Any other rule of compensation would be unjust and inequitable. "The plaintiff asks for the stock itself, not for damages. If the court finds he is entitled to the stock, but defendant cannot transfer the stock, because it has none to transfer, then there can certainly be but one rule or measure of damages: that is to decree as much as would buy the same amount of stock at the time the decree is rendered, for the money comes in lieu of the stock—stock which should be transferred at or after the decree, and it is wholly immaterial what that stock may have been worth at any former period. * * * He has not, however, chosen to bring his action for damages, but for the stock itself. Why should he then be permitted to recover more than the stock, or

its value at the time it would have been delivered to him under the judgment, if the defendant had it in his power to deliver it? It is perfectly clear that the plaintiff must be entitled to some relief beyond the delivery of the stock, if he is entitled to a money judgment for more than its value at the time of trial. But here the plaintiff prays for a delivery of the stock, and as it was shown that the defendant did not have it in his possession, a money judgment for its highest market value after conversion is rendered against the defendant. In our opinion, the plaintiff was only entitled to a judgment for a delivery of the stock, or in case delivery could not be had, then its value at the time of the trial." *O'Meara* v. *N. Amer. Min. Co.*, 2 Nev. 633, 637, 647.

The trustee further contends that the objectors should not be permitted to acquiesce in the sale by the alien property custodian of shares of the capital stock of the Pioneer Mill Company, Limited, an Hawaiian corporation, prior to surrender held by the trustee as a part of the estate distributable to Helen L. Isenberg and Paul Otto Isenberg, the market value of which has since said sale depreciated, and repudiate the sale by the alien property custodian of 670 shares of Kekaha stock, the market value of which since said sale has appreciated, but should be required to adopt or reject the sale by the alien property custodian as a whole. *Cestui que trustent* by the waiver of one breach of duty by their trustee are not estopped thereby to assert the liability of their trustee for another breach of trust although both are similar in character and committed at or about the same time. The breach herein complained of is not the sale of Kekaha stock but the failure of the trustee to reduce the same to possession. The sale itself was absolutely void.

The trustee further contends that it is not liable for dividends that would have accrued upon the 670 shares

of Kekaha stock or for interest thereon from the respective dates upon which they would have become due and payable. The liability of the trustee to account to the court is independent of and superior to the liability of the trustee to comply with the demands of the alien property custodian. The issues involved herein are directed to the former. That the trustee after accounting to the court for dividends may be obligated by reason of the previous demands of the alien property custodian to pay them to the latter is immaterial. The primary obligation is to account to the court of its appointment for the income which it should have received. Where as here shares of stock in a private corporation are lost to the trust estate through failure of the trustee to reduce them to possession the estate should be reimbursed in the aggregate amount of the income that would have accrued to the trust estate from such shares by way of cash dividends had the shares been reduced to possession by the trustee together with interest from the respective times that said dividends were due and payable. If the demands of the alien property custodian were not effective in law to seize the equitable interests of the enemy children of Otto Ernst Isenberg in the trust estate created by their father the trustee was liable to account for these dividends as a part of the trust corpus of the estate unincumbered by any demands.

The trustee further contends that the court erred in adopting such portions of the report of the master as depended upon the following erroneous computations and charges: (a) That the master in computing the value of the trust estate as it would have been upon the date of reference, if properly administered, included the proceeds of the sale by the alien property custodian of 381 shares of the capital stock of the Pioneer Mill Company, Limited, which had been turned over to the alien prop-

erty custodian; (b) that the master improperly charged the trustee with the sum of $11,061.55, paid by the trustee to the alien property custodian as income accrued subsequent to the death of Paul Otto Isenberg upon property prior to demand held by the trustee for the benefit of said decedent; (c) that incorrect rates of interest were applied. These objections will be considered *seriatim.* (a) In computing what the value of the estate of Otto Ernst Isenberg would have been had it been properly administered the proceeds of the sale by the alien property custodian of shares of stock in the Pioneer Mill Company belonging to the trust estate and distributable to Paul Otto when he should have arrived at the age of twenty-five years, which were transferred by the trustee to the alien property custodian, were properly included. The proceeds of the sale of the 381 shares of the capital stock of the Pioneer Mill Company were transferred by the Trent Trust Company, Limited, to the alien property custodian. These 381 shares had the same status in respect to the estate as the Kekaha stock. Of the one-third of the estate set aside for Helen L. Isenberg there were originally 149 shares of Pioneer. Of the portion of the estate set aside for Paul Otto Isenberg there were originally 42 shares of Pioneer. In 1912 the capital stock of the Pioneer Mill Company was increased from $2,750,-000 to $4,000,000 and the par value changed from $100 to $20. In 1916 the capital stock was increased to $5,000,000. In both instances the increase represented stock dividends. The 1912 stock dividend was declared partly by writing up assets and partly from profits which had accrued since the inception of the trust. The 1916 stock dividend was declared entirely from accrued profits. Applying the rule adopted in this jurisdiction in the cases of *Carter* v. *Crehore, supra,* and *Evans* v. *Garvie, supra,* of the Pioneer stock held for the benefit of Helen

L. Isenberg, after the adjustment of fractional shares, 1066 shares were corpus and 287 shares were income. Of the Pioneer stock held for the benefit of Paul Otto Isenberg, after the adjustment of fractional shares, 300 shares were corpus and 81 shares were income. The breach by the trustee in respect to Pioneer stock was the same as in the case of the Kekaha stock. The practical result of this proceeding is that the breach of the trustee to reduce the Pioneer stock to possession must be considered similarly as its breach to reduce the Kekaha stock to possession. Were the court to take any other position a trustee would profit by his own negligence. The trustee similarly as in the case of Kekaha stock was guilty of a breach of trust in failing to reduce the 381 shares of Pioneer stock to possession. It might be that were the same rule of damages applied to the breach by the trustee of its duty to reduce the Pioneer stock to possession the trustee would only be liable in default of the restoration of said stock for the value thereof at the time of reference plus dividends accrued and interest. But in the absence of evidence that the proceeds of sale of the Pioneer stock were greater than its market value at the time of reference plus dividends and interest the basis of computation should not be disturbed. (b) Assuming that the demands of the alien property custodian operated to sequester the income payable to Paul Otto Isenberg and that such income as had accrued was payable to the alien property custodian all income that accrued after the death of Paul Otto, in the absence of additional demands, was payable to the administrator of his estate and the Trent Trust Company, Limited, having on or about August 1, 1920, been advised of his death in November, 1918, previous, wrongfully paid to the alien property custodian the income which accrued subsequent to November, 1918, and which it had in its possession

at the time it was advised of his death.    (c) The trustee is chargeable with eight per cent upon all dividends that would have accrued upon 670 shares of Kekaha stock. The trial court assumed that the equitable interests of Helen L. Isenberg and of her enemy children had been seized by virtue of the demands of the alien property custodian upon Hermann Schultze, one of the trustees of the estate of Otto Ernst Isenberg. Thus far I have also so assumed. But the demand of the alien property custodian was not made upon both trustees but only upon one trustee and hence the equitable title of the enemy children was never seized. The income of the estate vested in both trustees; not in Schultze alone. In order to effect a valid attachment the demand of the alien property custodian must be made upon all of the trustees in whom is vested the legal title of the trust corpus. Where the control and disbursement of moneys are in and devolve upon joint trustees sequestration can only be had upon notice to all of the joint trustees. (*Frizzell* v. *Willard,* 37 Ark. 478, 482.) The persons upon whom demand must be made and persons upon whom service of demand may be made should not be confused. Demand and service of demand are two separate and distinct propositions. (*Miller* v. *Rouse,* 276 Fed. 715.) The statutory rate of interest in Hawaii for money detained is eight per cent. (R. L. 1915, s. 3585.)

The trustee further contends that the court erred in surcharging it with all commissions received and the disallowing of commissions payable to the trustee as such. Without going into the question of propriety of the charges of commissions it is sufficient to say that by the uniform decisions of this court commissions have been disallowed all fiduciaries who have been faithless to their trusts. Statutory commissions are provided by way of compensation for the proper execution of trusts and

where a trustee negligently fails to perform his duties commissions are properly disallowed. (*Estate of Lalakea,* 26 Haw. 243, 273, 274; *Re Crowell, Late a Minor,* 27 Haw. 439, 451, 452, 457; *Re Trask Minors,* 27 Haw. 343, 361; *Guardianship Isaac Kaiu,* 17 Haw. 517, 519; *Guardianship of Hoare,* 14 Haw. 443, 448; *Estate of Lazarus,* 13 Haw. 242, 245; *Estate of Alina,* 13 Haw. 388; 630; *Estate of Akana,* 11 Haw. 420, 422.)

The trustee also contends that the court erred in removing it from office. The negligence of the trustee in failing to reduce to possession the 670 shares of Kekaha stock belonging to the trust estate without more was sufficient to justify its removal.

The error assigned to the allowance of a master's fee of $7500 is without merit. At first I was inclined to doubt the reasonableness of the fee allowed to the master. But after examining the evidence adduced before him and his report thereon I am convinced of its fairness. Although the master held an official position and was otherwise engaged the hearings were held after hours and in the evenings. The work is not to be measured by the actual number of hearings. The report shows lengthy and arduous endeavor. Most of the evidence was directed to the issue raised by the trustee that sales of stock upon the open market at or about the time of reference were not fair reflections of the value of such stock due to the effect of pending litigation upon stock in a corporation of small capitalization, the shares of which were closely held, and that the intrinsic value should control. This required many hearings and the examination of involved calculations. The report shows a painstaking analysis of the evidence and a masterly handling of the figures submitted. The fact that neither party took exceptions to the value placed by the master upon shares of the Kekaha Sugar Company and that the only

exceptions to his report were those presented here under the assignments of error is a commentary on the thoroughness of his services and the learning and ability that he applied to his labor. The costs of reference to the master were properly chargeable against the trustee. The expense of reference made necessary by default of a trustee may properly be charged against him as a part of the expenses of litigation. (*Re Estate of Alina,* 13 Haw. 388, 391.)

Finally as to jurisdiction. The trustee contends that the circuit court in equity was without jurisdiction of the subject-matter of the cause for the reasons (1) that the alien property custodian was not made a party to the cause; (2) that the objectors' only remedy was under section 9 of the Trading with the Enemy Act and (3) that under the Treaty of Berlin, signed August 25, 1921, Germany undertook to compensate her nationals in respect to the sale of their property by the alien property custodian under the Trading with the Enemy Act and such of the objectors as were German nationals were without remedy in the premises. The circuit court in equity had jurisdiction of the parties and the subject-matter of the proceeding and neither section 9 of the Trading with the Enemy Act nor the provisions of the Treaty of Berlin apply. The proceeding was one in equity to settle the accounts of a trustee. The objectors made no claim against the alien property custodian. The decree does not affect the alien property custodian. The proceeding did not involve as between these parties the claim of a national of Germany against the Trent Trust Company for compliance with a legal demand but the negligent failure by it as trustee to reduce the property of the trust estate to possession.

The decree appealed from should in all respects be affirmed.